```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,      )  CR. NO. 21-00070 JAO
                                    )
 5             Plaintiff,           )  Honolulu, Hawaii
                                    )
 6        vs.                       )  June 6, 2023
                                    )
 7   BLAINE LOUIS JACINTHO (1),     )  JURY TRIAL - DAY 2
     KEONI ALLEN HOLI (2),          )
 8                                  )
               Defendants.          )
 9   _____)

10

                     TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE JILL A. OTAKE
              UNITED STATES DISTRICT COURT JUDGE
12
     APPEARANCES:
13
     For the Government:        MARGARET C. NAMMAR, AUSA
14                              NICOLE HUDSPETH, Special Assistant
                                U.S. Attorney
15                              United States Attorney's Office
                                District of Hawaii
16                              300 Ala Moana Boulevard, Room 6-100
                                Honolulu, Hawaii 96850
17
     For Defendant (1)          RANDALL K. HIRONAKA, ESQ.
18   Blaine Louis               Hiroshi & Hironaka, LLLC
     Jacintho:                  201 Merchant Street, Suite 2240
19                              Honolulu, Hawaii 96813

20   For Defendant (2)          GARY GURMAIL SINGH, ESQ.
     Keoni Allen Holi:          Topa Financial Center
21                              Bishop Street Tower, Suite 2000
                                Honolulu, Hawaii 96813
22
     Official Court             ANN B. MATSUMOTO, RPR
23   Reporter:                  United States District Court
                                300 Ala Moana Boulevard, Room C-338
24                              Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

1                    I N D E X

2   WITNESSES                                    PAGE NO.

3   FOR THE GOVERNMENT:

4    ANDREA LARICK

5     DIRECT EXAMINATION (Continued)               27

6     CROSS-EXAMINATION                            32

7     CROSS-EXAMINATION                            36

8     REDIRECT EXAMINATION                         37

9    JOSHUA KENT (Re-Called)

10    DIRECT EXAMINATION                           39

11    CROSS-EXAMINATION                            44

12    REDIRECT EXAMINATION                         49

13   JOSEPH SOEKA

14    DIRECT EXAMINATION                           52

15    CROSS-EXAMINATION                            90

16    REDIRECT EXAMINATION                         93

17   ROLANDO LOPEZ

18    DIRECT EXAMINATION                           95

19    CROSS-EXAMINATION                           136

20    CROSS-EXAMINATION                           154

21    REDIRECT EXAMINATION                        158

22    RECROSS-EXAMINATION                         165

23

24

25   (Continued)

1                          I N D E X

2    WITNESSES                                   PAGE NO.

3    FOR THE GOVERNMENT (Continued):

4     TYLER YATES

5      DIRECT EXAMINATION                        171, 193

6      VOIR DIRE EXAMINATION                        192

7      CROSS-EXAMINATION                            204

8      CROSS-EXAMINATION                            211

9      REDIRECT EXAMINATION                         212

10   FOR THE DEFENDANTS:

11    None.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     E X H I B I T S

2                                                    <u>PAGE NO.</u>

3    Government Exhibits 7, 7A, and 7A-2
     received in evidence                              31
4
     Government Exhibit 71 received in evidence        63
5
     Government Exhibit 71A received in evidence       71
6
     Government Exhibits 71B-1 through 71"O"
7    received in evidence                              74

8    Government Exhibit 71D-3 received in evidence     75

9    Government Exhibit 62 received in evidence       123

10   Government Exhibit 65 received in evidence       126

11   Government Exhibit 67 received in evidence       129

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   TUESDAY, JUNE 6, 2023                        8:28 O'CLOCK A.M.
 2              (Open court out of the presence of the jury.)
 3              COURTROOM MANAGER:  Criminal Number 21-00070-JAO,
 4   United States of America versus Defendant Number 1, Blaine
 5   Louis Jacintho, and Defendant Number 2, Keoni Allen Holi.
 6              This case has been called for a status conference.
 7              Counsel, please make your appearances for the record.
 8              MS. NAMMAR:  Good morning, Your Honor.  Margaret
 9   Nammar and Nicole Hudspeth for the United States.  Also present
10   is our paralegal specialist Frances Vess and our case agent TFO
11   Jared Lee.
12              THE COURT:  Good morning.
13              MR. HIRONAKA:  Good morning, Your Honor.  Randy
14   Hironaka on behalf of Blaine Jacintho.  Your Honor, I believe
15   he's present downstairs and he's making his way up.  So for the
16   time being I would ask to waive his presence for this status.
17              And also, Your Honor, my apologies for being late.
18   I'm on some medication with some unfortunate side effects.
19              THE COURT:  Okay.
20              MR. HIRONAKA:  Yeah.  Sorry.
21              THE COURT:  Are you going to need more recesses
22   today?
23              MR. HIRONAKA:  You know, I -- sorry.  I know we're on
24   the record, but I might just, you know, make it -- it's not one
25   of those where it comes on superfast.  But I may just kind of
```

1    throw you a signal and hopefully I'll be okay.

2          THE COURT:  Okay.  And if I'm not looking at you,

3    please obviously let Ms. Mizukami know.

4          MR. HIRONAKA:  I appreciate that.

5          MR. SINGH:  Good morning, Your Honor.  Gary Singh and

6    Mr. Holi.  He's present in court.

7          THE COURT:  Good morning to both of you.

8          Everyone, you may be seated.

9          We are here to discuss the jury instructions, at

10   least at this very initial conference.

11         And as I mentioned yesterday, my intent is to just

12   get a better sense of what the parties' positions are on some

13   of these instructions.

14         My goal is to get through as many as we can before

15   8:45, but if we don't get through all of them before 8:45,

16   we're not going to delay the jury.  So we will go ahead as far

17   as we can with regard to this.

18         So in reading the United States of America's proposed

19   jury instructions at ECF-123, I have a sense of the ones that

20   the defense objects to, or at least Mr. Hironaka objects to.

21         The -- my understanding is that the ones that the

22   defense objects to -- and Mr. Hironaka, you can tell me if I'm

23   wrong about this -- include the Transcript of Recording in

24   English, 2.6.  That is the Proposed Special Jury Instruction

25   Number 2, at -- and is from Ninth Circuit Instruction 2.6.

1     That is at ECF-123, at page 8.

2               And for the record, Mr. Jacintho is now present.

3               MR. HIRONAKA:  Thank you, Your Honor.

4               THE COURT:  What objection, if any, do you have to

5     this Proposed Special Jury Instruction Number 2?

6               MR. HIRONAKA:  Your Honor, my understanding is that

7     the government is not -- this instruction is just simply asking

8     them to be able to follow along with the transcript, which --

9     which I'm okay with.  I -- I believe, unless I'm reading their

10    instruction incorrectly, that they're not actually asking for

11    the transcript to be admitted into evidence 'cause the tape

12    itself is -- is the best evidence, essentially.  And then I

13    agree with what -- I think you said it yesterday, that the

14    transcript, though, and I -- you know, it should be somehow in

15    the record so that if there is an appeal it's -- it's just

16    easier to attach that, unless there are significant differences

17    between the transcript and the recording.

18              THE COURT:  Okay.  So you don't have any real

19    objection to this one?

20              MR. HIRONAKA:  No.  No, to the jury following along

21    and having the transcript while the exhibit is being played,

22    no, I do not.

23              THE COURT:  Okay.  But do you have any objection to

24    including it with the final instructions, so that it would say:

25    You have heard a recording that has been received in evidence.

```
 1   Each of you was given a transcript of the recording, blah,
 2   blah, blah?
 3           MR. HIRONAKA:  Yeah, to that, I -- I would need to
 4   give it some thought.  'Cause I -- I do believe that they
 5   shouldn't necessarily have it in jury --
 6           THE COURT:  No, they're not going to have it with
 7   them.  It's just --
 8           Well, let me ask you, Ms. Nammar.  Were you proposing
 9   this to be given at the end of the case?
10           MS. NAMMAR:  Your Honor, I know we're dealing with
11   this issue on appeal right now from a trial before Judge
12   Watson.
13           THE COURT:  Oh.  Okay.
14           MS. NAMMAR:  So I just want to be sure that, you
15   know, we do this properly for the record.  I'm not sure what
16   the result of that in issue will be, but it's been raised.  And
17   so I definitely would request that this instruction be given
18   prior to the -- the first time, at least.  And I think the
19   Ninth Circuit committee instruction, you know, recommends -- it
20   says you don't have to give that instruction with every
21   recording when there are multiple recordings, and there will be
22   multiple recordings in this case.  And so I think it's -- it
23   appears that it will be sufficient to advise them of that when
24   we hand out that initial transcript.  And then I think it
25   doesn't hurt to remind them, but they -- they will not have
```

1    that transcript.  We are not seeking to admit them into

2    evidence.  It is the recording.  So --

3              THE COURT:  The issue on appeal is that -- what is

4    the exact issue on appeal?

5              MS. NAMMAR:  You know, I am not -- it's not my case

6    so -- but I think it's just that maybe the instruction was

7    given at the end and not prior to the recording.

8              THE COURT:  Okay.

9              MS. NAMMAR:  And -- and I'm not saying that it was

10   necessarily error or anything.

11             THE COURT:  Right.  Obviously, right.

12             MS. NAMMAR:  Yeah.  So I think that's why -- I do

13   think it's important that it's a limiting instruction before.

14             THE COURT:  Okay.  But you're somewhat agnostic on

15   whether or not it needs to be given at the end?

16             MS. NAMMAR:  Correct.

17             THE COURT:  Okay.  And you're objecting to it being

18   given at the end?

19             MR. HIRONAKA:  Oh, I see what you're saying.  I'm

20   sorry, Your Honor.  I was thinking that you were saying

21   actually physically, the transcript be given to the jury.  But

22   if you're just talking about instructing them before they

23   listen to audio or video and then instructing them again in the

24   final instructions, that I don't have a problem with.

25             THE COURT:  You don't have a problem with that?

1            MR. HIRONAKA:  Yeah.

2            THE COURT:  Okay.  Thank you.

3            Mr. Singh.

4            MR. SINGH:  Judge, as long as they don't have the

5    transcript when they're deliberating, it's fine with me.

6            THE COURT:  Okay.

7            MR. SINGH:  Yeah.

8            THE COURT:  Thank you.  I think we're all in

9    agreement on that.

10           The next one -- and I do want to reserve about five

11   minutes to go over the instruction that Mr. Hironaka supplied

12   us with last night.  So let's get -- take the next five minutes

13   to go over the remaining proposed special instructions as best

14   we can.

15           Mr. Hironaka, I -- I suspect, based again on the

16   government's filing, that you are objecting to their Proposed

17   Special Jury Instruction Number 4, which comes from Ninth

18   Circuit Model 3.10.

19           MR. HIRONAKA:  Your Honor, I don't --

20           Yeah, I -- I don't know that I'm -- I'm actually

21   objecting to this.

22           THE COURT:  Okay.

23           MR. HIRONAKA:  So much as -- yeah, no.  No, Your

24   Honor.

25           THE COURT:  All right.  Mr. Singh, any objection?

 1          MR. SINGH:  No, Your Honor.

 2          THE COURT:  It might be more efficient, then, for

 3   you, Mr. Hironaka, to tell me which government instructions you

 4   are objecting to.

 5          MS. NAMMAR:  Your Honor, before we move on from that,

 6   with this instruction, I just want to note that obviously we've

 7   had testimony from an undercover agent at this point.  If we

 8   don't have testimony from an informant then -- then this

 9   instruction we would just request as to the undercover.

10          THE COURT:  That makes sense.

11          So Mr. Hironaka, why don't you tell me then which of

12   the proposed special jury instructions of the government you

13   object to.

14          MR. HIRONAKA:  Your Honor, I -- I guess maybe it --

15   sorry.  Could we -- could we sort of do it backwards?  Because

16   I think in going through some of the ones that I think I've

17   submitted that might be at issue, it would be easier to clarify

18   which ones I have an issue with, with respect to the

19   government, if that makes sense.

20          THE COURT:  So you want to go over your instructions?

21          MR. HIRONAKA:  I guess if that makes sense.  Because

22   there's a couple that are just kind of flagging issues that --

23   but they're involving the same instructions.  They're just ones

24   that I've essentially modified because of certain issues.  So,

25   for example, even the one we just read, or that government's

```
1   Number -- Number 4, it doesn't -- I -- for example, I don't
2   think even if Mr. Agapay does not testify, I still think this
3   instruction needs to be modified and given.  Obviously it's not
4   going to say testimony, but it should say something to the
5   effect of, I don't know, you know, testimony or evidence
6   regarding.
7           THE COURT:  Do you have a proposed instruction that
8   reads that?
9           MR. HIRONAKA:  So it has to do more with informants
10  and credibility, for example --
11          THE COURT:  Right.  But do you have a proposed
12  instruction that reads what you want to say?  Is that your
13  proposed instruction, Number 8?
14          No, it's not, because that does not appear to be --
15          MR. HIRONAKA:  No.  So it's more like Number 7.  So
16  even though that's the instruction that deals with the
17  testimony of cooperating defendants, then -- then you'll notice
18  up front, in the event some of these witnesses do not testify.
19  But there's obviously testimony about them, or evidence
20  regarding their involvement.  That's why I -- I modified it to
21  read:  You have heard testimony from or evidence regarding
22  Roscoe Agapay and -- and Kaui Boggs.
23          And so it's not necessarily, oh, they -- they
24  didn't -- they didn't testify so we're not going to give this
25  instruction.
```

1           THE COURT:  Okay.

2           MR. HIRONAKA:  Yeah.  So --

3           THE COURT:  I do think for my purposes, honestly,

4    it's going to be much more -- it's going to be much easier for

5    me if we go through the government's instructions first --

6           MR. HIRONAKA:  Okay.

7           THE COURT:  -- and then yours.

8           MR. HIRONAKA:  Okay.

9           THE COURT:  So tell me which ones you have objections

10   to.

11          And by the way, we have a juror who is stuck in

12   traffic, who's not checked in yet.  So we have a little bit

13   more time than expected.  We will know as soon as she's here.

14          MR. HIRONAKA:  Okay.  Let me just --

15          One is okay.

16          Two, we just talked about.

17          Three is okay.

18          Four -- four, I -- I think should be modified.   I

19   don't think it should hinge on whether or not they testify.

20   But I think we just talked about that too.

21          Five is okay.

22          Six is okay.

23          Seven is okay.

24          Eight is okay.

25          Nine is okay.

1           Eight is -- excuse me -- ten -- ten is okay.

2           Eleven -- oh, I'm sorry, Your Honor.  Actually --

3           Eleven, I do think that 11 needs to -- the first

4    element needs to be that it's -- that it's methamphetamine,

5    not -- not that the defendants knew that it was

6    methamphetamine, but the government needs to prove that the

7    substance was in fact methamphetamine.  And -- and I think that

8    the government's instruction is actually different from the

9    model, Ninth Circuit.

10          MS. NAMMAR:  No.  That is exactly as the model

11   instruction says it.  So in the conspiracy instruction it -- it

12   says you input the methamphetamine.  In the -- in the

13   possession instruction it -- it says possessed any controlled

14   substance.  So that's how I put it in there and -- and that's

15   not modified.

16          THE COURT:  Let me ask you on Instruction Number 10,

17   Ms. Nammar.  Do the instructions typically say in -- to

18   distribute methamphetamine, comma, a Schedule II controlled

19   substance?  Do they usually say that?

20          MS. HUDSPETH:  (Confers off the record.)

21          MS. NAMMAR:  That's a good question.  I would have to

22   look.

23          THE COURT:  Okay.  If you could take a look at

24   that --

25          MS. NAMMAR:  Okay.

1            THE COURT:  -- that would be helpful.

2            As to Instruction Number 11, I think Ms. Nammar's

3    right, that that is correct.  The same -- I have the same issue

4    with the phrase "a Schedule II controlled substance," in the

5    first sentence of that instruction.  I also note that the date

6    of the crime isn't included in Instruction Number 11, which I

7    think it needs to be.

8            But I'll let you further your objection,

9    Mr. Hironaka, if you have anything else.

10           MR. HIRONAKA:  Yeah.  Let me -- let me just take a

11   look.  I'm sorry, Your Honor.  The last drug trial I did, which

12   was admittedly a couple of years ago before Judge Kobayashi,

13   looked different than this.  And then I know that there's been

14   some modifications to the Ninth Circuit model that were just

15   made recently, which mostly consisted of renumbering every

16   single instruction, but I'll take a look.

17           THE COURT:  Okay.

18           MR. HIRONAKA:  Yeah, and see if there's anything, you

19   know, I'm missing.

20           MS. NAMMAR:  And so, Your Honor, just to be clear, so

21   Instruction Number 11 is -- we need to include the date of the

22   offense, correct?

23           THE COURT:  I believe you do.

24           MS. NAMMAR:  Yeah.

25           THE COURT:  And same thing with Instruction Number

1    12.

2            MS. NAMMAR:  Twelve, okay.

3            THE COURT:  I just realized, I think your page 6 of

4    your ECF-123, Ms. Nammar, might have the instructions numbered

5    incorrectly compared to the -- what you supplied.  But -- but

6    in any event, the -- because where is your aiding and abetting

7    instruction?

8            MR. HIRONAKA:  Your Honor, I think that's Number 12.

9            THE COURT:  That is Number 12?

10           MR. HIRONAKA:  Correct, on page 21.

11           THE COURT:  Oh, okay.  I'm sorry, then it is correct.

12   All right.  My mistake.

13           Okay.  So Mr. Hironaka, if you could finish up with

14   the other ones that you have a problem with, please.

15           MR. HIRONAKA:  Twelve, I -- I -- I'm okay.  But I

16   think maybe -- I don't know if Mr. Singh -- I'm assuming that

17   pertains more to his client.

18           THE COURT:  Right.  I plan on asking him --

19           MR. HIRONAKA:  Sure.

20           THE COURT:  -- his objections next.

21           MR. HIRONAKA:  Okay.  Twelve is fine.

22           Okay.  Thirteen, I think we -- I have a companion --

23   I have a differing one in my instruction.

24           THE COURT:  Okay.

25           MR. HIRONAKA:  So the issue here, to me, Your Honor,

1   is, for whatever reason -- or not for whatever reason -- the

2   law -- and I think it's U.S. v. Hunt, it's actually mentioned

3   in the commentary to the instructions.  It talks about there's

4   a difference between the -- the normal possession instruction,

5   for example, the one with respect to Count 2, versus attempted

6   possession, where the government does have to prove that the

7   defendant knowingly attempted to distribute specifically

8   methamphetamine.

9          It -- there is -- I know that the model instruction

10  was amended in the December 2022 revisions, and it -- and the

11  commentary specifically talked about sort of the -- the

12  interplay between Hunt and I think the more recent case.  I'm

13  not sure if it was Collazzo.  But in any event, it -- Hunt

14  hasn't actually been overruled.  So for whatever reason, the

15  model -- the committee changed the instruction and it -- it

16  doesn't include the need -- you know, I'll acknowledge that it

17  doesn't include the need for the government to prove that the

18  defendant specifically attempted to possess with the intent to

19  distribute the drug, i.e., methamphetamine, but it -- that's

20  just the committee's recommendation.  There's -- there's

21  nothing in the case law that specifically overrules Hunt.

22  So -- so that's why I've -- I've maintained the prior version

23  of attempted possession with intent to distribute in my

24  proposed instructions.

25          THE COURT:  All right.  I'll take a look at that.

1            Ms. Nammar, to clarify, I got the numbers wrong.  You

2    need the date of the crime in Instruction Number 11 and

3    Instruction Number 13.

4            MS. NAMMAR:  Okay.

5            THE COURT:  Okay.  Your objection's noted.

6            Mr. Hironaka, I'll take a closer look at that myself.

7            MR. HIRONAKA:  Thank you.

8            THE COURT:  Fourteen.

9            MR. HIRONAKA:  That, that -- that is fine.

10           THE COURT:  I think that needs to be clarified

11   between the defendants, because Mr. Holi's not charged in

12   Count 3.  But --

13           MS. NAMMAR:  Oh, I agree.

14           THE COURT:  Yeah.  So that needs to be fixed.

15           Instruction Number 15.

16           MR. HIRONAKA:  Your Honor, the only thing I'm pausing

17   on is the second sentence.  I -- if I can follow up with the

18   case cited by the government, I -- I don't mind the first

19   sentence, but it just -- I find the second one somewhat

20   argumentative.

21           THE COURT:  All right.  Well, I'm not going to

22   consider that an objection until you formally say so.

23           MR. HIRONAKA:  Sure.

24           THE COURT:  Okay.  Mr. Singh, let me hear your

25   objections.

1           MR. SINGH:  Your Honor, as to Instruction Number 14,

2    as you indicated, it needs to be corrected.

3           All right.  And then as to Instruction Number 12,

4    it's from the Ninth Circuit Model, and I'm going to go back and

5    look at it.  I may propose some of my own.

6           THE COURT:  All right.  So at this point no other

7    objections?

8           MR. SINGH:  Correct.

9           THE COURT:  Okay.  Thank you.

10          Let's turn then -- since we made it through the

11   government's we'll turn to -- we'll schedule another time for

12   Mr. Hironaka's.

13          Is the jury here?

14          COURTROOM MANAGER:  Yes.

15          THE COURT:  Okay.  While Ms. Mizukami's obtaining the

16   jury, let me ask, Ms. Nammar, do you have any issue with the

17   proposed instruction that Mr. Hironaka submitted last night?  I

18   have a rewording of it that I can offer.  But in general, do

19   you have an objection?

20          MS. NAMMAR:  Sure.  I will -- I'll listen to your

21   rewording.

22          THE COURT:  Sure.  So what I propose to say is:

23   You're about to see or hear evidence of written and verbal

24   conversations between Mr. Jacintho and another person.  I

25   instruct you that what the other person says is admitted only

 1    for the limited purpose of its effect on Mr. Jacintho, and

 2    therefore you must consider it only for that limited purpose

 3    and not for any other purpose.

 4              What the other person says is not admitted for the

 5    truth of what that person says, and you are forbidden from

 6    using it as proof of what is said by that other person.

 7              Any problem with that?

 8              MS. NAMMAR:  I have no objection to that, Your Honor.

 9              THE COURT:  All right.  Any problem with that

10    revision?

11              MR. HIRONAKA:  No, Your Honor, other than the first

12    one is "or," right?  Not "and."

13              THE COURT:  Thank you.

14              So it should be:  Written or verbal conversations.

15              MR. HIRONAKA:  Thank you.

16              THE COURT:  Okay.

17              Any objection, Mr. Singh?

18              MR. SINGH:  No, Your Honor.

19              THE COURT:  All right.

20              MS. NAMMAR:  Okay.  Your Honor, I just want to

21    clarify.  These are only the text messages and the -- relating

22    to the cooperator and Mr. Jacintho.

23              THE COURT:  That's my --

24              MS. NAMMAR:  The other text messages are the

25    coconspirator statements; is that correct?  Come in as

1    coconspirator --

2              THE COURT:  Who are the other folks he's texting

3    with?

4              MS. NAMMAR:  His supplier Amigo, Leona Boggs, Lucas

5    Bukoski, those individuals, and those are exhibits.  All those

6    communications, I think come in as coconspirator statements --

7              THE COURT:  All right.

8              MS. NAMMAR:  -- and statements of a party opponent.

9              THE COURT:  Right.

10             MS. NAMMAR:  And so this, my understanding of this is

11   just with regard to Jacintho talking to Roscoe Agapay, and I --

12   I want to -- I agree that it will apply to all of the -- all of

13   the statements.  I'm not going to seek coconspirator on any of

14   Mr. Agapay's statements if that makes sense.

15             THE COURT:  All right.  How is it a party opponent if

16   they're not parties to this case?

17             MS. NAMMAR:  So a party opponent would be for the

18   defendant --

19             THE COURT:  Right.

20             MS. NAMMAR:  -- Mr. Jacintho.

21             THE COURT:  Right.

22             MS. NAMMAR:  And then the others are coconspirators,

23   statements made by coconspirators in furtherance --

24             THE COURT:  Okay.

25             INTERPRETER:  -- of the conspiracy.

 1              THE COURT:  I understand better now.

 2              Any objection to that?

 3              MR. HIRONAKA:  Your Honor, just to clarify, it

 4  shouldn't just be the text messages of Mr. Agapay, but also

 5  there are several recorded conversations.

 6              THE COURT:  Right.

 7              MR. HIRONAKA:  So those as well.

 8              THE COURT:  Right.  But do you agree with her that I

 9  don't need to give this instruction for any communications with

10  people other than Mr. Agapay?

11              MR. HIRONAKA:  As -- correct.  Correct.

12              THE COURT:  Okay.

13              MR. SINGH:  No objections.

14              THE COURT:  All right.  Thank you.

15              MS. NAMMAR:  And, Your Honor, could we just make

16  clear that it only applies to those conversations, so that they

17  don't think that it applies to the coconspirator statements?

18              THE COURT:  Right.  So what I'll do is I can say

19  it -- well, how many exhibits are there where I would have to

20  say this for?

21              MS. NAMMAR:  So Exhibits 71J and 71K.

22              THE COURT:  Okay.  So let's do this.

23              MS. NAMMAR:  Are the only ones I -- I believe I'm

24  going to introduce.

25              THE COURT:  Okay.  So --

1          MS. NAMMAR:  All of the others I don't intend to

2    introduce.

3          THE COURT:  If you could just flag it for me and just

4    say "Your Honor, this would be a good time for the

5    instruction," and I'll read the instruction for both.

6          MS. NAMMAR:  Okay.

7          THE COURT:  Yeah.

8          MS. NAMMAR:  Perfect.  Thank you.

9          THE COURT:  And for the others I won't read the

10   instruction.

11         MS. NAMMAR:  And this is just given at the time.

12   This is not going to be then in the -- included in the final

13   instructions or --

14         THE COURT:  Nobody's proposed it, so --

15         MS. NAMMAR:  Okay.

16         THE COURT:  Is your forensic chemist here?

17         MS. NAMMAR:  Yes.

18         THE COURT:  Okay.  If you could bring her in and just

19   have her in the courtroom just so that we can proceed --

20         MS. NAMMAR:  Okay.

21         THE COURT:  -- quickly.  Thank you.

22         MS. NAMMAR:  Are we going to be able to address a few

23   other matters?  Are we off the record?

24         THE COURT:  No, we're on the record.

25         MS. NAMMAR:  Okay.  I have a few other quick things I

1  wanted to address.  Sorry.

2          THE COURT:  Okay.  What are they?

3          MS. NAMMAR:  If we could.

4          So I -- there's a forfeiture in this case, and the

5  defendant has the right to have that presented if -- if there's

6  a conviction in the end, then he has a right to presented to

7  the jury.  So I just want to flag that for Your Honor so we

8  don't dismiss the jury if he's not going to agree to that.

9          I have reached out to Mr. Hironaka, and he indicated

10  that the defendant intends to waive that and let the Court

11  decide that.  And the Court can decide it at a later date.

12          THE COURT:  Is that true, Mr. Hironaka?

13          MR. HIRONAKA:  Your Honor, that's correct.

14          THE COURT:  Okay.

15          MR. HIRONAKA:  And just for clarification, I believe

16  we're only talking about the sum of $4,000.

17          THE COURT:  All right.  If you could draft a waiver

18  for him to sign, please.

19          MS. NAMMAR:  Okay.  And then also, the government

20  would like to recall -- requesting permission to recall Special

21  Agent Josh Kent.  One would be to play the audio recording.

22  And then we also have one other exhibit that got separated that

23  I would like to bring in through him relating to the drugs.

24          THE COURT:  Okay.  I'll allow that.

25          MS. NAMMAR:  Okay.

1           THE COURT:  But are you starting with him or with the

2     forensic chemist this morning?

3           MS. NAMMAR:  We can recall him after the forensic

4     chemist.

5           THE COURT:  Okay.

6           Ms. Mizukami, is the jury here?

7           COURTROOM MANAGER:  Yes, Your Honor.

8           THE COURT:  All right.

9           COURTROOM MANAGER:  May I put the witness on the

10    stand first?

11          THE COURT:  Yes.  Thank you.

12          THE WITNESS:  May I be seated?

13          THE COURT:  You may.  We will ask you to stand when

14    the jury comes, though.

15          THE WITNESS:  Okay.

16          COURTROOM MANAGER:  All rise for the jury.

17          (Open court in the presence of the jury.)

18          COURTROOM MANAGER:  The United States District Court

19    for the District of Hawaii, with the Honorable Jill Otake

20    presiding, is now in session.

21          The jury and the gallery may be seated.

22          Criminal Number 21-00070 JAO, United States of

23    America versus defendant number 1, Blaine Louis Jacintho, and

24    defendant number 2, Keoni Allen Holi.

25          This case has been called for a jury trial, Day 2.

1           Counsel, please make your appearances for the record.

2           MS. NAMMAR:  Good morning, Your Honor.  Margaret

3   Nammar and Nicole Hudspeth for the United States.  Also present

4   is our paralegal specialist Francine Vess and our case agent

5   TFO Jared Lee.

6           THE COURT:  Good morning to all of you.

7           MR. HIRONAKA:  Good morning, Your Honor.  Good

8   morning, ladies and gentlemen.  Randy Hironaka on behalf of

9   Blaine Jacintho.  Your Honor, he's present to my left.

10          THE COURT:  Good morning to both of you.

11          MR. SINGH:  Good morning, Your Honor.  Gary Singh and

12  Mr. Holi.  He's present.

13          THE COURT:  Good morning to both of you as well.

14          You may all be seated.

15          Ladies and gentlemen, welcome back.  I hope you had a

16  restful evening.  You should now have a copy of the calendar,

17  as promised yesterday, to help you stay organized with your

18  personal lives and work lives outside of this life.

19          So if you have any questions about that, please just

20  let Ms. Mizukami know.

21          And with that, we are ready to proceed.  We will

22  continue with the testimony of this witness.

23          Ma'am, I will remind you that you remain under oath.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Thank you.

1    ANDREA LARICK, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.

2                DIRECT EXAMINATION (Continued)

3  BY MS. HUDSPETH:

4  Q    Good morning.

5  A    Good morning.

6  Q    So I think where we left off was after you discussed the

7  lab report, Exhibit 9, and your findings.  And just to refresh

8  everybody where we left off.  And we talked about the testing.

9        Now I want to actually talk about what it is that you

10  tested 'cause we -- we know the results of your testing, so I

11  want to talk about the -- what you tested.  And you showed us

12  pictures yesterday, Exhibit 8 of the bundles, or burrito-like

13  things that you tested and opened.  And so I'm going to --

14              MS. HUDSPETH:  Is it all right that I go back and

15  forth and hand her exhibits, Your Honor?

16              THE COURT:  That's fine.

17              MS. HUDSPETH:  Okay.

18  BY MS. HUDSPETH:

19  Q    So I'm going to start with Exhibit A, and hand that to the

20  witness.

21        Do you recognize that?

22  A    I do.

23  Q    How do you recognize it?

24  A    I see the LIMS number, which is our laboratory information

25  management system number, as well as my initials.

1           THE COURT:  I'm sorry.  Which exhibit number is this?

2           MS. HUDSPETH:  7A, Your Honor.

3           THE COURT:  7A.

4    BY MS. HUDSPETH:

5    Q    And what LIMS number do you recognize that as being?

6    A    May I refresh my memory?

7    Q    You may.

8    A    2021-SFL8-00867.

9    Q    And what does that LIMS number, to your knowledge,

10   reference?

11   A    This is the -- when the evidence arrived at the

12   laboratory, it was assigned a unique number, this LIMS number

13   that's associated with the -- the case.

14   Q    And it's associated with this particular case that we've

15   been talking about?

16   A    Yes.

17   Q    And what is inside that bag?

18   A    This is the original packaging that was on the suspected

19   drug material when I received it.

20   Q    Okay.  So when you talked about yesterday taking out the

21   substances from the packaging, that's the packaging?

22   A    Correct.

23   Q    Okay.  I'm going to retrieve that exhibit and hand you

24   another portion of 7A.  So that's a bag full of plastic.  And

25   then I'm going to hand you another portion of 7A.

1           THE COURT:  Ma'am, we can't have two 7As.  So that if

2    you can mark that second one as 7A-2, I think that would be

3    helpful.

4           MR. HIRONAKA:  (Confers off the record.)

5           MS. HUDSPETH:  And I have retrieved 7A and given the

6    witness 7A-2.

7    BY MS. HUDSPETH:

8    Q    And what is that?

9    A    This is the original box that the evidence was submitted

10   in by the investigating agency.

11   Q    And how do you recognize it?

12   A    Again, I see the LIMS number as well as my handwriting and

13   initials.

14   Q    And is that the same LIMS number that matched the one that

15   you just read on the bag?

16   A    That's correct.

17   Q    And what is that document that's -- or the signature thing

18   that you're referencing on the box?

19   A    So this box has a white evidence label that has the case

20   and exhibit numbers, and then I filled it out when I first

21   received it with our LIMS number as well as the date that it

22   was opened, and my initials.  And then following my analysis, I

23   proceeded to add the date resealed and my initials again.

24   Q    And I am retrieving 7A.  But -- or 7A-2.

25        But yesterday I saw you handling this evidence without

1    gloves.  Can I handle this without gloves?

2    A    Yes.

3    Q    Okay.

4    A    It's still sealed.

5    Q    And I've handed the witness Exhibit A and retrieved 7A-2.

6            THE COURT:  I'm sorry.  You called it Exhibit A.

7            MS. HUDSPETH:  I'm sorry, Your Honor.

8            I handed the -- Exhibit 7 and retrieved 7A-2.

9    BY MS. HUDSPETH:

10   Q    What is that?

11   A    This is the reserve material, the drugs that were left

12   over after my testing.

13   Q    And how do you recognize that?

14   A    Again, I see the LIMS number as well as my signature and

15   handwriting on the bags.

16   Q    And so after you tested, were you actually the one who put

17   them in those bags?

18   A    Yes.

19   Q    And are those bags in substantially the same condition as

20   they were when you sealed them?

21   A    Yes, they are.

22   Q    And how can you tell?

23   A    I placed a seal along the top with my signature and case

24   information, and that seal is intact on both bags.

25   Q    And these -- to be clear, that's the substances that you

1   ran the tests that you talked about yesterday?

2   A    Yes.

3   Q    And they tested positive for what?

4   A    These tested positive for methamphetamine hydrochloride.

5   Q    And do you recall the weight that -- that is in those

6   bags?

7   A    The net weight of all ten packages, between these two

8   bags, was 4,479 grams.

9   Q    And do you have any idea how to convert that to ounces or

10  pounds, something that we're more familiar with, generally?

11  A    It's about 9.8 pounds.

12              MS. HUDSPETH:  I'm going to retrieve Exhibit 7.

13              And, Your Honor, at this time the government asks to

14  admit Exhibits 7, 7A and 7-2 [sic] into evidence.

15              MR. HIRONAKA:  Objection, Your Honor.  Lack of

16  foundation as to all three.

17              MR. SINGH:  Same position, Your Honor.

18              THE COURT:  I'll overrule the objection.  Seven --

19  Exhibit 7, Exhibit 7A, and Exhibit 7A-2 are admitted.

20              (Government Exhibits 7, 7A, and 7A-2 received in

21  evidence.)

22              MS. HUDSPETH:  I have no further questions.  Thank

23  you.

24              THE COURT:  Thank you.

25              Cross-examination.

1          MR. HIRONAKA:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. HIRONAKA:

4    Q    Okay, Ms. Larick, good morning.

5    A    Good morning.

6    Q    Okay.  So -- okay.  You talked about some testing that you

7    did, specifically on the -- the contents of Exhibit 7, correct?

8    A    Yes.

9    Q    Okay.  And did I hear you correctly that when you -- so

10   when you receive a substance for -- for testing for

11   something -- specifically, presumably drugs, that you -- did

12   you say that you -- your test is for -- for any substance,

13   basically?

14   A    That's correct.

15   Q    Okay.  Now, you talked about what you called submission

16   paperwork.

17   A    Correct.

18   Q    Which is what the agent who submitted the drugs to you for

19   testing believes the contents of that -- the package are?

20   A    Yes.  With every exhibit that is brought to the laboratory

21   accompanies it a -- what we call a DEA 7, is a form that has

22   all of their case information, a description of the evidence,

23   and then their signatures and the date that it was sent to the

24   lab.

25   Q    Okay.  Is the submission paperwork necessary to -- for you

1  to ascertain through your tests what the substance is?

2  A    The submission paperwork is required in order to submit

3  the evidence to the laboratory.  As I mentioned yesterday, it

4  does have an indication of what the suspected material is, but

5  that does not influence my findings.

6  Q    Let me clarify my question.

7       Does the submission paperwork containing the substance the

8  agent believes it is, is that necessary in order for you to

9  do -- to figure out?  Not to actually be authorized to do the

10 test.

11 A    Oh.  No, no, that's not necessary for -- for my testing.

12 Q    Okay.  So you're saying that the only purpose of the

13 submission paperwork, saying what the agent believes it is, is

14 to just be able to go ahead and do the test?

15 A    Right.  The submission paperwork is required for entry

16 into the lab.  And then, at our lab specifically, evidence is

17 assigned to chemists based on the suspected drug type from the

18 agent.  So I work in the methamphetamine group.  So that is how

19 that exhibit was routed to me specifically.  But it doesn't

20 impact the testing that I perform on the an -- on the evidence.

21 Q    Okay.  Okay.  And, now, the testing itself, you talked

22 about there being sort of this -- these ten different, you

23 called them burritos.  And you tested -- it sounded like from

24 your testimony that you repackaged each burrito into, was it

25 separate Ziploc bags or one Ziploc bag?

1  A    Correct.  Ten separate Ziploc bags.

2  Q    So each of those ten burritos was individually tested?

3  A    I tested nine of the ten.

4  Q    Oh, I'm sorry.  Nine of the ten.  Okay.

5       And the testing, how does that work?  Is there a

6  representative sample that's taken from each burrito?  In other

7  words, are you just taking a small portion of that and testing

8  it or are you -- is the machine, or whatever it is, actually

9  analyzing every particle or part of that burrito, particular

10 burrito?

11 A    I took two very small samples from nine of the ten units.

12 So that is a small sample that is consumed in the process of

13 testing.  So that evidence does get destroyed by the testing

14 process, which is why I use a very small amount.  And then

15 following the initial testing, I formed what's called a

16 composite, by taking one-gram samples from each of the ten

17 packages until I had a total of 15 grams.  And that is

18 considered a representative composite of the entire seizure.

19 And then I take small portions from that for additional

20 testing.

21 Q    What is the purpose of not testing that tenth burrito?

22 A    We have policy to do a statistical sampling plan.  We can

23 receive hundreds of individual units in some cases.  And so

24 it's not feasible to be able to test every single one every

25 time.  So our policy is to test up to nine, just because we

1    have to draw a cutoff somewhere.  So we have a mathematical

2    formula that tells us the statistics so that I can apply a

3    statement with 95 percent confidence that at least 70 percent

4    of the population contain the substance identified.

5    Q    So scientifically speaking, though, you have no idea

6    what's in that tenth burrito?

7    A    In theory, yes, that's correct.  I did not test that

8    specific package for the initial testing process.

9    Q    Well, not in theory.  In actuality you don't know what

10   scientifically what's in that tenth burrito, correct?

11   A    Correct.

12   Q    Now, the -- and -- I'm sorry.

13        You take two small samples from each burrito.  What is the

14   weight of each of those two small samples?

15   A    It's approximately 10 milligrams, so very small.

16   Q    And that's out of each burrito averages somewhere in the

17   neighborhood of 450 grams?

18   A    That's correct.

19   Q    And a milligram is one one-thousandth of a gram?

20   A    That's correct.

21            MR. HIRONAKA:  Okay.  Ms. Larick, thank you.

22            Your Honor, that's all I have.

23            THE COURT:  Mr. Singh.

24   ///

25   ///

1                           CROSS-EXAMINATION

2    BY MR. SINGH:

3    Q    Good morning, ma'am.

4    A    Good morning.

5    Q    So just to follow up, so it's possible that the tenth

6    burrito could be something else?

7    A    It is possible.  However, that -- there was substance

8    taken from that tenth package to form the composite.  And since

9    that composite is ground and sieved to a consistent mesh size,

10   if there was additional substances present, I would have found

11   them in my additional testing.

12   Q    But I thought you told us earlier that you only tested the

13   nine burritos, not the tenth?

14   A    The initial screening process where I took two samples

15   from nine of the ten, so there was not two samples taken of

16   that package specifically, but it was included in the composite

17   formation.

18   Q    So the tenth was tested or was not tested?  I'm kind of

19   confused on that.

20   A    A small portion of the tenth package was tested as part of

21   the representative composite of the entire exhibit.

22                MR. SINGH:  Nothing further.

23                THE COURT:  All right.  Thank you.

24                Ms. Hudspeth, anything else?

25                MS. HUDSPETH:  Yes, Your Honor.

1          REDIRECT EXAMINATION

2  BY MS. HUDSPETH:

3  Q    I think we talked about it yesterday, and we maybe went

4  high level and lost some details, but how many tests did you do

5  when you took the drugs for -- and did your analysis?

6  A    I performed two tests on each of the nine packages, and

7  then after the composite formation, I performed two additional

8  tests.

9  Q    So to be clear, each -- and also to be clear, we keep

10  talking about burritos, but it's burrito-sized packaging but

11  not actual burritos, right?

12  A    Correct.  It's burrito shaped.

13  Q    Yeah, okay.  I just want to make sure the record reads

14  good for everyone who's not here.

15        And so the first two tests are individual, this

16  burrito-size parcel test, this burrito-size and -- is that

17  correct, the first two?

18  A    Yes.

19  Q    And then the third test is you actually take a gram or so

20  from each of the ten and form one substance and test again?

21  A    Yes.

22  Q    Okay.  And then your results, how do you tell us the

23  results?  What's the distinction?

24  A    So on the report I just list the totality of the testing.

25  So each of those tests I look at individually, but then I also

1    check to see if they're corroborating each other, which is why

2    we do multiple tests.  So my report states that I found

3    methamphetamine hydrochloride present in the exhibit.

4    Q    Okay.  And so you talked about the individual burrito-

5    sized packages, you only tested nine.

6         Do you recall for the tenth burrito size generally what

7    the weight was of that?

8    A    I believe that they were all roughly the same weight, but

9    I took the weight in total.  So I put all ten packages on the

10   scale at one time.  I didn't weigh those separately from each

11   other.  They were in separate bags but in one weighing event.

12   Q    Right.  But for the nine that you did individually test

13   positive, did they aggregate more than 50 grams?

14   A    Yes.

15   Q    Okay.

16             MS. HUDSPETH:  That's all the questions I have.

17   Thanks.

18             MR. HIRONAKA:  I have no recross.

19             MR. SINGH:  No questions, Your Honor.

20             THE COURT:  May this witness be excused?

21             MR. HIRONAKA:  Yes, Your Honor.

22             MR. SINGH:  Yes, Your Honor.

23             THE COURT:  Thank you, ma'am.

24             THE WITNESS:  Thank you.

25             THE COURT:  You may step down.

 1                                         (Witness excused.)

 2            THE COURT:  The government may call its next witness.

 3            MS. NAMMAR:  Yes, Your Honor.  And the government

 4    re-calls Special Agent Josh Kent.

 5            THE COURT:  Mr. Kent, I advise you that you're still

 6    under oath from yesterday.

 7            THE WITNESS:  Yes, ma'am.

 8            THE COURT:  All right.  Thank you.

 9        JOSH KENT, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.

10                 DIRECT EXAMINATION (Re-called)

11    BY MS. NAMMAR:

12    Q    Good morning, Special Agent Kent.

13    A    Good morning.

14            MS. NAMMAR:  Yesterday we had some technical

15    difficulties when we were publishing Exhibit 71B.  So at this

16    time I'd request the Court's permission to publish what's in

17    evidence as 71B.

18            THE COURT:  You may.

19            Let's pause it until we -- okay.  I'm sorry.  Do we

20    have the volume working?

21            (Recording played.)

22    BY MS. NAMMAR:

23    Q    And is this the same video you saw on defendant Jacintho's

24    phone on the date of his arrest?

25    A    Yes.

1  Q    Is that the same audio that you heard as well?

2  A    Yes.

3  Q    I'd also like to discuss yesterday you were asked about

4  the controlled substances which you seized from Mr. Jacintho's

5  vehicle?

6  A    Yes.

7  Q    And Mr. Holi's vehicle as well?

8  A    Yes.

9  Q    Can you remind the jury of the steps that you take when

10  you seize controlled substances and submit them into evidence?

11  A    So when we seize controlled substances we typically do

12  like a presumptive test before we process it, which means we

13  place it into self-sealing evidence bags.  We sign it, have a

14  witness signed it, and seal it.

15      When there's a large amount, like, for example, we call it

16  bulk seizure, which is in this case ten pounds roughly, there's

17  a little bit different process.  We place it into a box.  That

18  box itself essentially becomes one big evidence bag.

19      And that's what we send off to the lab.  The box then has

20  a thing that we put on it where we sign on top of the box, and

21  it's stuck to the box.

22  Q    And do you submit any paperwork with the exhibit when you

23  submit it to the lab?

24  A    Yes.

25  Q    And what -- please explain that paperwork to us.

1   A    The paperwork, it's called a DEA 7.  It essentially shows

2   like what drug we're submitting, what exhibit number it's

3   under, what case number it's under; and it usually includes a

4   remarks section of the custody of evidence that explains where

5   it was seized, who seized it, who processed it, and then how it

6   was sent to the lab.

7   Q    And in this case, did the drugs that you seized from

8   Mr. Holi and Mr. Jacintho's vehicle remain in your custody or

9   in the secured evidence locker until you shipped them?

10  A    Yes.

11  Q    And did you follow the procedures that you just set forth

12  in this case?

13  A    Yes.

14          MS. NAMMAR:  And if I can have permission to approach

15  the witness?

16          THE COURT:  You can.

17  BY MS. NAMMAR:

18  Q    I'm going to show you what's been marked as Government's

19  Exhibit 7A and, while I'm up there, 7A-2.

20          Do you recognize these exhibits?

21  A    Yes.

22  Q    And how do you recognize them?

23  A    I recognize them, the plastic wrappings look like the

24  wrappings that the ten pounds of methamphetamine were found.

25  And this box has my signature on the evidence label.

1    Q    Okay.  And are there any other signatures on the evidence
2    label?
3    A    Yes.
4    Q    And if you could please describe?
5    A    The witness -- sorry.
6         The witness's signature, Special Agent Tyler Ganzel, and
7    then it appears to have a -- a signature from a -- from the
8    lab.
9    Q    And do you know when this exhibit was seized?  Is that
10   indicated on the label?
11   A    Yes, February 1st, 2021.
12   Q    And then does the label indicate that it was seized by
13   you?
14   A    Yes.
15   Q    Does the label indicate when it was sent to the lab?
16   A    It indicates when the lab opened the exhibit.  The 7 in
17   the report indicates that we sent it the next day.
18   Q    Okay.  And so that label indicates when it was received by
19   the lab, or opened by the lab?
20   A    Opened by the lab, yes.
21   Q    Okay.  And so yesterday we showed you Government's
22   Exhibit 7, the actual methamphetamine.  When you submitted it
23   to the lab, did it look like it does in Government's Exhibit 7?
24   A    Yes.
25   Q    It was in that same --

1           MS. NAMMAR:  May I approach?

2    BY MS. NAMMAR:

3    Q    And I'll hand you what's marked, marked as Government's

4    Exhibit 7.

5           THE COURT:  You may.

6    BY MS. NAMMAR:

7    Q    As it is in Government's Exhibit 7, as it appears, is that

8    how you submitted it to the lab?

9    A    Yes.  It would have been placed into these self-sealing

10   envelope bags and then placed into this box and sealed within

11   the box.

12   Q    Okay.  But you did not place them into those envelope

13   bags, did you?

14   A    Into these envelope bags?  Possibly I could have.

15   Q    Government's Exhibit 7A, what --

16   A    Oh, this one.

17   Q    What was that?

18   A    Apologies.  These are the wrappings that the -- the

19   crystal methamphetamine was found to contain with -- when doing

20   the search if the vehicle.

21   Q    And so was Government's Exhibit 7, the methamphetamine --

22   A    Yes.

23   Q    -- contained inside those wrappings when you submitted it

24   to the lab?

25   A    It was -- I believe so.

1    Q    Okay.  So you do not open up the drug evidence from the

2    wrapping before you submit it?

3    A    It -- it depends.  So, for example, the evidence, the ten

4    pounds seemed like pretty similar in consistency.  So we may

5    have opened one to test it and just submitted the rest of it in

6    the box.

7    Q    Okay.  And then Government's Exhibit 7A-2, that box, is

8    that the box that you actually sealed those drugs in and

9    submitted them to the lab in?

10   A    Yes.

11   Q    And once again, you know that because?

12   A    It has my signature on it.

13   Q    Okay.

14              MS. NAMMAR:  One moment, please.

15              Nothing further.

16              THE COURT:  All right.  Thank you.

17              MS. NAMMAR:  Do you want me to retrieve the exhibits?

18              THE COURT:  Yes, please.  Thank you.

19              Mr. Hironaka, your witness.

20              MR. HIRONAKA:  Thank you, Your Honor.

21                          CROSS-EXAMINATION

22   BY MR. HIRONAKA:

23   Q    Okay.  Good morning again, Agent Kent.

24   A    Good morning.

25   Q    Okay.  Just want to clarify a couple of things.  So the

1   video that we looked at, Exhibit 71B, the one that we just saw?

2   A    Mm-hmm.

3   Q    You -- you don't know just by looking at that video who --

4   who took that video, correct?

5   A    The video from the angle it was taken, you can't see the

6   person that was using it, you know, taking the video.  Yes.

7   Q    So -- so that's a -- that -- my -- that's correct, then?

8   A    Right.

9   Q    You can't tell -- okay.

10       And -- okay, so I want to clarify the 7, Exhibit 7, 7A,

11   and 7A-2.

12       Your testimony was that -- were you talking about

13   Exhibit 7, which is the bag that contains the -- the ten pounds

14   individually wrapped, that you -- that you submitted those

15   drugs; you put them in the box, 71A-2 [sic] -- you took the ten

16   individually wrapped bricks, or whatever they are.  You put

17   them into 71A [sic], correct?

18   A    For us, it was called Exhibit 4 under the DEA case.

19   Q    Oh, okay.

20   A    Yeah, yeah.

21   Q    But when you put it into that larger plastic bag?

22   A    The larger plastic bag -- for us, what we do when we

23   process it, it -- pretty much everything that it's found in

24   would have been either separated and submitted or we would have

25   just submitted it all together with the plastic wrappings,

1  either way.  And then at the lab, I believe they're the ones

2  that actually separate -- if there's any plastic remaining

3  covering any drug exhibits, they're the ones that actually

4  remove the plastic as well.

5  Q    Okay.  So was it your testimony just now that you may have

6  submitted the drugs in that packaging that's in -- in -- in

7  Exhibit 7?

8  A    Possibly.  Or it was possible that we submitted the drugs

9  into the box just all together, and then the -- the lab

10 technician would have -- the evidence specialist would have

11 separated the plastic bags and put it in their own self-sealing

12 envelope as well.

13 Q    Okay.  Okay, so you're not sure whether or not, as we look

14 at it, each individually wrapped quantity of drugs is -- is how

15 it was originally?  Or could have been rewrapped?

16 A    You mean placed back in the plastic?

17 Q    Correct.

18 A    No, no, no.  So the way we seize it was they were all in

19 that plastic wrapping, right, with the extra like plastic

20 wrapping on top of it.  That would have either been -- one of

21 them was opened up, we tested it, and we would have submitted

22 all the plastic wrappings, or we would have taken all the

23 plastic wrappings off but submitted it all together anyways.

24 Q    Okay.

25 A    So everything we took out of the vehicle that was a

1  controlled substance or wrapped in a plastic bag would have all

2  been submitted in that box.

3  Q    When you testified you may have opened one to test it, you

4  mean here, in Honolulu?

5  A    Yeah, it would have been that presumptive test.

6  Q    Okay.

7  A    It's like a presumptive test for drugs.

8  Q    Okay.  And why do you say "may have"?  You don't know

9  whether or not you did?

10  A    The -- when I mean may have, I know we did, but the

11  explanation was when we're trying to take off the plastic we

12  would have taken off of one to test, and the others may have

13  contained and still been contained within that plastic, and

14  then just sent to the lab all together like that.  Or we may

15  have taken all the plastic wraps off, separated it, and put it

16  all in that box.

17  Q    Okay.  So help us out with something.

18        The way that -- let's just talk about one -- any one

19  sample, or any one-pound quantity.

20        The methamphetamine, like if you were just holding it in

21  your hand, would be similar to what?  Like sugar?  I mean as

22  far as texture appearance?

23  A    No.  They're large crystals, so like a crystalline, kind

24  of like white crystalline.

25  Q    Okay.  And when you say large, like if you took one piece

1    and held it in your hand, how big are we talking about?

2    A    It depends.  Some -- sometimes the methamphetamine we'll

3    seize, the crystals will be smaller.  Sometimes it'll be

4    like -- it could be as big as like a marker sometimes.  So it

5    just depends on exactly we're seizing.

6    Q    Okay.  And the way these were packaged, is it, you know,

7    like Saran wrap, Saran wrap, tape?  How -- how is it?  Is it

8    loosely packaged or is it put into another -- like a Ziploc

9    bag?

10   A    Yeah, it appear -- it appeared to be wrapped in plastic

11   and then wrapped in even more like separate plastic.

12   Q    Okay.  So when you -- or when you may have done that one

13   presumptive test on one sample, you're saying that you guys

14   unwrapped that Saran wrap, whatever it is, and then you did

15   your presumptive test, and then you rewrapped it the way it

16   was?

17   A    No.  It wouldn't have been necessarily like rewrapped.  It

18   would have been separated.  And then we would have taken

19   essentially that plastic covering, and then the other substance

20   that also had plastic covering, and then put that into the

21   exhibit.

22   Q    Okay.

23            MR. HIRONAKA:  Okay.  Thank you, Agent Kent.

24            Your Honor, that's all I have.

25            MR. SINGH:  No questions, Your Honor.

```
 1              THE COURT:  Thank you.

 2              Thank you.  Any redirect?

 3              MS. NAMMAR:  Just briefly.

 4                         REDIRECT EXAMINATION

 5   BY MS. NAMMAR:

 6   Q    Special Agent Kent, if you would have put the drugs in

 7   those clear plastic bags that they are in as in Government's

 8   Exhibit 7, would your signature be on that bag?

 9   A    As in if I placed it into that bag?

10   Q    Correct.

11   A    No, not necessarily.

12   Q    So do you have the chain of custody procedures that you

13   follow with drug evidence?

14   A    Yes.

15   Q    And you testified that the label on the box is the chain

16   of custody when you put the drugs in the box; is that correct?

17   A    Yes.

18   Q    And that's how you know those are the drugs that you sent

19   to the lab?

20   A    Yes.

21   Q    Correct?

22              MS. NAMMAR:  May I approach the witness?

23              THE COURT:  You may.

24   BY MS. NAMMAR:

25   Q    I'm going to hand you again what's marked as Government's
```

1    Exhibit 7A-2.

2        Can you tell if the lab technician has opened that package

3    by looking at that label?

4    A    Yes.

5    Q    Okay.  And then I'm going to -- if I may approach the

6    witness again -- I'm going to hand you again Government's

7    Exhibit 7.

8        And did the lab technician indicate her signature on

9    those exhibits?

10   A    Yes.

11   Q    Okay.  And those are the drugs that she took out of that

12   box; is that correct?

13   A    Yes.

14   Q    That you submitted to the lab.  Okay.

15           MS. NAMMAR:  No further questions.

16           MR. HIRONAKA:  I have no recross.

17           MR. SINGH:  No recross, Your Honor.

18           THE COURT:  May the witness be excused?

19           MR. SINGH:  Yes.

20           MR. HIRONAKA:  Yes.

21           THE COURT:  You may step down.  Thank you.

22                                        (Witness excused.)

23           THE COURT:  Government may call its next witness.

24           While they are doing so, let's take a stretch break.

25           Okay.  This might actually be a good time for a short

1    restroom break, so why don't we take a ten-minute break.

2              Let me ask Ms. Mizukami.  Can we use the restrooms on

3    this floor?  Can they use the restrooms on this floor?

4              COURTROOM MANAGER:  Sure.

5              THE COURT:  Okay.  So we'll take just a ten-minute

6    break.  Thank you.

7              COURTROOM MANAGER:  All rise for the jury.

8              (The jury was excused at 9:30 a.m.)

9              COURTROOM MANAGER:  Please be seated.

10             (Open court outside the presence of the jury.)

11             THE COURT:  Let me just make sure that -- is there

12   anything that needs my attention before I get off the bench?

13             MS. NAMMAR:  No, Your Honor.

14             MR. HIRONAKA:  Not from me.

15             MS. NAMMAR:  I guess, he is going to operate his own

16   electronic equipment.  We set that up with the courtroom

17   manager, so --

18             THE COURT:  Who is he?

19             MS. NAMMAR:  I'm sorry.  My expert witness.  This is

20   Joe Soeka.

21             THE COURT:  All right.  Expert in what?

22             MS. NAMMAR:  Digital forensics.

23             THE COURT:  All right.  That's fine.

24             MR. HIRONAKA:  No objection.

25             MR. SINGH:  No objections.

 1              THE COURT:  All right.  Thank you.  I will step down.

 2    Thank you.

 3              COURTROOM MANAGER:  This court stands in recess.

 4          (The proceedings recessed at 9:31 a.m. until 9:36 a.m.)

 5              (Open court in the presence of the jury.)

 6              THE COURT:  All right, everyone, you may be seated.

 7              The government may call its next witness.

 8              MS. NAMMAR:  The government calls Joseph Soeka.

 9              COURTROOM MANAGER:  Could you please stand?  Please

10    raise your right hand.

11               JOSEPH SOEKA, GOVERNMENT'S WITNESS, SWORN.

12              THE WITNESS:  I do.

13              THE COURT:  Please be seated.

14              Speak about four to six inches away from your

15    microphone.

16              THE WITNESS:  Okay.

17              COURTROOM MANAGER:  Please state your name, and spell

18    your first and last name for the record.

19              THE WITNESS:  My name is Joseph Soeka; J-O-S-E-P-H,

20    S-O-E-K-A.

21                          DIRECT EXAMINATION

22    BY MS. NAMMAR:

23    Q    And how are you currently employed?

24    A    I am a senior digital investigative analyst for the

25    Computer Crime and Intellectual Property Section of the

1    Department of Justice's cybercrime lab.

2    Q    And how long have you been employed with the Department of

3    Justice's cybercrime lab?

4    A    I began my employment there in January of 2021.

5    Q    And what did you do before that?

6    A    I was in law enforcement.

7    Q    If you could, describe for the jury your educational

8    background.

9    A    Sure.  So I got my bachelor's degree in Law and Society

10   with minors in Forensic Science and Psychology from Purdue

11   University in West Lafayette, Indiana, in 2008.  I then went to

12   the Alaska Law Enforcement Training Academy in 2010, where I

13   graduated top of my class; and then I am currently enrolled in

14   the master's of the Digital Forensics program from the

15   University of Central Florida.

16   Q    And so were you in law enforcement from approximately

17   2010, when you graduated from the academy, until you began with

18   the Department of Justice?

19   A    Yes.  I worked for the State of Alaska for five years,

20   during which time I was assigned as a task force officer with

21   the Drug Enforcement Administration.  Following that, I moved

22   to Colorado and worked as a certified law enforcement officer

23   for the City and County of Broomfield, and I worked there until

24   I left in 2020.

25   Q    Let's talk about your role as a forensic examiner for the

1   Department of Justice.  What do you do in that role?

2   A    We analyze a wide variety of digital media, to include

3   computers, mobile devices, servers and productions from

4   third-party providers such as Facebook.  We analyze the data

5   that they provide, and we provide reports outlining that

6   acquisition and analysis to the customer.

7   Q    And is this your full-time job?

8   A    It is.

9   Q    And so would you say that you analyze digital devices on a

10  daily basis?

11  A    I would.

12  Q    If you could please describe your training as it relates

13  to digital forensics and tell us about any certifications that

14  you hold.

15  A    I go through a wide variety of trainings annually in my

16  role.  I've gone through trainings hosted by the SANS

17  Institute, which is a certifying body in the field of cyber

18  security, digital forensics, and incident response.  I've gone

19  through their advanced smart phone forensics training course,

20  and I did receive their certification through GIAC, which is

21  their certifying entity.  I've also gone through their advanced

22  Windows analysis training course and received certification in

23  that regard, and I've gone through their certified analyst

24  training course and have received certification from that.

25       Earlier this month, I also attended their Mac forensics

1    and iOS course.  I will currently be going through that

2    certification process, which is a four-month process.  Each of

3    those certifications do require a four-month preparation

4    period, and then you take a practical and written examination

5    going over the different topics that are learned for each of

6    the courses.

7        In addition, I also am a certified forensic examiner

8    through IACIS, which is the International Association Of

9    Computer Investigative Scientists [sic].  I also am a coach for

10   them.  So in addition to that four-month process of

11   certification, I now pay it forward, so to speak, and do for

12   new candidates that are going through.  I grade their problem

13   sets that they have to submit monthly.  And you are required to

14   receive a hundred percent passing with each -- with each of

15   those problem sets before you can move on to the next and

16   ultimately obtain your certification.

17       In addition to that, I've also gone through IACIS's Mobile

18   Device Forensics training course and received certification in

19   that at the end of 2022.

20   Q    And do you hold any other certifications?

21   A    I do.  They're vendor-specific certifications for a wide

22   variety of forensic tools to include FTK, Cellebrite.  I've

23   gone through Belkasoft SQLite training courses, things like

24   that, but those are more tool-specific --

25              THE WITNESS:  My apologies.

1    A    A wide variety of vendor-specific trainings.  We use a

2    multitude of forensic tools in our day-to-day operations, and

3    those tool vendors will sometimes offer specific training for

4    the operation of their tools.

5    BY MS. NAMMAR:

6    Q    And you mentioned Cellebrite.  Could you tell us what

7    Cellebrite is?

8    A    Cellebrite is a tool that we use to process data into a

9    more user friendly format.  So we're feeding in datasets and it

10   builds out a graphic user interface, which is basically like a

11   program where you can see different fields.  It's easier to

12   read than raw data.  I am a Cellebrite-certified operator and a

13   Cellebrite-certified physical analyst.  Those are both

14   trainings that they provide as the tool vendor, and they do

15   require recertifications every three years.

16   Q    And so if you could tell us how you became certified as a

17   Cellebrite analyst?

18   A    I've recertified twice now.  I was certified in my role as

19   a forensic examiner when I was with the police department in

20   Colorado.  Since then, as I said, I've gone through two

21   recertifications, as recently as January of 2023, where all

22   members of our lab went through the certification process.

23   Q    And what is Cellebrite Physical Analyzer?

24   A    Cellebrite Physical Analyzer is the specific tool, again,

25   that we use to bring in extractions or acquisitions of mobile

1   devices or productions from data providers, again, such as

2   Facebook or Apple.  And it will process that data.  It will

3   parse it out, and it will structure it in a way that we can

4   review the data.

5   Q    Approximately how many times have you used the Cellebrite

6   Physical Analyzer to analyze and examine information from

7   cellular phones?

8   A    I don't know an exact number, but it would be in upwards

9   of a hundred times.

10  Q    And aside from Cellebrite, what other tools do you use in

11  your role as a senior digital investigative analyst?

12  A    We use Axiom, which is another forensic suite tool.  We

13  will use that for certain productions.  We use FTK Imager,

14  X-Ways, FTK Lab and a wide variety of other tools, depending on

15  the needs of the support.

16  Q    Do you -- are you familiar with GrayKey?

17  A    I am.

18  Q    And do you use that as a tool as well?

19  A    I do.

20  Q    Do you also teach in the area of digital forensics?

21  A    Yes.  Part of my current role is we travel internationally

22  and teach on the topics of mobile device forensics, computer

23  forensics to judges, prosecutors, and investigators.  I've

24  recently come back from a program in Budapest.  We travel all

25  over the world to teach these topics.

1    Q    Okay.  And, I'm sorry, I'm just going to ask you if you

2    can remember to slow down just a little bit.

3    A    I do apologize.

4    Q    I think our court reporter is having a hard time.

5    A    I will make sure to focus on it.

6    Q    Thank you.

7         Do you have any professional memberships relating to the

8    forensic examination of electronic devices?

9    A    I do.  I am currently a member of IACIS, which is that

10   international association I mentioned earlier; and I am also a

11   member of the SANS advisory board.  The SANS advisory board

12   gives membership to those who achieve a score higher than

13   90 percent on its certifications.  It's a Listserv, where we

14   can troubleshoot advanced problems in the field of digital

15   forensics.

16   Q    And have you published any articles relating to the

17   forensic examination of electronic evidence?

18   A    I have not.

19   Q    You said you began in your position as a senior digital

20   investigative analyst approximately two years ago.  Is this the

21   first time that you have testified in court as an expert

22   witness?

23   A    It is.

24   Q    And in your former role as a law enforcement officer, did

25   you testify both in federal and state courts as a case agent in

1  cases that required the use of digital forensics?

2  A    I did.

3            MS. NAMMAR:  Your Honor, at this time the United

4  States tenders Senior Digital Investigative Analyst Joseph

5  Soeka as an expert in the area of digital forensics.

6            MR. HIRONAKA:  No objection.

7            MR. SINGH:  No objections.

8            THE COURT:  He'll be so qualified.

9  BY MS. NAMMAR:

10 Q    You testified that one of the tools that you use in the

11 execution of your job is GrayKey.

12       If you could please tell the jury about what GrayKey is?

13 A    GrayKey is an advanced acquisition services tool.  It

14 allows us to acquire data from mobile devices.  Aside from

15 that, it is a proprietary tool.  I can't speak to the

16 functionality of the tool.  I do not know how it operates, and

17 there are non-disclosures associated with it.

18 Q    And is this tool available to the general public?

19 A    It is not.

20 Q    Who is it available to?

21 A    Law enforcement agencies.

22 Q    Is it regularly used by law enforcement?

23 A    It is.

24 Q    Do you know whether evidence from GrayKey has been

25 admitted in other courts?

1  A    It has.

2  Q    And do you use the GrayKey to acquire information -- did

3  you use the GrayKey to acquire information from a cell phone in

4  this case?

5  A    I did.

6  Q    Approximately when was that?

7  A    May 11 of 2023.

8  Q    And specifically, what were you asked to do?

9  A    I was asked to do an acquisition of data from an iPhone 11

10  Pro.

11  Q    Was consent obtained prior to your search of that device?

12  A    I was provided a signed consent form with a password.

13  Q    And was a search warrant also obtained prior to your

14  search of the device?

15  A    I was also provided with a search warrant to execute the

16  search of the device.

17        MS. NAMMAR:  Permission to approach the witness.

18        THE COURT:  You may.

19        MS. NAMMAR:  If I could please have Government's

20  Exhibit 70.  It's already in evidence.

21        I'm going to hand him two exhibits, just for the

22  purposes of not walking back and forth.

23  BY MS. NAMMAR:

24  Q    And if you'll take a look at Government's Exhibit 70,

25  which is already in evidence, and let me know if you recognize

1    it.

2    A    It appears to be the bag that the iPhone was packaged in

3    when I received it and sent it back.

4    Q    Is the iPhone in that bag?

5    A    It is.

6    Q    And is that the same iPhone that you conducted an --

7    examined and conducted an extraction on?

8    A    It appears to be.

9    Q    Okay.  Were you successfully able to acquire information

10   from Exhibit 70?

11   A    I was.

12   Q    And what did do you with the original cell phone when you

13   finished?

14   A    I repackaged the cell phone and shipped it back at your

15   request.

16   Q    And are there different types of acquisitions?

17   A    There are.

18   Q    If you could tell the jury about the types of

19   acquisitions?

20   A    So there are different types of acquisitions we do of

21   mobile devices.  It basically outlines the amount and type of

22   data that we receive.  So there's advance -- there's logical

23   acquisitions of devices, and I will speak in the realm of

24   iPhones since that's what we're currently dealing with.

25        A logical extraction is like a backup of the device.  So

1    if you've ever used iTunes or if you do backups of your devices

2    to the iCloud, that's kind of what a backup is.  It's backing

3    up the native applications for the phone, the native data like

4    photos, your contacts, calendars, text messages, things of that

5    nature.

6         Whole file system acquisitions get all of this data as

7    well, but it also gets system files and some logs, third-party

8    application data, and keys that are required to decrypt those

9    applications.  So a full file system acquisition in some cases

10   can get you up to 90 percent more data than a logical

11   acquisition.

12        And then a physical acquisition is a bit for bit beginning

13   to end acquisition of the device that gets unallocated space,

14   which is the area that holds data that's ready to be used or

15   deleted data, full file system acqui -- or I'm sorry.

16        Physical acquisitions of iOS devices are not something

17   that we can get because they run off of file-based encryption.

18   And the unallocated space would be in an encrypted state, which

19   would not be useful for us.

20   Q    And what type of acquisition did you conduct on the iPhone

21   in this case?

22   A    I did a full file system acquisition.

23   Q    And I've handed you what has been marked as Government's

24   Exhibit 71.  Do you recognize it?

25   A    I do.

1  Q    And how are you able to recognized it?

2  A    It's a box containing the drive that I sent you with this

3  acquisition and subsequent reports.

4  Q    And is this a true and accurate copy of the acquisition

5  from the iPhone?

6  A    It is.

7  Q    Which is Exhibit 70, the iPhone, I'm sorry.

8  A    Yes.

9          MS. NAMMAR:  And, Your Honor, at this time the

10  government moves to admit Exhibit 71.

11          MR. HIRONAKA:  Your Honor, I -- I'm just going to

12  object for lack of foundation.

13          MR. SINGH:  Same position.

14          THE COURT:  Objection's overruled.  71 is admitted.

15          (Government Exhibit 71 received in evidence.)

16  BY MS. NAMMAR:

17  Q    It you will, there's a binder up there.

18  A    Yeah.

19  Q    And if you'll turn to -- it's Volume I.  And if you'll

20  turn --

21          THE WITNESS:  May I hand these off to --

22          MS. NAMMAR:  Yes.  Your Honor, may I approach and

23  retrieve the exhibits?

24          THE COURT:  You may.

25  BY MS. NAMMAR:

1    Q    If you will turn to Government's Exhibit 71 -- I'm

2    sorry -- 71A.

3    A    I'm there.

4    Q    Do you recognize this exhibit?

5    A    Yes.  This is the GrayKey progress report that is created

6    by the tool, following acquisition.

7    Q    Okay.  And if -- is this the report that was generated

8    when you conducted the acquisition?

9    A    Yes.

10   Q    Can anything change about the data in this report from

11   when you conduct the acquisition?

12   A    You'll see --

13   Q    Sorry.  Go ahead.

14   A    You will see on page 2 that there is an extraction result

15   summary.  This summary contains hash values.  It has a SHA256

16   hash value associated with the extraction and also one

17   associated with the keychain file, which contains the

18   decryption keys for the -- for certain containers within the

19   extraction.

20        Hash values are like digital DNA of files.  So a hash

21   value is an alphanumeric number.  In this case, it's two to the

22   power of 256.  So we use this to say that the data at time of

23   extraction is the same as the data that I used in the

24   processing and creation of my reports.

25        If I were to change one character, one bit from a one to a

1    zero, that number is completely changed and not slightly

2    changed.  It's not even remotely the same number.

3        So we use this to validate that the data pulled from the

4    tool at the time of extraction is the same data that we use in

5    the creation of our reports.

6    Q    And what else does this report tell us?

7    A    The report has a log containing time stamps that just show

8    when the process began and when it was completed.

9        It also has target device information to include the

10   owner's name, device phone number, the international mobile

11   equipment identifier, which is the number for the device, and a

12   number of other fields.

13   Q    And what was the phone number for the device?

14   A    The phone number for the device is 1 (808) 639-0595.

15   Q    And was that pulled directly from the phone?

16   A    It was.

17   Q    And what about the owner?

18   A    That information is also pulled from the phone during the

19   extraction.

20   Q    And who is the owner of this device?

21   A    It is listed as Blaine Jacintho.

22   Q    And what is the accounts section?

23   A    The account section shows an email of

24   jacintho5055@gmail.com.  That would be the associated iCloud

25   account.

1  Q    Is this a true and accurate copy of the GrayKey report?

2  A    It is.

3  Q    Have any changes been made from when it was first

4  produced?

5  A    No.

6  Q    Okay.  What tools did you use in this case to analyze the

7  data?

8  A    I used Cellebrite Physical Analyzer.

9           MR. HIRONAKA:  Your Honor, I'm sorry.  Before we go

10  further, could we approach at sidebar?

11           THE COURT:  You may.

12           Ladies and gentlemen, if you want to take a stretch

13  break while we discuss at sidebar you may do so.

14           (Sidebar on the record.)

15           THE COURT:  That's for the court reporter so that she

16  can have a recording of this in case she can't hear us.

17           MR. HIRONAKA:  Oh, okay.  Okay.

18           Okay, this is Randy Hironaka.  So my -- it's not an

19  objection; it's more of a clarification.  So my understanding

20  is that Exhibit 71 includes hundreds of pages under multiple

21  subparts, all the way up through O, and then even ones such as

22  D contains -- I'm not sure if they're going to be attempted to

23  be admitted separately, like 71A, 71B, because there's no

24  actual 71 (inaudible).

25           MS. NAMMAR:  71 is the extraction itself.  That's the

1    hard physical piece of evidence that I handed him.

2            MR. HIRONAKA:  Right.

3            MS. NAMMAR:  That's the hard drive.  That contains

4    the extraction.  He's going to demonstrate that report because

5    you can't print that exhibit.

6            MR. HIRONAKA:  Okay.  So seventy -- the other

7    subparts are not going to be introduced?

8            MS. NAMMAR:  They are going to be -- I'm moving to

9    admit all of them.

10           MR. HIRONAKA:  Okay.

11           MS. NAMMAR:  Because they have been pulled from this

12   phone.

13           MR. HIRONAKA:  Okay.  So then I guess what I would

14   ask is that if something's going to be -- because he's just

15   testified as to contents of 71A, and it hasn't been admitted.

16           MS. NAMMAR:  Correct.

17           MR. HIRONAKA:  So I guess now I do have an objection

18   if it's going to be done that way.

19           MS. NAMMAR:  Sorry.  I will move to -- he's going to

20   have to show the exhibit on his computer because we can't

21   switch back and forth between the presentation is my

22   understanding.  And so I should probably have had him pull up

23   the report first.  So I can do that.  Because I couldn't have

24   him -- I wasn't going to move to admit it and -- because he

25   can't publish it.  Do you know what I mean?

1                MR. HIRONAKA:  I do.

2                MS. NAMMAR:  I mean at the same time I need to have

3     him pull it up.

4                MR. HIRONAKA:  Right.  So, I mean, maybe it would

5     help if, you know, like our -- just -- so it's just some of the

6     subparts are intended to be admitted --

7                MS. NAMMAR:  So what I intend to admit with him is 71

8     through 71-O.

9                MR. HIRONAKA:  Oh, so A through O?

10               MS. NAMMAR:  All of it, ah-huh.

11               MR. HIRONAKA:  Okay.  And then some of those

12    themselves have sub-subparts?

13               MS. NAMMAR:  And then he -- so all of those.  I

14    mean like --

15               MR. HIRONAKA:  Okay.

16               MS. NAMMAR:  -- 71D, 71 -- 71-D1, 71-D2, 71-D3.  I

17    can't remember how many there are.

18               MR. HIRONAKA:  Oh, I see.  But they're going to be

19    done separately, you're saying?

20               MS. NAMMAR:  I'm going to try to move them all in

21    together so that I'm not doing them all separately.  He's not

22    going to testify as to each exhibit.

23               MR. HIRONAKA:  Okay.

24               MS. NAMMAR:  He's laying the foundation for the --

25               MR. HIRONAKA:  Okay.

1              MS. NAMMAR:  Does that make sense?

2              MR. HIRONAKA:  (Inaudible.)

3              MS. NAMMAR:  But then he will testify to some of the

4    subparts, so I will be moving to -- like, for example, the text

5    messages with Amigo, there are some videos in there.  He's

6    going to testify as to those.

7              MR. HIRONAKA:  Okay.  So actually, 71 was -- I mean

8    by admitting 71, it was essentially laying the foundation for

9    all of these subparts too then?

10             MS. NAMMAR:  Mm-hmm.

11             MR. HIRONAKA:  Okay.

12             MS. NAMMAR:  And then 71A, which is what you said he

13   was testifying about, that's just the report that shows the

14   accuracy.  That's like printed out, that extraction.

15             MR. HIRONAKA:  Okay.

16             MS. HUDSPETH:  But he created B through O.

17             MR. HIRONAKA:  He created --

18             MS. HUDSPETH:  Yes.

19             MR. HIRONAKA:  Right.

20             MS. NAMMAR:  He created, ah-huh.  He created all

21   these --

22             THE COURT:  Are the jurors not going to be shown any?

23   Are they going to be shown all of B through O?

24             MS. NAMMAR:  They are.

25             THE COURT:  Okay.

1           MS. NAMMAR:  So -- but not like -- we're not going to

2    go through all of the --

3           THE COURT:  Right.  Okay.

4           MS. NAMMAR:  With him.

5           THE COURT:  Right.

6           MS. NAMMAR:  Does that make sense?

7           THE COURT:  Yeah.

8           MS. NAMMAR:  I'll just ask that if he (simultaneous

9    speaking) --

10          THE COURT:  -- can explain what they are?

11          MS. NAMMAR:  Mm-hmm.

12          THE COURT:  Okay.

13          MR. HIRONAKA:  I think that clarifies it for me.

14   Yeah.

15          THE COURT:  All right.

16          MR. HIRONAKA:  Thank you.

17          (End of sidebar.)

18          THE COURT:  Thank you for your patience, ladies and

19   gentlemen.

20          You may proceed.

21   BY MS. NAMMAR:

22   Q   Okay.  We talked about your report.  I think at this time,

23   do you have your computer up there on the stand?

24   A   I do.

25   Q   And Government's Exhibit 71 was the extraction; is that

1    correct?

2    A    71A.

3    Q    I'm sorry.  71, the hard drive.

4    A    Oh.  That is correct.

5    Q    And do you have that actual report on your computer?

6    A    I do.

7    Q    And can you demonstrate that for the jurors?  As to the

8    Cellebrite -- I'm sorry.

9         The report that's generated from that extraction?

10   A    The GrayKey extraction report?

11   Q    Yes.

12             THE COURT:  I'm sorry.

13             MS. NAMMAR:  Oh, I'm sorry.

14             THE COURT:  So this one has not yet been admitted?

15             MS. NAMMAR:  It has not.

16   BY MS. NAMMAR:

17   Q    So we just discussed Government's Exhibit 71A.

18   A    Yes.

19             MS. NAMMAR:  Your Honor, at this time I'd move to

20   admit Government's Exhibit 71A.

21             MR. HIRONAKA:  No objection.

22             MR. SINGH:  No objections.

23             THE COURT:  71A is admitted.

24             (Government Exhibit 71A received in evidence.)

25             MS. NAMMAR:  Okay.  If you could publish that to the

1   jury.

2              THE COURT:  You may.

3              MS. NAMMAR:  Do you have it connected on your --

4              THE WITNESS:  It is connected.

5              MS. NAMMAR:  The GrayKey report?

6              COURTROOM MANAGER:  One moment.

7              MS. NAMMAR:  Okay.  Sorry.

8   BY MS. NAMMAR:

9   Q    Okay.  And so, I'm sorry, now that the jury can see this

10  Exhibit 71A, can you explain once again how you got this

11  report?

12  A    Yes.  This report is automatically created by the tool

13  following successful acquisition.  You can see the serial

14  number for the tool, its operating system, the date and time

15  the report was generated, and the target device information.

16       So this is what I was referencing earlier related to the

17  phone number of the device, the identifier of the device, the

18  owner name that was entered for the device, and the account

19  that was entered for the device.

20       It is then followed by the event log, which has the date

21  and timestamps of when it was initialized all the way to when

22  it was completed and the report was generated.

23       Below that is the extraction result summary that I

24  referenced, that has the hash values of the individual files.

25  This is the extraction file, and this is the keychain file.

1    It provides both a SHA256 hash value and an MD5 hash

2  value.

3  Q    And then what tools did you use to analyze the data?

4  A    From this extraction I used Cellebrite Physical Analyzer

5  to analyze this extraction, and I also created a report using

6  Axiom.

7  Q    Okay.  And is that report, are you able to print that

8  report out, or is that contained on the hard drive?

9  A    It is contained on the hard drive.  The report is very

10  large.  We have created individual smaller reports of specific

11  data, but I have the report here.

12  Q    And if you can -- I believe you have them on your device

13  and also in the notebook, Government's Exhibits 71-B through

14  71-O.  If you could browse through those and let me know after

15  you've done so.

16  A    I will need to get the second binder.

17  Q    Oh, sorry.  Yes.

18  A    This one.

19    Those exhibits appear to contain those PDF reports that I

20  referenced.

21  Q    And did you create those reports?

22  A    I did.

23  Q    And once again, that was from this original extraction?

24  A    Correct.

25  Q    Okay.

1          MS. NAMMAR:  And at this time, Your Honor, the

2   government moves to admit --

3   BY MS. NAMMAR:

4   Q    Are those true and accurate copies -- reports -- sorry --

5   pulled from that hard drive?

6   A    They are.

7   Q    And have they been altered in any way?

8   A    No.

9          MS. NAMMAR:  At this time the government moves to

10  admit -- 71-B is already admitted, and so we move to admit

11  71B-1 through 71-O.

12         And if Your Honor would like, I could go through all

13  of the subparts.

14         MR. HIRONAKA:  No objection, Your Honor.

15         MR. SINGH:  No objections, Your Honor.

16         THE COURT:  The Court will admit 71-B-1 through 71-O.

17         For the purposes of the record, the exhibit numbers

18  are listed in Document Number 144.  So where there are

19  subparts, those are indicated there.  And I'm admitting those

20  subparts as well.

21         (Government Exhibits 71B-1 through 71"O" received in

22  evidence.)

23         MS. NAMMAR:  And, Your Honor, I'm sorry.  The

24  government would also move to admit Exhibit 71B-2.  But I

25  believe it's not on that list, so one moment.

1          Your Honor, this morning -- I'm sorry.  I said 71B-2.

2    My mistake.

3          71D-3 has been provided to the defense this morning

4    and added as an exhibit as well.

5          THE COURT:  All right.  If you could please file

6    later today a second amended exhibit list.

7          MS. NAMMAR:  I will.

8          THE COURT:  And any objection to that document?

9          MR. HIRONAKA:  Your Honor, sorry, I haven't seen this

10   until now.  I just --

11         (Counsel confer off the record.)

12         MR. HIRONAKA:  Your Honor, no objection.

13         MR. SINGH:  No objections.

14         THE COURT:  71D-3 is also admitted.

15         MS. NAMMAR:  Okay.  Thank you.

16         (Government Exhibit 71D-3 received in evidence.)

17   BY MS. NAMMAR:

18   Q    Okay.  And just to be clear, you created 71D-3 as well?

19   A    I did.

20   Q    Okay.  Are you familiar with something called metadata?

21   A    I am.

22   Q    And could you describe for the jury what metadata is?

23   A    Metadata is data about data.  So when you create a Word

24   document using Microsoft Word, it's tracking metadata for that

25   document, timestamps of when the document was created,

1    modified, the author of the document.  This goes for a number

2    of other file types, to include multimedia, photographs.

3    Q    Okay.  And would now be a good time for you to explain the

4    report to the jury from -- present from your laptop?

5    A    Yes.

6    Q    Okay.  And if you could do that.  And this is the

7    Cellebrite analyzer report; is that correct?

8    A    Correct.

9              THE COURT:  Which exhibit number --

10             THE WITNESS:  Which exhibit?

11             THE COURT:  -- is this?

12             MS. NAMMAR:  This is the actual extraction.

13   BY MS. NAMMAR:

14   Q    Were you going to show us the extraction 70 -- your report

15   that you can't print out that's too large from which you

16   created the subparts?

17             THE COURT:  So this is Exhibit 71?

18             MS. NAMMAR:  Correct.

19             THE COURT:  And does defense counsel have any

20   objection to publishing it in this fashion?

21             MR. HIRONAKA:  No, Your Honor.  That's fine.

22             MR. SINGH:  No, Your Honor.

23             THE COURT:  71 will be published to the jurors.

24   BY MS. NAMMAR:

25   Q    And if could just show the jury how you created these

1    subparts, 71B-1 through 71O, from your report?

2    A    What you are seeing here is Cellebrite Reader.  Cellebrite

3    Reader is a report-viewing entity for Physical Analyzer.

4        So this is what Physical Analyzer would look like

5    following the introduction of the GrayKey extraction and that

6    keychain file.

7        It once again puts data in a way that is easier for an

8    examiner to review.

9        On the left side here, we have analyzed data, which

10   catalogs the different data points.  We have the file system,

11   which has a breakdown of the extractions, containers, and a

12   timeline that puts things in order of their associated time

13   stamps.

14       My reports were created using this tool.  So I could

15   filter by specific date ranges, phone numbers, contract names,

16   multimedia locations, and so forth.

17   Q    And so did you pull videos from this cell phone?

18   A    I did.

19   Q    And Exhibit 71-B, which is in evidence, do you have that

20   on your computer?

21   A    I do.

22   Q    Did you pull this from the iPhone?

23   A    I did.

24   Q    And does this exhibit have metadata?

25   A    It does.

1    Q     And what does that metadata tell us?

2    A     Metadata says the type of device that created the video,

3    and its lat -- associated latitude and longitude.

4    Q     Do you have Exhibit 71-B on your -- if we could publish --

5    on your computer?

6    A     I do.

7              MS. NAMMAR:  If we could publish Exhibit 71B.

8    Dash-one.  I'm sorry.  71B-1.

9    BY MS. NAMMAR:

10   Q     Which is the report you generated from 71B-1 -- B, I

11   believe.  I'm sorry.

12             And if you could explain to the jury what this is.

13   A     This is a screen capture of the video itself.  On the

14   right side of the screen capture you will see the associated

15   path of where the photo came from and a hash value.  And then

16   this is a screen capture that's been enlarged using a tool

17   called EXIF Tool to show you the associated metadata of the

18   file.

19             So it shows that the video was created using an Apple

20   iPhone 11 Pro, software version 14.3.  It has the creation date

21   and timestamp, which is in Hawaii Standard Time.  And it has

22   the associated GPS locations of latitude and longitude.

23             THE COURT:  Let me ask the jurors if they're able to

24   see that.

25             Can you see the screen fine?  Okay.  I see --

1              THE WITNESS:  I can zoom in as well if it is helpful.

2              THE COURT:  That might help.  Thank you.

3   BY MS. NAMMAR:

4   Q    So what, if anything, can you tell when this video was

5   made?

6   A    It was made on February 1st, 2021, at 6:07:41 Hawaii

7   Standard Time.

8   Q    Is that 6:07 a.m. or p.m.?

9   A    P.m.

10  Q    And what can you tell from the location data?

11  A    Using the coordinates and using Google Maps, they were

12  entered in -- I can tell that these are the associated latitude

13  and longitude of the metadata of the video.

14  Q    And so does that tell you where this video was actually

15  taken?

16  A    It appears to be in the area of Jasmine Street.

17  Q    And that is in Honolulu?

18  A    It is in Honolulu, Hawaii.

19  Q    And do you know approximately what block of Jasmine

20  Street?

21  A    The 2400 block.

22  Q    And all of that is contained in the phone; is that

23  correct?

24  A    It's contained within the file from the phone, yes.

25  Q    Okay.

1               MS. NAMMAR:  Thank you.  You can take that down.

2               I next want to turn to Government's Exhibit 71C, and

3     if you can publish that for the jury.

4     BY MS. NAMMAR:

5     Q     And if you can tell us what we're looking at here.

6     A     This is one of the created PDF reports I mentioned

7     earlier.  So this was a report created from the request of a

8     date range and to involve the parties, the device owner and the

9     phone number ending in 1390.

10    Q     And if you could read that, the entire phone number for

11    the --

12    A     Yes.  It is 1 (714) 749-1390.

13    Q     And then the device owner, once again, is?

14    A     It lists the phone number of 1 (808) 639-0595 and the

15    associated iCloud account of jacintho5055@gmail.com.

16    Q     Okay.  And then I see a blue -- a blue text bubble.  Can

17    you describe what these text bubbles signify, or the colors?

18    A     Yes.  So you will see, here in the bubble, it does outline

19    the direction the message has arrived.  So the blue will be

20    from the 1390 number to the owner, 0595.

21          The green is the opposite.  It is from the device owner to

22    the phone number ending in 1390.

23    Q     And do these indicate the time zone?

24    A     They indicate the time that the message was delivered and

25    read in Hawaii Standard Time.

1    Q    And if you could describe what the information below the

2    blue and -- immediately below the blue and green bubbles in

3    Exhibit 71C?

4    A    This information here that I have highlighted shows the

5    source path of where this information came from.  So from the

6    extraction created by GrayKey, this conversation is stored

7    within a database.  And that database is the sms-dot-db.  The

8    database is at this path, and it's referencing the tables that

9    the information came from.  And I'm happy to show what that SMS

10   database looks like --

11   Q    Okay.

12   A    -- now if that's helpful.

13   Q    Yes.  Please do.

14        And you're going into 71, Exhibit 71, your report,

15   correct?

16   A    Correct.

17        So this is the sms.db table.  Applications, stored data in

18   SQLite databases, which is a structured query language that is

19   self-contained.

20        So within it are tables that contain columns and rows,

21   much like an Excel spreadsheet.

22        So within the sms.db, we have tables on the left here that

23   have the titles of "message" and "handle," which is the two

24   tables that were used in the creation of this document.  Here

25   you can see that we used the table:  Messages and handles.

1          So within the table we have information such as the

2     direction of travel, the type of message, whether it was an

3     iMessage or an SMS message.  And then we have date and time-

4     stamps of when it was read and received.  The handle table

5     contains the associated contact information with specific IDs.

6     So this is just to show where that report is referencing to

7     create the green and blue bubbles.  It's based off of the

8     entries within this database.

9     Q    All right.  Within this -- going back to 71C, within this

10    message, were there also audio-video files?

11    A    Yes.

12    Q    And so those can't be printed in this -- obviously they

13    can't be printed out; is that correct?

14    A    I cannot print them up.  Yeah.

15    Q    And so if you would publish Government's Exhibit 71C-1,

16    and tell us if you can tell if it came from this message.

17    A    This is that item?

18    Q    I'm sorry.  71C-1, Image 1037.

19    A    My apologies.

20          (Recording played.)

21    BY MS. NAMMAR:

22    Q    I'm sorry.  We'll let this play and then you can --

23          (Recording played.)

24          MS. NAMMAR:  All right.  And if you can please play

25    Exhibit 71C-2, Image 1038.

1          (Recording played.)

2          MS. NAMMAR:  Okay.  Thank you.  You may take those

3    down.

4          If you will again publish 71C.  And turn to page 17

5    of Exhibit 71C.

6    BY MS. NAMMAR:

7    Q    And what can you tell us about 71C-1 and 71C-2 that we

8    just viewed?

9    A    I can tell you that these movie files were submitted as

10   attachments from the device owner sent to that 1390 number.

11   Q    And what else does this information tell us in the text

12   message?

13   A    In this message it shows it as an attachment.  However,

14   taking the file name, I was able to determine that these came

15   from a area of the phone called the DCIM, which is your digital

16   camera images.  So it shows that the video was taken using the

17   device.

18   Q    Okay.  And is that for both -- both Exhibits 71C-1 and

19   71C-2?

20   A    That is correct.

21   Q    And then those images were sent from that device to this

22   other number; is that correct?

23   A    That is correct.

24   Q    Okay.  Turning to -- if you can publish Government's

25   Exhibit 71C-3.

1      Was this also pulled from that text string that we're
2  looking at in 71C?

3  A    Yes.

4  Q    And what were you able to tell us with regards to this?

5  A    This is that file.  It is as an attachment sent from --
6  one moment.  Let me get back to the report.  1/28/2021 is the
7  creation time.  So I will be going to that location within this
8  report.

9      So it was sent from the 1390 number to the device owner,
10  0595.

11  Q    Okay.  And if you could tell us what that is a photo of.

12  A    It appears to be a photo of a UPS store parcel order
13  document.

14  Q    Okay.  And then if you will publish Government's
15  Exhibit 71C-4.

16  A    This is not one that I had separated, but it is within the
17  attachments fold.  So I just (sotto voce) --

18  Q    All right.  And did you pull this directly from that same
19  text chain, as we've been discussing with the previous
20  exhibits?

21  A    Yes.  It's from an attachments folder created by the
22  report from that text exchange.

23  Q    And what can you tell from the data about this?

24  A    I'm going to the location.  Sorry.

25  Q    That's okay.

1    A    Do you have the date and time without me --

2    Q    Yes.

3    A    -- pulling up the main report?

4    Q    If you'll turn to page 291 of Exhibit 71C?

5    A    291, thank you.

6    Q    I can't -- it's very tiny.  I think that's the correct

7    one.

8    A    This is the one that shows delivered.  So it will be this

9    one here.  Yeah, 2/1/2021, 10:44 a.m.

10   Q    And that's on page 290 of Exhibit 71C, correct?

11   A    Correct.

12   Q    And so this shows that -- that attachment that you just

13   showed as 71C-4, who sent that?

14   A    It was sent from the 1390 number to the device owner,

15   0595.

16   Q    And once again, on what date?

17   A    February 1st, 2021.

18   Q    Okay.  And so is this the same for all of the messages in

19   Government's Exhibits 71 -- the remaining communications, 71D

20   through 71O?

21   A    Yes.  I did a similar parameter search to create the other

22   exhibits.  I was provided with the parties involved and the

23   communications and the date range and created similar reports

24   to this with each involved party.

25   Q    All right.  And, I'm sorry, did you describe on the text

1    messages how we know that they came from the database?

2    A    Yes, that it's coming from the table called messages and

3    handles, and it's building out this report.

4    Q    Okay.  Are you familiar with Signal?

5    A    I am.

6    Q    And could you tell the jury what Signal is?

7    A    It's a third-party application that utilizes voice-over-

8    Internet protocols which basically allows you to make phone

9    calls over the Internet.  It's also a messaging application

10    that has a multitude of features.

11    Q    And were you able to pull messages from the Signal

12    application on this one as well?

13    A    I was.

14    Q    And if we could go to Government Exhibit 71K.

15    A    I'm going to go to it in my binder as well.  Just one

16    moment.

17    Q    Yes.

18        Sorry.  Do you have Exhibit 71K up?

19    A    I do.

20    Q    And where did these messages come from?

21    A    These came from the Signal database.

22    Q    And did you say, can Signal -- can messages from Signal be

23    deleted automatically?

24    A    You can set disappearing messages within Signal in certain

25    conversations.  So if you choose to have messages be deleted

1    after five minutes of being sent and received, you can.  You

2    can set it to a number of other time settings if you so choose.

3    Q    Okay.  And once again, on this document, 71K, how do we

4    know that it came from Signal --

5    A    Much --

6    Q    -- versus the native messages?

7    A    Much like the native message application on the source

8    info line, under the message, you will see that it comes from a

9    SQLite database.  This one is signal.sqlite.decrypted, and it's

10   outlining the table where the information came from.  In this

11   case it's TS interaction.  It's structured the same way an

12   SMS -- that the SMS database was structured, just with

13   different tables and different entries.

14   Q    All right.  One moment, please.

15        Okay.  Going back to Government's Exhibit 71C-1, which was

16   the Image 1037.

17   A    Image one, zero, three, seven?

18   Q    Yes.

19        And I believe you testified that this was sent from this

20   phone, correct?

21   A    Correct.

22   Q    And so can you tell what date these videos were created,

23   71C-1 and 71C-2, the video and the image were created on this

24   phone?

25   A    So when 1037 and 1038 were created?

1    Q    Correct.

2              MS. NAMMAR:  And that's on page 17 of Exhibit 71C.

3              THE WITNESS:  I'm pulling it up within the report so

4    you can see the data associated with its location on the camera

5    rather than the time it was sent as an attachment.  So one

6    moment.

7              MS. NAMMAR:  Okay.

8    BY MS. NAMMAR:

9    Q    Or if you could tell us, do you know where that was

10   created within this phone?  I can't remember if you already

11   testified as to that.  I'm sorry.

12   A    It was created by the phone, because it's located within

13   the DCIM.  So the DCIM is the area of your phone that holds the

14   photos that you take with your camera.  They are numbered

15   sequentially.  So Photo 1037 or Movie 1037 is followed by 1038

16   and 1039 and so on, so --

17   Q    Okay.  I believe that's sufficient.

18             MS. NAMMAR:  No further questions.  Your Honor, I

19   pass the witness.

20             THE COURT:  Why don't we take our morning break at

21   this time.

22             So ladies and gentlemen of the jury, we're going to

23   take the first of our two longer breaks.  This is a good

24   opportunity for you to have a snack if hopefully you brought

25   some, get some rest, use the restroom.  This would be about a

1    15-minute break, hopefully.  Our second break will be longer.

2    So you'll have a second, longer break later today.

3             As always, don't discuss the case with each other.

4    Don't talk about the witnesses or anything else, and don't do

5    any research on your phones while you're on your break.

6             So we'll take about a 15-minute break which, if I'm

7    doing my math correctly, takes us to 10:50.  So, all right,

8    thank you.

9             COURTROOM MANAGER:  All rise for the jury.

10            (The jury was excused at 10:36 a.m.)

11            (Open court out of the presence of the jury.)

12            THE COURT:  You may step down.

13            THE WITNESS:  Thank you, Your Honor.

14            THE COURT:  Does anything need my attention?

15            MS. NAMMAR:  Not from the government.

16            MR. HIRONAKA:  Not from me.

17            MR. SINGH:  No, Your Honor.

18            THE COURT:  All right.  One thing I'd like the

19   parties to do, if you haven't already, is to meet and confer

20   and report back to me, perhaps at the end of the day today, how

21   the jurors would view these digital exhibits during

22   deliberations, if you haven't talked about that yet.  All

23   right?  Thank you.

24            COURTROOM MANAGER:  All rise.  Court now stands in

25   recess.

1          (The proceedings recessed at 10:37 a.m. until 10:54 a.m.)

2              (Open court in the presence of the jury.)

3              THE COURT:  All right.  Thank you, everyone.  You may

4    be seated.

5              Mr. Hironaka, your witness.

6              MR. HIRONAKA:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. HIRONAKA:

9    Q    Okay.  Mr. Soeka -- am I pronouncing that correctly?

10   A    You are.

11   Q    Okay.  Good -- good morning.

12   A    Good morning.

13   Q    So just wanted to start off with a -- with a few basics.

14   So extracting data or -- from a phone, from a cell phone, a

15   phone -- all right, well, when you extract data, are you able

16   to extract data that's, quote-unquote, deleted?

17   A    No, because in the -- with this specific device -- if

18   we're talking in general, there are some devices where you can

19   access the unallocated space of a device.  But with iOS

20   devices, that area is encrypted.

21   Q    Okay.  So the exhibits we were looking at, we don't have

22   to go through them again, but the ones that we were looking at

23   that appeared to be text messages -- and when you -- earlier

24   when you testified as to SMS, those are more commonly referred

25   to as text messages, correct?

1    A    That is correct.

2    Q    And the ones that people commonly use on their phone, not

3    a third-party-type app --

4    A    That is correct.

5    Q    -- is that correct?  Okay.

6         The -- the ones that we saw pictures of, the exhibits that

7    you created, those came from your extraction, though, correct?

8    A    Correct.

9    Q    So not -- sometimes -- you've seen court exhibits which

10   are essentially screen shots or photographs of the screen of a

11   phone, like a text message.  You've seen those before?

12   A    Yes.

13   Q    Okay.  What yours was was not that, though?

14   A    No.

15   Q    Okay.  If there were -- now, on the iPhone, for text

16   messages, individual message bubbles, we'll call them, during a

17   text or a conversation, they can be deleted, though, correct?

18   A    Yes.  You can choose individual messages or entire

19   conversations.

20   Q    Okay.  So if something was deleted, then you're saying

21   that your -- this extraction would not reflect that, correct?

22   A    So the database itself puts messages, much like

23   photographs, in a chronological order.  So if a message has a

24   number of 1000, the next message in the database would be 1001,

25   1002.  If it jumps to 1005, we can say that message 1003 and

1    1004 were removed.  So we can see if messages are missing.  But

2    the content of them once they've been removed from the

3    database, including free pages, which is a temporary location

4    within the database that you sometimes can recover messages

5    from, but once it's determined that page is needed for new

6    messages, they're not recoverable.

7    Q    Are you talking about in an iPhone?

8    A    Yes, in the database.

9    Q    Okay.  So on the rare occasion you can recover,

10   quote-unquote, deleted messages?

11   A    Before they get removed from the database, yes.  So once

12   it goes to the unallocated space of the phone, we can't recover

13   it.  Because individual files within an iPhone carry their own

14   encryption keys.  And once that file is deleted, the key goes

15   with it.  And we're not able to recover the key, and therefore

16   we can't decrypt anything that is in that unallocated space.

17   Q    And about how long does it take for that to occur?

18   A    To be removed from the SMS database into unallocated?

19   Q    Correct.

20   A    It depends just on the need for the free pages.

21         MR. HIRONAKA:  Okay.  That is all I have.  Thank you,

22   Mr. Soeka.

23         THE WITNESS:  Thank you.

24         THE COURT:  Mr. Singh?

25         MR. SINGH:  No questions.

1           THE COURT:  Thank you.

2           MR. SINGH:  Thank you.

3           THE COURT:  Any redirect?

4           MS. NAMMAR:  One moment, please, Your Honor.

5    (Confers off the record.)

6           Briefly, Your Honor.  Sorry.

7                    REDIRECT EXAMINATION

8    BY MS. NAMMAR:

9    Q    Mr. Soeka, are you aware, on an iPhone, can someone record

10   a text string, like a video of a text string?

11   A    You can turn on screen recording from your iPhone device.

12   Most people access it by swiping down, hit record, and then a

13   countdown starts and you can create a recording of your screen.

14   Q    Okay.  And so can you tell if it's a recording of a screen

15   versus a real text message from this data?  Does that make

16   sense?

17   A    Speaking in regards to the report or a screen capture of

18   the message?

19   Q    Can you tell if the movies that we -- that you showed,

20   Government's Exhibit 71, C-1 and C-2, can you tell if those

21   have been manipulated by -- you said they -- from the DCIM you

22   can tell it came straight from the phone; is that correct?

23   A    Correct.

24   Q    Okay.

25           MR. HIRONAKA:  Your Honor, I'm going to object.

1   Beyond the scope.

2                THE COURT:  Sustained.

3                MS. NAMMAR:  Okay.  No further questions.

4                THE COURT:  All right.  You may step down, sir.

5   Thank you.

6                THE WITNESS:  Thank you, Your Honor.

7                                        (Witness excused.)

8                THE COURT:  The government may call its next witness.

9                MS. NAMMAR:  Your Honor, the government calls Rolando

10  Lopez.

11               COURTROOM MANAGER:  Hi.  Good morning.

12               THE WITNESS:  Good morning.

13               COURTROOM MANAGER:  Please come forward.

14               THE WITNESS:  Okay.

15               COURTROOM MANAGER:  Watch your step as you take the

16  stairs.  Come to the front of the chair and remain standing.

17               THE WITNESS:  Okay.

18               COURTROOM MANAGER:  Okay.  Raise your right hand.

19               ROLANDO LOPEZ, GOVERNMENT'S WITNESS, SWORN.

20               THE WITNESS:  Yes.

21               COURTROOM MANAGER:  Thank you.

22               Please be seated.

23               THE WITNESS:  Thank you.

24               COURTROOM MANAGER:  Speak about four to six inches

25  away from the mic.  Please state your name and spell your first

1    and last name for the record.

2          THE WITNESS:  My name is Rolando Lopez.  It's spelled

3    as R-O-L-A-N-D-O.  Last name is L-O-P-E-Z.

4                      DIRECT EXAMINATION

5    BY MS. NAMMAR:

6    Q    Good morning.

7    A    Good morning.

8    Q    Could you tell the jury what you do for a living?

9    A    Yes.  I work for Alcon Company making contact lenses,

10   manufacturing, in the engineering department.

11   Q    And how long have you been in that position?

12   A    With this company, a year and a half.

13   Q    And prior to working for Alcon, what did you do?

14   A    I worked for HPD for about nine years as a patrol officer

15   in specialized -- other specialized units.  The other year and

16   a half or so I was -- I was cross-deputized as a TFO for DEA.

17   Q    Okay.  And you've used some acronyms, so if you could

18   explain what HPD is.

19   A    HPD is the Honolulu Police Department.

20   Q    And TFO?

21   A    TFO is a task force officer.

22   Q    And who were you a task force officer for?

23   A    For the Department of -- for the DEA, please.

24   Q    And the DEA stands for?

25   A    Sorry.  Don't remember.  I'm sorry.

1   Q    Drug Enforcement Administration?

2   A    Yes.

3   Q    Okay.  So did you have a dual role with the Honolulu

4   Police Department and the Drug Enforcement Administration?

5   A    I did, yes.

6   Q    Okay.  And how long were you in law enforcement, total?

7   A    I would say almost approximately about 12 years, 11 and a

8   half to 12 years.

9   Q    Okay.  And why did you leave your position with DEA and

10  the Honolulu Police Department?

11  A    My mother have gotten -- has gotten severely ill so I went

12  back to take care of her.

13  Q    And so do you live on the mainland now?

14  A    Yes, ma'am.

15  Q    Okay.  Do you hold any degrees?

16  A    Yes.  An associate's in manufacturing and automation,

17  bachelor's in information technology, and a master's in

18  business administration.

19  Q    And before joining HPD, what did you do?

20  A    Before HPD I -- it's the company I mentioned prior, it was

21  actually called CIBA vision, they were bought over by Alcon.

22  So I worked for CIBA vision for about nine years, doing the

23  same thing, engineering.

24  Q    Okay.  Turning back to your time as a task force officer

25  with the Drug Enforcement Administration, what were your

1    general responsibilities?

2    A    Well, we would investigate and look into federal

3    violations, law violations.

4    Q    And I want to turn your attention to August of 2020.  Were

5    you working as a task force officer with the Drug Enforcement

6    Administration during that time?

7    A    Yes.

8    Q    And did you become involved in an investigation into

9    Blaine Jacintho?

10   A    I did, yes.

11   Q    How did you become involved in this investigation?

12   A    When I first learned of Jacintho was an operation that was

13   being ran, and was also a case agent, was Perry Lar --

14   Lardizabal.  And we were to go to Kauai to Lawai Beach Resort,

15   where we had information that Blaine Jacintho was staying at.

16   We were to go there and further the investigation to -- to

17   conduct surveillance and see if there was any associates that

18   we could continue the investigation and learn from.

19   Q    Okay.  And so you conducted a surveillance on Kauai in

20   August of 2020; is that correct?

21   A    Yes, ma'am.

22   Q    Did there come a time when TFO Lardizabal was no longer

23   the case agent?

24   A    There was a time, yes.

25   Q    And who became the case agent?

1  A    I would believe right around -- I'm not sure of the end

2  but Perry Lardizabal ended the -- his responsibilities around

3  October of 2020.  And initially it was given to TFOs -- or Task

4  Force Officer Akana.  He was also cross-deputized in and in our

5  unit.  And I was to assist him if he needed help, because at

6  the time he didn't have all the access to the systems, the DEA.

7  Q    I'm sorry.  Did you assist TFO Akana in writing a report?

8  A    I did, yes.

9  Q    And what was that in regard to?

10  A    That was in regards to information that was given to us by

11  KPD, Kauai Police Department, Officer Tyler Yates.  He informed

12  Akana and myself that there was a parcel that was intercepted,

13  a black speaker box-type container.

14            MR. HIRONAKA:  Your Honor, I object.  Hearsay.

15            THE COURT:  Sustained.

16            MS. NAMMAR:  Okay.

17  BY MS. NAMMAR:

18  Q    Do you know approximately when you received this

19  information?

20  A    Yes.

21  Q    And wrote your report?

22  A    Yes.  I believe that was -- I believe it was mid October,

23  somewhere in there.

24  Q    Okay.  At some point did you become the case agent on this

25  case after TFO Akana?

1    A    Yes.

2    Q    And when was that by, approximately?

3    A    Approximately around December 4th of 2020.

4    Q    Okay.  And what is the role of a case agent?

5    A    The responsibilities of looking into, again, federal

6    violations.  My role specifically was to make sure that -- that

7    roles and responsibilities were given out while the

8    investigation was ongoing, including operations, how they were

9    set up and, again, distributed, depending on what that

10   operation was for that given time.

11   Q    Okay.  So is it fair to say that you're essentially

12   responsible for the investigation; you're the lead agent or

13   officer on the investigation?

14   A    Yes, ma'am.

15   Q    And you have other officers and agents assist you on these

16   investigations as well?

17   A    Yes.

18   Q    Were you responsible for directing a cooperator in this

19   case?

20   A    Yes, I was.

21   Q    And who was that cooperator?

22   A    Roscoe Agapay.

23   Q    And while that cooperator was in your presence, did he

24   make any controlled call to Blaine Jacintho?

25   A    Yes.  With our directions we -- we had him make a call,

1    specifically one I can think of, on January 13th.  Yes.

2    Q    Okay.  And who physically made that call?

3    A    Ros Agapay.

4    Q    And how did you confirm the phone number that he dialed?

5    A    I was looking over his shoulder as he dialed the number,

6    and -- yeah.

7    Q    Who was present during this call?

8    A    It was -- at the time it was the -- the group supervisor,

9    Michael Short, for the DEA, and also Special Agent Fujimoto.

10   Q    And was this call recorded?

11   A    Yes, it was.

12   Q    Did you use a recording device and start that prior to the

13   call?

14   A    Fujimoto used the recording device, and he started it

15   prior to the call being made.

16   Q    And was that phone on speaker so that everyone could hear

17   the conversation?

18   A    Yes.

19           MS. NAMMAR:  Permission to approach the witness?

20           THE COURT:  You may.

21   BY MS. NAMMAR:

22   Q    I'm going to hand you what's been marked as Government's

23   Exhibit 46.

24        Do you recognize this?

25   A    Yes, I do.

1   Q    And what is it?

2   A    It is an audio recording that was made on January 13th,

3   from Roscoe Agapay to Jacintho.

4   Q    And is the call recorded on Exhibit 46 a true and accurate

5   recording of the call that you observed and overheard on

6   January 13th, 2021?

7   A    Yes.

8   Q    Were there any modifications, additions or deletions from

9   the original recording?

10  A    No.

11         MS. NAMMAR:  Your Honor, at this time the government

12  moves to admit Exhibit 46.

13         MR. HIRONAKA:  Your Honor, our limiting instruction.

14  I don't have an objection, though, to the foundation.

15         THE COURT:  All right.  I will read the limiting

16  instruction.  Any objection?

17         MR. SINGH:  No, Your Honor.

18         THE COURT:  Ladies and gentlemen of the jury, before

19  I admit this exhibit I have an instruction to read to you.

20         You are about to hear evidence of a verbal

21  conversation between Mr. Jacintho and another person.  I

22  instruct you that what the other person says is admitted only

23  for the purpose of its effect on Mr. Jacintho, and therefore

24  you must consider it only for that limited purpose and not for

25  any other purpose.

1        What the other person says is not admitted for the

2   truth of what that person says, and you are forbidden from

3   using it as proof of what is said by that person.

4        Exhibit 46 is admitted.  You may play it.

5        MS. NAMMAR:  And, Your Honor, at this time I would

6   like to show the witness what's been marked as Exhibit 46A,

7   just the witness.  And I'll lay a foundation for that, unless

8   you don't want me to.

9        Sorry.  I think we need to switch the cord from the

10  last witness.

11       COURTROOM MANAGER:  I did.

12       MS. NAMMAR:  Okay.

13       246-A, please.

14       COURTROOM MANAGER:  Wait.

15       THE COURT:  You may show it to him.

16       MS. NAMMAR:  I'm sorry.  It's the transcript.

17       THE COURT:  If you want to show him a hard copy,

18  that's fine.

19       MS. NAMMAR:  Okay.  Oh, there it is.

20  BY MS. NAMMAR:

21  Q    Do you see that on the screen?

22  A    Yes, ma'am.

23  Q    And do you recognize this?

24  A    Yes, I do.

25  Q    And what is it?

1   A    It is a typed -- it's a typed document of the audio

2   recording that we made on the 13th of January 20 --

3   Q    And when you listened to this audio recording prior to

4   coming to court today, were you also given this transcript?

5   A    Yes.

6   Q    And did you follow along and review as you listened to it?

7   A    Yes, I did.

8   Q    And is that transcript an accurate and true transcript of

9   the conversation you heard on Exhibit 46?

10  A    Yes.  I just mentioned the other day that I just didn't

11  see the preamble at the beginning.  But other than that,

12  nothing's been changed or modified.

13  Q    Okay.  So at the beginning of the call there'll be a

14  preamble, and that's not typed in the transcript?

15  A    From my knowledge, yes.

16  Q    All right.  And do you know what that -- who gave that

17  preamble?

18  A    Yes.  It was Special Agent Fujimoto.

19  Q    Okay.

20          MS. NAMMAR:  Your Honor, at this time I'd like to

21  pass out the transcripts to the jurors.

22          THE COURT:  Any objection?

23          MR. HIRONAKA:  No, Your Honor.

24          MR. SINGH:  No objections, Your Honor.

25          THE COURT:  All right.  Let's have Ms. Mizukami do

1   that.

2         MS. NAMMAR:  Okay.

3         THE COURT:  And as she is doing that, ladies and

4   gentlemen, let me read you another instruction.

5         You are about to hear a recording that has been

6   received in evidence.  Please listen to it very carefully.

7         Each of you are now being given a transcript of the

8   recording to help you identify speakers and as a guide to help

9   you listen to the recording.  However, please bear in mind that

10  it is the recording that is the evidence, not the transcript.

11  If you hear something different than what appears in the

12  transcript, what you hear is controlling.  After the recording

13  has been played, the transcript will be taken from you.

14        So in other words, ladies and gentlemen, the

15  recording is not -- is the evidence.  The transcript is help --

16  is given to you to aid in your understanding of that evidence.

17  You will not have that transcript with you in the jury room

18  during deliberations.

19  BY MS. NAMMAR:

20  Q    And before we play this recording, Mr. Lopez, were you

21  familiar with the voices of the individuals on this recording?

22  A    Yes, ma'am.

23  Q    And once again, who are the two individuals that are

24  speaking on this -- other than the preamble -- who are speaking

25  on this recording?

1  A    Roscoe Agapay and the defendant Blaine Jacintho.

2  Q    Okay.  If we could please start the recording.

3            (Recording played.)

4            MS. NAMMAR:  Please -- 46.

5            (Recording played.)

6            MS. NAMMAR:  If we could please pause.

7  BY MS. NAMMAR:

8  Q    The voice that you just heard, do you recognize that

9  voice?

10  A    Yes, I do.

11  Q    And who is that?

12  A    The defendant Bl -- Jacintho.

13  Q    Okay.  If we could play it again.

14            (Recording played.)

15            MS. NAMMAR:  Would you pause, please.

16  BY MS. NAMMAR:

17  Q    And that individual, do you recognize that voice?

18  A    Yes.  That's Roscoe Agapay.

19            MS. NAMMAR:  Okay.  If you could please resume.

20            (Recording played.)

21            MS. NAMMAR:  Your Honor, at this time it might be

22  appropriate to collect the transcripts.

23            THE COURT:  All right.  Thank you.

24  BY MS. NAMMAR:

25  Q    After listening to that call, do you recall this

1    conversation?

2    A    Yes, I do.

3    Q    And what was being discussed on this call?

4    A    Initially it was discussed there could be a deal made for

5    ten, and he -- ten waters, which means they were talking

6    about --

7              MR. HIRONAKA:  Your Honor, I'm going to object.

8              THE COURT:  Sustained.

9    BY MS. NAMMAR:

10   Q    In your training and experience and your personal

11   involvement in this investigation, do you know what "ten"

12   stands for?

13             THE COURT:  Ms. Nammar, let's have a sidebar on this.

14             MS. NAMMAR:  Okay.

15             (Sidebar on the record.)

16             THE COURT:  This is what we -- sorry.

17             This is what we covered in the motion in limine

18   proceeding, where I wanted to clarify from you if any of your

19   witnesses are hybrid lay and expert witnesses.  He's now

20   testifying to expert based on his training and experience what

21   waters means.

22             MS. NAMMAR:  Or his personal involvement on the call.

23             THE COURT:  Say that again.

24             MS. NAMMAR:  Okay.  So he cannot testify as to his

25   personal involvement in this conversation.

 1          MS. HUDSPETH:  But it's also effect on the listener

 2   of how they -- next steps in investigation.

 3          THE COURT:  We talked about this during motions in

 4   limine.  This should have been brought up in motions in limine.

 5   You can bring it in through your expert what this means --

 6          MS. NAMMAR:  Okay.

 7          THE COURT:  -- but I'm not going to let you bring --

 8          MS. HUDSPETH:  I want to elicit to him what that

 9   stands for.

10          MS. NAMMAR:  Can I, Your Honor -- I mean, we can

11   still ask what his understanding of the investigation was, just

12   not that they were -- I mean that they were going to meet and

13   to buy ten pounds of meth.

14          THE COURT:  Yeah, he --

15          MS. NAMMAR:  He's just not going to define what

16   "waters" --

17          THE COURT:  Right.

18          MS. NAMMAR:  -- is?

19          THE COURT:  Right.

20          MS. NAMMAR:  Okay.  But ten, is that okay?

21          THE COURT:  Yeah.  That's fine.

22          MS. NAMMAR:  Okay.

23          (End of sidebar.)

24          THE COURT:  You may proceed.

25   BY MS. NAMMAR:

1  Q    Okay, Mr. Lopez.  Without -- sorry.  Without defining any

2  terms, if you could just tell us generally what the

3  conversation was being discussed on this call.

4  A    Okay.  In summary, I guess, they were discussing a deal to

5  happen in Oahu, possibly around the 22nd of January, 2021.  And

6  there would be a purchase of a quantity of illicit drugs.

7  Q    And how much -- what was the quantity?

8  A    Ten pounds.

9  Q    And what type of drugs?

10 A    Crystal methamphetamine.

11         MS. NAMMAR:  Okay.  You may proceed.

12         MR. HIRONAKA:  Your Honor, I move to strike that last

13 answer.

14         THE COURT:  That last comment will be stricken.

15         MS. NAMMAR:  I'm sorry, Your Honor.  Could we have a

16 sidebar again?

17         THE COURT:  No.  Crystal methamphetamine

18 is stricken --

19         MS. NAMMAR:  Okay.

20         THE COURT:  -- with this witness.

21         MS. NAMMAR:  Okay.

22         THE COURT:  You may continue.

23         MS. NAMMAR:  Okay.

24 BY MS. NAMMAR:

25 Q    All right.  And if you could tell us what the rest of the

1  conversation?

2  A    Okay.

3        MR. HIRONAKA:  Your Honor, I would object to the

4  witness's narrative, Your Honor.  The conversation is best

5  evidence.

6        THE COURT:  Sustained.

7  BY MS. NAMMAR:

8  Q    Okay.  After that recorded conversation, did the

9  cooperator continue to communicate with Blaine Jacintho?

10 A    Yes.

11 Q    And how did he communicate with him?

12 A    Via text messages.

13 Q    And did he show you those text messages?

14 A    Yes, he did.

15 Q    And did he send those text messages at your direction?

16 A    Yes.

17        MS. NAMMAR:  I'd like to show the witness what's been

18 admitted as Government's Exhibit 71K.

19        THE COURT:  You may.

20        MS. NAMMAR:  And if we may publish.

21        THE COURT:  You may.

22 BY MS. NAMMAR:

23 Q    Do you recognize Government's Exhibit 71-K?

24 A    Yes, I do.

25 Q    And what are these?

1    A    These are text messages between Roscoe Agapay and Blaine

2    Jacintho.

3    Q    Okay.  And I think it might be easier if you turn to the

4    binder.

5              MS. NAMMAR:  If we could have the witness get the

6    Volume II binder.

7              THE WITNESS:  71.  Okay, thank you.

8    BY MS. NAMMAR:

9    Q    There are multiple pages to this exhibit; is that correct?

10   A    No -- yes, I have a question, ma'am.  I -- she said 71A,

11   but I don't --

12   Q    71K as in kings.

13   A    K, okay.

14   Q    Sorry.

15             THE WITNESS:  I don't see a tab that says 71K, just

16   71D from there.

17             MS. NAMMAR:  71K.  May I approach?

18             It might be in -- it's Volume II.

19             THE WITNESS:  Okay.

20   BY MS. NAMMAR:

21   Q    And there are 24 pages to this exhibit.  Is that accurate?

22   A    Yes.

23   Q    Okay.  And so are these the communications, the text

24   message communications that the cooperator had with Blaine

25   Jacintho?

1    A    Yes.

2    Q    And what dates, between what beginning and end date did

3    these communications take place?

4    A    January 26, 2021, beginning date, and the 8 -- end date is

5    February 1st, 2021.

6    Q    Okay.  And during this time period what were you directing

7    the cooperator to communicate?

8    A    Continue the -- the drug transaction that was talked about

9    in the audio recording.

10   Q    Okay.

11   A    Contact, yes.

12   Q    And did there come a time where you set up an operation?

13   A    Yes.

14   Q    And what was that operation for?

15   A    The operation, it was February 1st, 2021, and that

16   operation was to -- to do a buy-bust on -- of all these text

17   messages and the recordings that was agreed upon to have a drug

18   transaction between Ja -- Jacintho and Ros Agapay.

19   Q    And who agreed to sell?

20   A    Blaine Jacintho, yeah.

21   Q    And what was he agreeing to -- what was the operation?

22   What was your understanding of what this operation was going to

23   accomplish?

24   A    Right.  To -- to make a deal of illicit drugs to Roscoe

25   Agapay.

1   Q    Okay.  And so what did you do as -- was this originally

2   set for February 1st?

3   A    Not originally.  It --

4   Q    When was the -- originally set for?

5   A    From going back to the audio recordings, it was -- it was

6   going on a Friday.  It was going to be January 22nd, 2021.

7   Q    And what happened?

8   A    The information we were getting back from Jacintho is that

9   it -- the illicit drugs hadn't arrived, so the dates had to get

10  pushed back.

11          MR. HIRONAKA:  Your Honor, I'm going to object.  It

12  calls for hearsay.

13          THE COURT:  Overruled.

14  BY MS. NAMMAR:

15  Q    You may proceed.

16  A    So due to the illicit drugs not arriving, then the dates

17  got pushing back ultimately to February 1st, 2021.

18  Q    Okay.  So as case agent, what did you do in preparation

19  for this buy?

20  A    Before February 1st -- actually, on January 30th of 2021,

21  we were given and granted a -- a warrant to ping Jacintho's

22  phone.  And within that ping we were able to locate him on

23  Oahu, North Shore area, at the Banzai Pipeline Beach Park.

24  Q    And was anyone else with him?

25  A    Yes.  Upon arriving, I was able to observe him at the

1    beach with a thin -- thin middle-aged female, maybe younger,

2    30s possibly, and a large-size local male.

3    Q    Okay.  And Mr. Lopez, I'm sorry, I see you looking down.

4    And if you'll just set that -- it appears you are reading from

5    it and I --

6    A    Sorry.

7    Q    -- don't believe you are.  But if you'll just set that

8    exhibit aside, please?

9    A    Okay.

10   Q    Thank you.

11       So once again, if you could tell us who you observed with

12   him at --

13   A    So my observations was he was at the beach, and he was

14   with a large-size male, local male, and a -- a thin female,

15   Asian-Pol-looking.  I was able to take photos, send 'em over

16   to -- to Tyler Yates, a KPD officer on Kauai.  And he

17   positively ID'd all three individuals as Jacintho --

18           MR. HIRONAKA:  Your Honor, objection.  It's hearsay.

19           THE COURT:  Sustained.

20   BY MS. NAMMAR:

21   Q    Okay.  So after conducting your surveillance, did you

22   observe anything else beside the individual?

23   A    Yes.  There was a white Dodge Caravan that all individuals

24   returned to.  And the license plates on that vehicle was tango,

25   yankee, bravo, 484.  Checks were made, and it came out to a

1  rental company, EAN Holdings.

2  Q    What did you do next?

3  A    After they all entered the vehicle, they proceeded to a

4  local Foodland grocery store, where myself and -- and then

5  Special Agent Fujimoto was able to observe the vehicle parked.

6  And again, acknowledged the plates.

7  Q    Okay.  And so after conducting surveillance on the 30th,

8  what did you do as part of your operation?

9  A    Okay.  So after the 30th, we set up an operation with

10  several individuals, law enforcement, and we -- they -- the

11  roles were given out, response -- is given out.  Also a lot of

12  attention was given to the safety of not just officers and

13  civilians, but the suspects.  So we decided to bring blue and

14  white after there was -- the scene was made safe -- safe, and

15  we would -- we would just make it known that it was a police

16  operation.  So all those roles and responsibilities were given

17  out to several officers, and a target vehicle was given out,

18  and just information so they could educatedly observe and know

19  what they were looking at once they saw it.

20  Q    Okay.  And did this operation occur on February 1st?

21  A    Yes, ma'am.

22  Q    And what happened?

23  A    So starting on February 1st, first thing I did was send

24  out my surveillance unit to go out and to locate the vehicle

25  based on the pings that I mentioned earlier.  And the vehicle

1    was located at the Hilton hotel in Waikiki.  And it was parked

2    unattended in a closed or -- or -- in a -- in a parking

3    structure.

4         Officers were able to confirm the white Dodge Caravan with

5    the same plates, and they were just -- they took a VP until

6    they further observed -- one of the officers observed the light

7    come on and the vehicle leave the parking structure.

8         At that time they decided to hold back for other reasons,

9    and they just stood back and let the vehicle leave.  And we

10   didn't see it again until a later ping, and it -- it -- it

11   showed that it was in Waianae.  And I sent officers over there

12   again, on that same date, I'm thinking early in the morning,

13   right before noon.  So officers again were able to observe the

14   same vehicle, bearing the same plates, in the area of Waianae.

15   Parked not at anybody's driveway, but close to a driveway that

16   we knew of at the time.  And after the interview that we had

17   was an address that was given to us where he was staying with

18   his sister.

19   Q    And where was this buy-bust transaction expected to occur?

20   A    It was agreed upon between Roscoe Agapay and Jacintho that

21   it would -- it would occur, and the transaction would be made

22   at the Magic Island, Ala Moana Beach Park.

23   Q    And is that here in Honolulu?

24   A    Yes.

25   Q    And at what time was that expected to occur?

1    A    It wasn't a solid time but sometime in the evening.  I

2    would say anywhere -- we didn't have an exact time.  It would

3    just happen sometime in the evening, that I can recall.

4    Q    And did Mr. Jacintho show up?

5    A    Yes.

6    Q    And tell us about that.

7    A    So again, some of these text messages that I'm looking at,

8    it's towards the end you'll notice that he was giving us

9    information that he was about 15 minutes out, and that he gave

10   us a description of a -- that I was able to also observe, that

11   it was -- in the text, that it was a white van with dark color

12   wheels.

13       At that point we instructed Roscoe Agapay to inform that

14   he would send a runner and that he would be in a -- he gave a

15   description of the car and a name.

16   Q    Okay.

17   A    That he would meet him at the -- at the park.

18           MS. NAMMAR:  And if we could turn to Government's

19   Exhibit 71K, and page 20, if you'll put that up on the screen,

20   please.

21           THE COURT:  Mr. Hironaka, is this a point at which

22   you'd want me to read the limiting instruction again?

23           MR. HIRONAKA:  No, Your Honor.  I think you already

24   covered it --

25           THE COURT:  Okay.

1           MR. HIRONAKA:  -- for this exhibit.  Thank you.

2           THE COURT:  All right.  Thank you.

3  BY MS. NAMMAR:

4  Q    And if you could look at the green, direct your attention

5  to the green bubbles.

6  A    Are we supposed to --

7           MS. NAMMAR:  Sorry.  Could you zoom in?  I think

8  there's trouble seeing because it's --

9           JUROR:  It's so small.

10          MS. NAMMAR:  -- so far away.  Small.

11          Is that better?

12          THE COURT:  Can everyone see that?

13          (Jury responds.)

14          THE COURT:  Thank you.

15          JUROR:  We couldn't see the first one either.

16          THE COURT:  Can you see this one?

17          JUROR:  Now we can.  But the ones before this --

18          MS. NAMMAR:  Okay.

19          JUROR:  -- we couldn't read.

20          MS. NAMMAR:  Okay.  Thank you.

21          THE COURT:  Thank you.

22  BY MS. NAMMAR:

23  Q    Could you tell us what this says?

24  A    Reading, this is a message from Jacintho to Ros, Roscoe

25  Agapay, and it says, "Are you there"?

1    Q    Okay.  And then if you could go down to the next one?  And

2    zoom in, please.

3         And if you'll read this one.

4    A    Same.  This is also from Jacintho to Roscoe Agapay.  And

5    that's where he stated and I observed that one saying I'm

6    about -- I'm 15 minutes away.

7    Q    Okay.  And then is that what you were talking about?

8    A    Yes.

9    Q    If we could turn to page 22, please.  And if you'll zoom

10   in on the second bubble.

11        And if you'll read that.

12   A    This is from Jacintho to Roscoe, and he's stating that --

13   the text says:  White van, black rims, I'm going pull behind

14   him.  Tell him jump in with me.

15   Q    And then if we could enhance the second -- the third

16   bubble.  And if you'll read that, please.

17   A    This is from Jacintho to Ros:  Tell him just park and I'll

18   pull up.  L -- LMK, question mark.

19   Q    And can you tell what time this text message was sent?

20   A    Looking at this, it was delivered February 1st, 2021.

21        Do you want -- there's two times here.  Should I look at

22   the one in the far bottom right or the one in the middle?

23   Q    The time that it's delivered.

24   A    I got you.  Delivered is February 1st, 2021, at 6:45:54

25   p.m.

1   Q    Okay.  And if we could turn -- if we could turn to

2   page 23.  And if you will zoom in the green -- the last green

3   box and if you could read that.

4   A    This is from Jacintho to Roscoe Agapay.  He is saying in

5   the text:  I am pulling in now.

6   Q    And once again, the date and time?

7   A    February 1st, 2021.  6:54 ten seconds p.m.

8   Q    All right.  And so at approximately that time, what

9   happened?

10  A    The -- at that point we'll deduce he had arrived and

11  parked.  Jacintho's vehicle, the target vehicle had pulled up

12  next to the UC vehicle.

13       We were given play-by-play over our assigned law

14  enforcement radios that to pull in and -- and make the

15  buy-bust.  Which is the security pulling in to -- to basically

16  police arriving and let them -- letting them know that, yeah.

17  Q    And --

18  A    (Simultaneous speaking.)

19  Q    -- was anyone arrested?  Who -- who arrived?  I'm sorry.

20  Who arrived at that parking lot?

21  A    There was -- in the target vehicle it was Holi as the

22  driver and Jacintho in the front passenger seat.

23  Q    And could you please explain what the target vehicle --

24  A    Target vehicle is the vehicle we took surveillance on the

25  30th, two days prior.  This is the same vehicle that was at

1    Banzai Pipeline in North Shore.  It is the same vehicle we

2    observed the two defendants get into, the target vehicle, which

3    was the white Dodge Caravan bearing the plates of tango,

4    yankee, bravo, 484, and it was the exact same match and

5    confirmed by security.

6    Q    And once again, who was driving that vehicle when it

7    arrived at Magic Island?

8    A    Keoni Holi.

9    Q    And who was in the passenger seat, if anyone?

10    A    Blaine Jacintho.

11    Q    And were any arrests made that night?

12    A    Yes, ma'am.

13    Q    Who was arrested?

14    A    Jay -- Blaine Jacintho was arrested and Keoni Holi.

15    Q    And what did they arrive with?

16    A    They arrived with ten pounds of illicit drugs.

17    Q    And were you involved in the arrest of either of those

18    individuals?

19    A    I was involved on the -- I was there in the blue and

20    white.  I was involved with the transport of one of the

21    individuals.

22    Q    And who did you transport?

23    A    Keoni Holi.

24    Q    Where did you transport him to?

25    A    To the Honolulu district office, here in Honolulu.

1  Q    And was he -- do you know what he was wearing?  Was he

2  wearing anything in particular that evening?

3  A    Yeah, well, the -- what caught my attention was a red

4  shirt he was wearing.

5  Q    Okay.  And do you see in the courtroom today the

6  individual that you arrested and transported to the federal

7  building?

8  A    I transported, yes.

9  Q    Is it Keoni Holi?

10  A    Yes, I do.

11  Q    And if you could identify him by an article of clothing

12  he's wearing.

13  A    He's wearing a black T-shirt.

14         MS. NAMMAR:  If the record could reflect that the

15  witness has identified the defendant.

16         THE COURT:  It shall.

17  BY MS. NAMMAR:

18  Q    And that's the same individual that you arrested that

19  evening?

20  A    Yes.  Transported, yes.

21  Q    Transported.

22         And when you arrived at the federal building, what did you

23  do next?

24  A    We did routine processing.  And after the routine process

25  of Holi, we put him into a holding cell for an interview,

1    incoming interview.

2    Q    And did you conduct an interview with him?

3    A    Yes, I did.

4    Q    Did you advise him of his Miranda rights?

5    A    Yes.

6              MS. NAMMAR:  One moment.

7              If we could show for the witness only Government's

8    Exhibit 62.

9              THE COURT:  You may.

10    BY MS. NAMMAR:

11    Q    And do you recognize this?

12    A    Yes.

13    Q    What is it?

14    A    This is the advice of rights that I gave Holi.

15    Q    And how are you able to recognize it?

16    A    Right off, I see my -- my name and my signature.

17         And I also, as I can get into more detail if you want, but

18    I see his initials and checkmarks.

19    Q    Okay.  And is this a true and accurate copy of the advice

20    of rights form that you went over with the defendant?

21    A    Yes, with the exception of the Exhibit 62 on the far right

22    corner, everything is the same.

23    Q    All right.  Have any -- so other than that Exhibit 62

24    sticker, or the Bates stamp, has there been any changes to this

25    document?

1   A    No.

2           MS. NAMMAR:  At this time the government moves to

3   admit 62.

4           MR. SINGH:  No objections.

5           MR. HIRONAKA:  No objection.

6           THE COURT:  All right.  62 is admitted.

7           (Government Exhibit 62 received in evidence.)

8           MS. NAMMAR:  If we could have permission to publish

9   to the jury, please.

10          THE COURT:  You may.

11  BY MS. NAMMAR:

12  Q    And Mr. Lopez, now that we are looking at this form, if we

13  could zoom in on the top so that the jurors can see it a little

14  better, we'll start with the top half of the form.

15          And if you can explain what you did.

16  A    So, yes, it's -- initially I gave him this form here, and

17  I kept a -- a copy, so I could read it out loud to him as he

18  followed along.  And as I mentioned earlier the -- as I was

19  reading out to him and he was following along out loud, I would

20  have him initial and check the area that I was reading out to

21  him.

22  Q    Okay.  And what time was this, do you know?

23  A    Yes.  Approximately at 7:57 p.m.

24  Q    And on what date?

25  A    On February 1st, 2021.

1          MS. NAMMAR:   Okay.  If we could zoom in on the bottom
2    half of Exhibit 62.

3    BY MS. NAMMAR:

4    Q    And if you could explain this.

5    A    Again, you'll see where right after the waiver of rights,

6    I asked him if he understood and if he could -- and I read this

7    out as well, and he initialed and -- and put checkmarks on both

8    of 'em.

9          And then you could see, I was the first one that -- that

10   also was another indication that I was reading to him because I

11   would be the first one to sign it.  And it was witnessed and

12   signed by Special Agent Fujimoto, which is right underneath my

13   signature.  Approximately the time 7:59 p.m. is when we -- we

14   actually signed it, finished signing it and reading it out to

15   him.

16   Q    Okay.  And then who signs this form, where it says

17   "signed"?

18   A    Other than myself and Special Agent Fujimoto, Keoni Holi

19   did.  To the right.

20   Q    So that's Keoni Holi's signature on that line?

21   A    Yes, ma'am.

22   Q    And did you witness him sign that?

23   A    I did.

24   Q    Did he waive his rights?

25   A    Yes.

1              MS. NAMMAR:  All right.  We can take Exhibit 62 down.

2   BY MS. NAMMAR:

3   Q    And he agreed to speak with you; is that correct?

4   A    Yes.

5   Q    What did he tell you?

6   A    Initially we asked him if -- if he knew what was

7   transpiring.  He said -- approximately he said yes, he knew.

8        And then we asked him to go into more detail, and that's

9   kind of when we noticed he wasn't being as forthcoming.  So we

10  decided to just stop the -- the -- the interview at that point

11  and turn our attention to go interview Blaine Jacintho to

12  further the investigation and to possibly come back.

13  Q    Okay.  So was Blaine Jacintho arrested at Magic Island

14  that evening?

15  A    Yes.

16  Q    And was he brought to the federal building?

17  A    Yes, he was.

18  Q    And did you have occasion to interview him?

19  A    Yes.

20  Q    Did you advise him of his rights?

21  A    Yes.

22              MS. NAMMAR:  If we can show the witness only

23  Government's Exhibit 65.

24              THE COURT:  You may.

25  BY MS. NAMMAR:

1  Q    Do you recognize this?

2  A    I do.

3  Q    And how are you able to recognized it?

4  A    Once again I've -- I've got my name, TFO R. Lopez.  And

5  then you've got my signature.

6        And as I did before, I -- in this -- I had him put his

7  initials and checkmarks as I read it out loud to him.

8  Q    And what is this?

9  A    This is his advice of rights.

10 Q    Right.  Have any changes been made to this form other than

11 the exhibit sticker and Bates stamp number?

12 A    No, no changes.

13 Q    And so is this a true and accurate copy of the advice of

14 rights form that you presented to Blaine Jacintho on the

15 evening of February 1st?

16 A    Yes.

17           MS. NAMMAR:  Government moves to admit Exhibit 65.

18           MR. HIRONAKA:  No objection.

19           THE COURT:  65 --

20           MR. SINGH:  No objection, Your Honor.

21           THE COURT:  65 is admitted.

22           MS. NAMMAR:  If we could publish to the jury, please.

23           THE COURT:  You may.

24           (Government Exhibit 65 received in evidence.)

25           MS. NAMMAR:  And if he with could zoom in on the top

1    half.

2    BY MS. NAMMAR:

3    Q    And please describe for the jury what you did.

4    A    I had a -- I had this copy given -- or this original given

5    over to Blaine, and I had another copy that I would read it and

6    have him follow along as I read out loud.

7         An again, normal practice for me was to have him initial

8    as I read each line to him and have it checked off.

9    Q    Okay.  And if we could see the bottom.

10        So the initials, those are whose initials?

11   A    Yes.

12   Q    Whose initials?  I'm sorry.

13   A    Blaine Jacintho.

14        MS. NAMMAR:  Okay.  And if we could see the bottom of

15   the -- zoom in on the bottom of the form.  I'm sorry.

16   BY MS. NAMMAR:

17   Q    And if you could explain the bottom of this.

18   A    My signature.  As you could see, it's the first witness,

19   and I had, again, Special Agent Fujimoto as my second witness.

20   And over to the right we had Blaine Jacintho sign, and that is

21   his signature.

22   Q    Okay.  And by his signature, what's he indicating?

23   A    That he understood what I read to him and he was waiving

24   his rights.

25   Q    And did he agree to speak you?

1    A    Yes.

2          MS. NAMMAR:  All right.  We can take that down.

3    BY MS. NAMMAR:

4    Q    At some point in your interview with Mr. Jacintho, after

5    advising him of his rights, did you seek his consent to search

6    anything?

7    A    Yes.

8    Q    And I'm showing you what's been marked as Government's

9    Exhibit 67.  For the witness only, please.

10          THE COURT:  You may.

11   BY MS. NAMMAR:

12   Q    Do you recognize this?

13   A    I do.

14   Q    And how are you able to recognized it?

15   A    I see my signature and --

16   Q    What is this?

17   A    This is a consent to search.  And this one in particular

18   is he agreed to search --

19   Q    Okay.

20   A    -- his phone.

21   Q    Just a second.  Consent to search.

22          Other than the exhibit marker at the bottom and the Bates

23   stamp number, has this document been altered in any way from --

24          I'm sorry.  Which date -- what time -- what day did you

25   present this to Mr. Jacintho?

1    A    On February 1st, 2021.

2    Q    And so other than the -- I'm sorry.

3         Other than the exhibit number and the Bates stamp, has

4    this document been altered in any way from February 1st, 2021?

5    A    No.

6    Q    And it's a true and accurate copy of the consent to search

7    form that you presented to Blaine Jacintho?

8    A    Yes, it is.

9              MS. NAMMAR:  At this time the government moves to

10   admit Exhibit 67.

11             MR. HIRONAKA:  No objection.

12             MR. SINGH:  No objections.

13             THE COURT:  67 is admitted.  May be shown to the

14   jury.

15             (Government Exhibit 67 received in evidence.)

16   BY MS. NAMMAR:

17   Q    And if you could zoom in on the top half of this form,

18   please.  And if you could explain what you sought consent for.

19   A    We asked that he give us -- or if he was okay with giving

20   us permission to -- to review his phone.  He said yes, and we

21   asked him, okay, give us a description of the phone, phone

22   number.  And additionally, we used the same one to say can we

23   also check the white rental Caravan, and he said yes.

24        And then we said, okay, is there a pass code.  He said

25   yes.  I said you could please put it in there for us, and

1    that's what the last information states.

2    Q    Okay.  And what phone number is that?

3    A    That is the phone number that we would -- we used to ping.

4    And this is also the number that -- that Roscoe would use to

5    call and make -- make the deal.

6    Q    When you made the recorded calls, was that the number that

7    was dialed?

8    A    Yes.

9    Q    Okay.

10          MS. NAMMAR:  If we could zoom out and zoom in on the

11    bottom half of the form.

12    BY MS. NAMMAR:

13    Q    And then if you can -- what -- or whose signature is on

14    that line?

15    A    The first signature, it would be Blaine Jacintho's.

16    Q    And that's the line that indicates signature?

17    A    Yes.

18    Q    Correct?

19          And witnesses?

20    A    The first witness is myself.  That's my -- that's my

21    signature.  And then underneath is Special Agent Fujimoto as my

22    second witness.

23    Q    Okay.  And what was Mr. Jacintho indicating by signing his

24    signature?

25    A    That he was giving us permission to search his phone and

1    target vehicle.

2    Q    And was his phone recovered from the vehicle?

3    A    Yes, it was.

4    Q    Okay.

5              MS. NAMMAR:  We can take that down.

6    BY MS. NAMMAR:

7    Q    After advising Mr. Jacintho of his rights, did he make any

8    statements to you?

9    A    Yes.

10   Q    And what did he tell you?

11   A    He started off with stating that he was in Oahu to meet up

12   with a male he -- he called Ros, and we knew Ros was -- that it

13   was the same person we were using as our cooperator, Roscoe

14   Agapay.  He stated that he was to meet with him to do a -- to

15   do a drug transaction at Ala Moana Beach Park.  Yeah.

16   Q    Did he tell you what kind of drug transaction?

17   A    Yes.  He said -- it's okay.  Methamphetamine, for ten

18   pounds.  And he stated it was going to be sold for 65,000.

19   Q    Okay.  Did he tell you anything else?

20   A    He stated, when -- yes.  He stated how -- when they

21   arrived that he was staying with his sister and that after an

22   argument they decided to stay at the -- at another place.  He

23   also stated that throughout the day he was waiting for a -- for

24   a package to arrive.  In this case, the illicit drugs.

25             He knew it would be sent to his sister's residence, which

1    is Makaha.  It's an area that we had pinged earlier that day

2    and where officers observed the vehicle in the vicinity of that

3    address.  After making checks, it was an address where his

4    sister stayed.  He mentioned also that when the package arrived

5    it was left outside the -- the doorstep area, fronting the

6    doorstep area, and it was retrieved and walked back into the

7    target vehicle, where they proceeded to drive in town, towards

8    the Honolulu area, with ten pound of the crystal meth.

9        He actually also mentioned that they -- they stopped at

10   a -- at a -- in a house in Palolo.  In Palolo Valley area, they

11   stopped over there.  He mentioned that he had used his phone to

12   record the -- the container the meth was placed in.  He said

13   he -- he used it and he was able to count out loud.  You could

14   hear him also in the voice counting out loud as he was counting

15   the -- the illicit drug inside the container.

16   Q    Did you observe that video on his phone that night?

17   A    I did.

18        MS. NAMMAR:  And if we could publish Government's

19   Exhibit 71B.

20        THE COURT:  You may.

21        (Recording played.)

22   BY MS. NAMMAR:

23   Q    Is this the video that Mr. Jacintho was explaining to you?

24   A    Yes.

25   Q    And did you see anyone in that video?

1   A    I did.

2   Q    Did you recognize anyone in that video?

3   A    Yes.

4   Q    And who did you recognize in that video?

5   A    Keoni Holi sitting -- in the seated position near the box.

6   Q    And what did you recognize about him?

7   A    What caught my initial attention was the red shirt.

8   Q    And if I could show you, one moment --

9        Okay, I'm sorry.  Did Mr. Jacintho tell you anything about

10  where he received the package?

11           MS. NAMMAR:  We can take that exhibit down.

12  A    Yes.  He mentioned that he had a contact or source in --

13  across the border, down south, and that he named the person as

14  a source name as Amigo, and that he had -- he would send him

15  a -- he would send him -- he -- he would give him an address

16  and a name to send it to, which is what Amigo did.  And that

17  happened to be the same address, the sister's address.

18  BY MS. NAMMAR:

19  Q    And did he state anything about whether he owed Amigo

20  anything?

21  A    He stated that he owed Amigo money and by sending him the

22  proceeds of this transaction that it would clear him.  Those

23  were his words.  It would clear him from a debt that he owed

24  him.

25  Q    And did he tell you how much?

1    A      Fifty-five, 55,000.

2    Q      After interviewing Mr. Jacintho, what did you do next?

3    A      After we concluded the -- the interview, we proceeded to

4    go back to Keoni Holi.  We had learned more information after

5    further investigation and also with the knowledge of the phone

6    and what was contained in it with the video we just went over.

7    We proceeded to -- to go talk to Keoni and see if we could

8    perceive more of the information from that angle as well.

9    Q      And then what happened?

10    A      So when we walked in, we briefly just asked him some

11    questions.  He -- again, I didn't feel like he was too -- in my

12    opinion was forthcoming, so I decided to show him Jame --

13    Blaine Jacintho's phone.  He was -- he reviewed it in my

14    presence.  And at that time I had Officer Lee with me from HPD.

15    He was my witness.  And we observed him watching it.  And then

16    when it was done, I asked him -- I asked him, you know, were

17    you in that room?  Do you know this -- have you seen this

18    video?  He said that was me.  I was near the -- I was sitting

19    near the box.  I asked him anything else?  And he said, you

20    know, at that point he was -- he did not want to say anything

21    else.

22    Q      Did he tell you anything regarding the parking lot at

23    Magic Island?

24    A      We asked him, and he did say that he was there and he --

25    he knew why he was there is what he said.

1          Because we asked him do know you why, do you know why you

2     were there?  And he said yes, I know why I was there.  That's

3     all he -- he was willing to tell us.

4     Q    And Mr. Lopez, do you see the individual that you

5     interviewed, Blaine Jacintho, on the night of February 1st, in

6     the courtroom today?

7     A    Yes.

8     Q    And if you could, describe an article of clothing he's

9     wearing.

10    A    He's the only one wearing the face -- black face mask and

11    the aloha green shirt.

12    Q    And where is he seated?

13    A    Sitting right there, next to a male with a gray suit.

14    Q    Behind me?

15    A    Right behind.

16    Q    Behind the podium?

17    A    Yeah.

18          MS. NAMMAR:  Can the record reflect that the witness

19    has identified the defendant Blaine Jacintho?

20          THE COURT:  It will.

21          MS. NAMMAR:  One moment, please.

22    BY MS. NAMMAR:

23    Q    With regards to Mr. Holi's interview, you stated that

24    Jared Lee was present for the second part of that; is that

25    correct?

1   A    That's correct.

2   Q    And during Blaine Jacintho's interview, do you know who

3   was present with you?

4   A    Yes.  It was Special Agent Fujimoto and also Officer Lee.

5   Q    And was anyone else present that you can recall?

6   A    Yes.  KPD Officer Tyler Yates.

7          MS. NAMMAR:  No further questions, Your Honor.

8          THE COURT:  Thank you.

9          Ladies and gentlemen, let's take a stretch break for

10  now, just to -- for full disclosure we're going to take a break

11  at 12:30.  That's going to be our longer break for the

12  morning -- for the day.  But let's take a stretch break right

13  now, and we'll then you turn the witness over to Mr. Hironaka.

14         So let's stretch.

15         (Pause in proceedings.)

16         THE COURT:  Are we ready, Mr. Hironaka?

17         MR. HIRONAKA:  Yes.

18         THE COURT:  All right.  You may proceed.

19         MR. HIRONAKA:  Thank you.

20                     CROSS-EXAMINATION

21  BY MR. HIRONAKA:

22  Q    Mr. Lopez, good -- good afternoon.

23  A    Good afternoon, sir.

24  Q    I'm going to ask you some questions, but I'm going to do

25  it a little bit out of order.  Okay?  So forgive me.

```
 1              MR. HIRONAKA:  Could we publish Exhibit 67 again?

 2              THE COURT:  You may.

 3              MR. HIRONAKA:  Appreciate that.  Thank you.

 4              And if we could (indicates), just the -- that top

 5    half.  The top portion.

 6              Thank you.

 7    BY MR. HIRONAKA:

 8    Q    Okay.  This was the consent to search form that you said

 9    you went over with Mr. Jacintho, correct, sir?

10    A    Yes.

11    Q    Okay.  And the -- the handwriting in the upper portion --

12    so not including pass code 5555 -- who wrote that, the phone

13    number, phone, black phone?  Who -- who wrote that?

14    A    I don't have a -- I don't recall that one.

15    Q    Okay.  So you're not sure if it was the -- well, let's

16    clarify.

17              Who was present when this consent to search form was gone

18    over with Mr. Jacintho?  You were there?

19    A    Yes, sir.

20    Q    Okay.  Anybody else?

21    A    Right.  Special Agent Fujimoto, Officer Lee, and Kauai

22    Police Officer Tyler Yates.

23    Q    So four law enforcement and Mr. Jacintho?

24    A    Yes.

25    Q    Okay.  You don't have a memory, though, of who wrote that
```

1    top portion?

2    A    Not on top of my head, no.

3    Q    Okay.  How about the pass code 5555 and the dots.  Was

4    that the same person, or do you not recall?

5    A    I don't -- I do not recall.  No.

6    Q    Okay.  All right.

7              MR. HIRONAKA:  We can take that down.  Thank you.

8    BY MR. HIRONAKA:

9    Q    The -- the interview that you described having with

10   Mr. Jacintho -- and were you primarily the one doing the

11   questioning?

12   A    It wasn't just myself.  It was Fujimoto and Tyler, Tyler

13   Yates.  So, I mean, we -- I would ask questions, but that was

14   not -- I guess because I was the case agent, I would -- I would

15   say yes, I was the primary.  But I had other -- I had officers

16   with me that were asking questions as well.

17   Q    Now, when -- and, I'm sorry, could you clarify again?

18             When you say you were the case agent --

19   A    Mm-hmm.

20   Q    -- you were the overall (gestures) agent in charge of the

21   investigation?

22   A    My roles and responsibilities was the operation.  And I

23   was -- so to answer your question, yes, overall, I would be

24   the -- the lead.

25   Q    Okay.  And so the operation to -- to do the -- the buy --

1    A    Mm-hmm.

2    Q    -- at Magic Island --

3    A    Yes.

4    Q    -- that was coordinated primarily by -- under your

5    direction and supervision?

6    A    Myself and my secondary, Lee, would be your -- in this

7    case would be Fujimoto.  So, yes, both of us.  We worked the

8    case, but I would be the main one.  If you're looking at our

9    system, I would be the lead.  But again, depending on what --

10   what's go on and what needed to be done, Special Agent Fujimoto

11   would also help.

12   Q    Okay.  Were you -- you were present at Magic Island

13   February 1, 2021?

14   A    Yes.

15   Q    And you were in a nearby vehicle?

16   A    Yes, I was.

17   Q    Okay.  And then after the arrests were made -- were you

18   part of the arrest team, by the way?

19   A    Not -- I was not part of the arrest team.

20   Q    You were just present when it happened?

21   A    Yes.

22   Q    Okay.  And then you told us that you --

23   A    Sorry.  I -- after they arrested him, I was driving up.

24   So I would say not exactly at the same time because my -- I was

25   driving a blue and white, and I had to make sure that the scene

1  was also safe and that everybody -- we were there.  So --

2  Q    Oh, I see.  You were in a marked police vehicle?

3  A    Correct.

4  Q    Okay, in the area?

5  A    Yes.

6  Q    So not -- not at, physically at Magic Island when the

7  arrest were -- or when the --

8  A    While the arrest was going on, I was proceeding.  When

9  I -- over the radio I could hear it was already in action.

10  Q    Gotcha.

11  A    So when I arrived they already had the individuals in

12  custody.

13  Q    And you said that you transported Mr. Holi?

14  A    Yes.

15  Q    Okay.  Was anybody else in the car with you and Mr. Holi?

16  A    No.

17  Q    And that transport was to the federal building?

18  A    You know, being that it was -- I'm trying to think if

19  there was anyone else.  I -- if it's okay, I'd just like to say

20  I'm not really sure about that one actually either.  So --

21  Q    Okay.  How about where you transported?

22  A    Yes.  It was the Honolulu district office.

23  Q    Which is where, sir?

24  A    It would be right across this building, which is right off

25  300 Ala Moana.

1    Q    On the makai side?

2    A    Yes, sir.

3    Q    Okay.  So not -- not HPD headquarters or anything like

4    that?

5    A    No, sir.

6    Q    Okay.  And separately Mr. Jacintho was also transported to

7    that same location?

8    A    Yes.

9    Q    Now, this location, it's the district office for the DEA?

10   A    Yes.  Correct.

11   Q    Okay.  So this is where Honolulu DEA headquarters are?

12   A    From my understanding, yes.

13   Q    And the interviews that you conducted or attempted to

14   conduct that day, could you tell us, how is that -- is it --

15   are there interview rooms?

16   A    Right.  There -- so in this particular operation we had

17   two interview rooms available, one for Jacintho and the other

18   one for Holi.

19   Q    The interview rooms have recording devices available?

20   A    Not to my knowledge.  So not -- and when I say recording

21   device, I don't know if they're in the room or -- but it's

22   got more common practice that we ask, and we had a recording

23   device on us.  Or one of us would have one.

24   Q    Okay.  Let me ask it to you a different way.

25   A    Right.

1   Q    Do you have the ability at the office, the district

2   office, to audio record interviews?

3   A    Yes.

4   Q    Do you have the ability at the district office to video

5   record interviews?

6   A    I'm not aware how because I never had a case like that,

7   but I -- it'd be hard to answer yes or no because I'm not sure.

8   But I would -- I would think yes --

9   Q    Okay.

10  A    -- in this case.

11  Q    Is the audio and/or audio-video recording equipment at --

12  it's kept at the district office, correct?

13  A    You know -- again, to my knowledge, I never had to use one

14  in the time that I was with him, but I would say yes, I

15  would -- I would -- I would assume yes in the situation.

16  Q    Okay.  The interviews that were conducted, though, in this

17  instance --

18  A    Mm-hmm.

19  Q    -- for this case, were neither audio nor audio-video

20  recorded?

21  A    We asked Jacintho if he wanted to have -- have the

22  interview recorded, and he acknowledged that he did not.

23  Q    Are you -- are you suggesting, sir, that you did not audio

24  or video record it because Mr. Jacintho didn't want you to?

25  A    We asked him if he wanted it recorded.  He said no.  So --

1  Q    Okay.  My question is:  Are you saying that the only

2  reason why you didn't audio or video record it is because

3  Mr. Jacintho said that he did not want it to be?

4  A    I would say yes.  And I also had officers and witnesses

5  next to me.  So I was comfortable with -- with not recording if

6  that's what he didn't -- what he preferred.  Because I wanted

7  to make sure he was comfortable enough to be cooperative and

8  talk.  And by having three other officers, I was comfortable

9  with having witnesses and -- and writing down our notes.

10  Q    You're saying that if he had not indicated that that you

11  would have audio or video recorded the interview, despite never

12  having done it before?

13  A    Well, my partner, Fujimoto, he had a recording device.

14  And he was given the opportunity if he wanted it recorded or

15  not.  When he said he did not, we just -- we went -- we moved

16  forward to ask him questions, so.

17  Q    Are you guys generally in the practice of conducting your

18  interviews the way that your subject interviewers --

19  interviewees want them conducted?

20  A    I'm not sure how to answer other than I feel comfortable

21  knowing there's different practices and techniques that we can

22  use to make sure they're comfortable to -- to be cooperative

23  and not -- he did not want to be recorded.  I felt that, okay,

24  we would proceed with a normal -- other normal practice is to

25  take our notes and turn 'em in as evidence.

1  Q    Mr. Holi indicated no such desire to not have his

2  interview recorded, correct?

3              MS. NAMMAR:  Objection, Your Honor.

4              THE COURT:  What's the basis?

5              MS. NAMMAR:  He -- foundation.

6              THE COURT:  Overruled.

7  BY MR. HIRONAKA:

8  Q    Do you understand my question?

9  A    Can you repeat it, please?

10 Q    Okay.  Mr. Holi expressed no desire not have his interview

11 recorded, correct?

12 A    When we asked him, he said no.  That was the only time.

13 Q    You asked Mr. Holi that as well?

14 A    We asked him if he wanted the interview recorded.

15 Q    Mister -- Mr. Holi?

16 A    Sorry.  Not Holi.  Sorry.  The interview.

17 Q    Yeah, my question is Mr. Holi.

18 A    So Holi, I don't recall asking him.

19 Q    Okay.  And yet his was also not recorded, correct?

20 A    Correct.

21 Q    So all we have to go off of as to what happened in that

22 interview is what either you or any other law enforcement or

23 Mr. Jacintho would testify to, correct?

24 A    Correct.

25 Q    You testified when Ms. Nammar asked you a question

1   about -- you said that Mr. Jacintho said that he owed somebody

2   named Amigo money and that by sending the would-be proceeds

3   from this transaction, the February 1, 2021, that would clear

4   him, correct?

5   A    Yes.

6   Q    And you said that amount was $55,000?

7   A    Yes.

8   Q    Are you certain?

9   A    Yeah.  I said that, yes.

10  Q    Now, I want to go backwards.  You mentioned a cooperator

11  named Roscoe Agapay.  And let me start with this question:  How

12  long -- you talked about the surveillance that you conducted on

13  Mr. Jacintho on Kauai, August 2020?

14  A    Yes.

15  Q    Okay.  Was that your first involvement in the

16  investigation regarding Mr. Jacintho?

17  A    Yes.  I first learned from Jacintho, because at that time

18  Perry Lardizabal, he was our TFO, he was in charge of this case

19  initially.  So I first learned details and information about

20  this case from Perry Lardizabal, and that's when we went to

21  Kauai, yeah, on the fourth.

22  Q    So your first involvement was sometime in that -- or just

23  prior to that August 2020 time frame?

24  A    Yeah.  Approximately, yes.

25  Q    Okay.  And am I correct when I'm saying that

1    essentially -- what it sounds like you're describing is Agent

2    Lardizabal is kind of handing off the baton to you as far as

3    the TFO or the case agent?

4    A    The way I remember it was -- it was actually given

5    initially to TFO Akana, and I was the backup to assist him.

6    Q    Okay.  How long was he with TFO Akana before --

7    A    That, I don't recall.  I'm not -- it wasn't very long at

8    all.

9    Q    Okay.  When you first got involved in that August 2020

10   time frame, was Agapay already a cooperating source in this

11   investigation?

12   A    Yes.

13   Q    Okay.  So you were aware of him when you came on the case

14   and you became familiar with the details?

15   A    Correct.

16   Q    Okay.  And were you aware of the circumstances of him

17   becoming a cooperator in the first place?

18   A    I -- I will mention something, if just to clear it up.  I

19   was aware of Ros from other cases that I worked on.  But at

20   that time I wasn't -- I wasn't aware that he was also

21   cooperating in this particular case, as a -- as an informant.

22   Q    Oh, I see.  It was only after you started working on this

23   case that you learned he was a cooperating informant?

24   A    I think I -- if I recall right, I believe I -- I

25   remember -- you know, I remember him being a cooperator more

1  towards this case when we debriefed him, the -- the group

2  supervisor, myself and Fujimoto.  And that might have been

3  around -- close to the same time you're talking about, right

4  around -- between October and December.

5  Q    Of 2020?

6  A    Yeah.  And we were just given information that he could

7  talk to -- or was able to talk and had some conversations with

8  Blaine.

9  Q    Okay.

10  A    And that's kind of when I knew, for sure.

11  Q    Okay.  And what were the circumstances of Mr. Agapay

12  becoming a cooperator in this case in the first place, do you

13  know?

14  A    Yeah.  He was given -- if he was to cooperate, he -- and

15  when he had to go to court to face his responsibilities of

16  the -- also drug, illegal drug, illicit crimes that had

17  occurred and he was arrested for, that there would be some kind

18  of a perhaps leniency or something to talk about on his behalf

19  if he was to cooperate with -- with DEA.

20  Q    Okay.  So you said a few things there.  Let's try and

21  unpack that.

22  A    Yeah.

23  Q    So you're -- am I correct in saying that at some point

24  prior, Agapay got busted?

25  A    Yes.

1    Q    Okay.  For trafficking drugs?

2    A    Yes.

3    Q    Okay.  And do you know when that was?

4    A    I don't recall, the top of my head, no.

5    Q    Do you know by which agency he got busted in the first

6    place?

7    A    Right.  It was DEA, and at that point there was Perry

8    Lardizabal who was running it, and I can't her last name, but

9    another agent named Abby that I remember.

10   Q    Okay.  And that transaction that he got busted for, that

11   did not involve Blaine Jacintho, correct?

12   A    Correct.

13   Q    Okay.  So after he gets busted, he becomes a cooperating

14   informant for the DEA?

15   A    Yes.

16   Q    Okay.  And then he at some point, do you know when he

17   started becoming a cooperating informant?

18   A    So I -- you know, I wouldn't have exact days or even an

19   approximate month, but I did do a case that he was an informant

20   for something else, and it was before this case so --

21   Q    Okay.

22   A    I'm not sure how many months before.

23   Q    Okay.  So not involving Blaine Jacintho?

24   A    Correct.  It was a different case.

25   Q    Okay.  So he's cooperating, and he's just basically

1  bringing you guys other people then?

2  A    I would -- see, again, he at that time, Perry Lardizabal,

3  that was his source.  So I don't know how that went.  All I

4  know is that I did some other work that I was given all those

5  responsibilities for other cases involving Ros and an

6  informant.

7  Q    And you said something else, too, about his cooperation,

8  trying to -- trying to help him when -- you know, comes his

9  time to be sentenced or whatnot.

10       Do you know if he's been sentenced already for his case?

11 A    No, I don't know.  It's -- this particular case has been

12 over a year and a half or so, maybe only -- even up to two

13 years, approximately.  I'm not sure.  Once I was -- once I went

14 to the mainland, I don't know any -- any other information or

15 what happened, so I don't.

16 Q    Okay.  And when you say that he, you know, was cooperating

17 to help himself out, what do you mean by that?  Like what

18 would, in your experience, what would somebody typically get if

19 they're cooperating with the DEA?

20 A    I definitely cannot answer that.  I wouldn't know.

21 Q    Okay.

22 A    That's not up to me or -- or anyone else, other than the

23 courts.

24 Q    Now, the messages that we were looking at when Ms. Nammar

25 was asking you questions, the ones between Agapay and Ms. --

1    and Mr. Jacintho --

2    A    Mm-hmm.

3    Q    -- are the ones that we were looking at the first set of

4    message exchanges between them or -- or were there ones prior

5    to that?

6    A    So you guys -- I was shown today's text was -- was

7    right -- those that I was seeing today, that I saw, was right

8    after the recorded audio that was done on January 13, 2021.

9    Those particular texts were soon after that.

10   Q    Okay.  The call we listened to, the recorded call, were

11   there other calls that were made by Agapay to Jacintho under

12   the direction and supervision of the DEA?

13   A    To answer that, I'm not -- I'm -- I don't know.  I

14   couldn't tell you a date, but I am going to say possibly yes.

15   But for me, the one we heard today was the only one that I know

16   about.

17   Q    Okay.  As the -- as the case agent, though, you would be

18   aware if there are other calls, correct?

19   A    When they was transferred over to me, it had to have been

20   somewhere around November/December of 2020.  And this started

21   moving fairly quickly, soon after I -- I received the case and

22   became the case agent.

23        So everything was handed over to me, that I'm aware of.

24   And I -- I scanned through as much as I could to try to come up

25   to speed.  But again, this case picked up right after I got it,

1  right after, I believe, the CS debriefing.  It became really

2  apparent that we had to do something right away and make this a

3  priority.

4  Q    Let me ask it to you this way.  After you became in

5  this -- I think you're talking about this October/November 2020

6  time frame, correct?

7  A    Yes.

8  Q    Okay.  After you basically became the case agent, got up

9  to speed --

10 A    The best I could, yeah.

11 Q    Was this -- was this originally January 22nd, 2021

12 transaction, was that already set up when you came on

13 October/November 2020?

14 A    Yes.  If I'm understanding correctly, the -- the audio

15 recording happened on January twenty -- sorry.

16     I think it actually hap -- so January -- so when I did the

17 audio recording was January 13th.

18 Q    Right.

19 A    And so we did have a briefing before that, I think

20 December the 4th of 2020.  And in there is when we learned that

21 Roscoe Agapay had been in contact, and he mentioned that he

22 could make a purchase of illegal drugs from Jacintho.

23 Q    Okay.  So just to be clear --

24 A    Mm-hmm.

25 Q    -- this is a transaction, a purchase, being set up by

1  Roscoe Agapay.

2  A    No.  This is -- with our -- with our instructions and --

3  and in our control, we asked him to make a call and -- and try

4  to see if he can set up a transaction.

5  Q    Okay.  So under the guidance and supervision of the DEA --

6  A    Yes.

7  Q    -- Roscoe Agapay is initiating a drug buy from Blaine

8  Jacintho?

9  A    Yes.  And under our supervision, yes.

10 Q    Under -- okay.

11             MR. HIRONAKA:  Okay, Mr. Lopez.  Thank you.

12             Your Honor, that's all I have.

13             THE COURT:  Thank you.

14             Mr. Singh.

15             MR. HIRONAKA:  Thank you.

16             THE COURT:  Actually, Mr. Singh, how long do you

17 think you'll be?

18             MR. SINGH:  About ten minutes.

19             THE COURT:  Okay.  Why don't we go ahead and take our

20 longer recess now.

21             MR. SINGH:  Okay.

22             THE COURT:  Just because we're pretty close.

23             So ladies and gentlemen of the jury, we're going to

24 take about a 25-minute, 30-minute recess for -- so this is your

25 longer recess for the day during which you can have your lunch,

1   snack, whatever.  I think you go back down to the jury assembly

2   room as you usually do.  As always, don't talk to each other

3   about the case.  Don't conduct any research.  And we will see

4   you in about 25 to 30 minutes, so close to one o'clock.  Thank

5   you.

6               COURTROOM MANAGER:  All rise for the jury.

7               (The jury was excused at 12:27 p.m.)

8               THE COURT:  You may step down.

9               THE WITNESS:  Thank you.

10              THE COURT:  Thank you.

11              THE WITNESS:  Should I leave these exhibits?

12              THE COURT:  We can collect them, yes.  Thank you.

13                                      (Witness excused.)

14              THE COURT:  All right.  Is there anything that needs

15  my attention?

16              MS. NAMMAR:  Nothing from the government.

17              MR. HIRONAKA:  Not from me, Your Honor.

18              MR. SINGH:  No, Your Honor.

19              THE COURT:  All right.  So we'll see you all close to

20  one o'clock.  Thank you.

21              COURTROOM MANAGER:  All rise.

22              This Honorable Court now stands in recess.

23              (The proceedings recessed at 12:28 p.m. until 1:06 p.m.)

24              (Open court in the presence of the jury.)

25              THE COURT:  Thank you, everyone.  You may be seated.

1            Ladies and gentlemen, I'm sure you might have seen

2    Mr. Jacintho and Mr. Holi show up a little later.  It is not

3    their fault, so please do not hold that against them in any

4    way.  It was a logistical thing that they had no control over.

5    So please don't consider that in any -- in any way.

6            And, Mr. Singh, you may proceed.

7            MR. SINGH:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. SINGH:

10   Q    Good afternoon, Mr. Lopez.

11   A    Good afternoon, sir.

12   Q    You earlier testified that in August of 2020 you took a

13   trip to Kauai?

14   A    Yes.

15   Q    And when you went to Kauai, what did you learn on that

16   trip?

17   A    The first thing I learned is my initial observations of

18   Jacintho.  So it was the first time I saw him, and I learned

19   that he was staying at the -- at -- at some -- some hotel,

20   resort or hotel.  And -- Kauai.

21       I also saw a silhouette, and from a distance I was able to

22   see his other half, his girlfriend, from afar, getting in and

23   out of vehicles.

24       I also observed, you know, him interacting with other

25   associates or other individuals at the time, which is another

1    of my observations.

2    Q    Did you notice any illegal activities being -- him being

3    engaged in?

4    A    You know, we didn't pick up any evidence, but it was

5    alleged when -- in some of my observations that there was

6    constant movement with vehicles and personnel while he was

7    going to -- staying in a certain hotel, going up and down, in

8    particular, the downstairs room.  And like I said, vehicles

9    driving by, and he would approach, I observed that.  And to me

10   and through some of my experience, again, it would be alleged,

11   but there was activity that made me feel like there was

12   something illegal.

13   Q    But you did not see anything when you were there, right?

14   A    I saw like nothing in the actual, like I say, the product

15   of anything that I could observe.

16   Q    Okay.

17   A    But I was able to see hand-to-hand exchanges, specifically

18   one instance when a truck drove by fronting the resort, and I

19   observed Jacintho walking up to it, doing some talking.

20        This was on the road, not parked over or anything, and

21   there would be a transaction and --

22   Q    Well, walking up to a truck is not against the law --

23   A    No.

24   Q    -- right?  Okay.  And while you were there, did you see

25   Mr. Holi, by any chance?

1  A    No.  No, sir.

2  Q    You did not?

3  A    No, I did not.

4  Q    Okay.  So your next encounter with them was at the

5  Pipeline?

6  A    My first encounter, yes, from Holi, yes.

7  Q    Do you see Mr. Holi at the Pipeline?

8  A    At the time I didn't who he was, but, yes, I observed the

9  same description and same -- yes, and it was a photo that I was

10  able to take, so, yes, it was --

11  Q    Okay.  Could you please tell me, who else did you observe

12  at the Pipeline?

13  A    I remember seeing Jacintho, and I remember seeing at the

14  time what appeared to be his -- his other half, and they were

15  all at the beach.

16  Q    Okay.

17  A    It appeared like they were getting ready to leave,

18  actually, when I arrived and I first saw them.

19  Q    Now, you have named me so far three individuals.

20  A    Yes.

21  Q    Jacintho, Holi, and his other half.  Anybody else?

22  A    Not that I can recall, no.

23  Q    Did you see any kids?

24  A    Again, I -- I know he's -- he has kids because I observed

25  'em in Kauai, but I don't recall that particular day when I

1   was -- when we were doing surveillance at the Pipeline.

2   Q    Okay.  So, now, let's talk about February 1, 2021, the

3   date of the incident.

4   A    February 1st?  Okay.

5   Q    Yeah.

6        So you were the lead officer on this case?

7   A    I would say the lead, the -- the case agent.  So --

8   Q    Right.  Okay.  And you did an interview with Mr. Holi?

9   A    Yes.

10  Q    Now, you testified earlier that Mr. Fujimoto had a device

11  that they could do a recording, correct?

12  A    Mm-hmm.

13  Q    And you also testified that Mr. Jacintho declined to be

14  recorded?

15  A    Yes.

16  Q    Did you ask Mr. Holi whether he could be recorded?

17  A    I remember asking -- or hearing Fujimoto asking Jacintho,

18  but for whatever reason, I don't recall him asking or myself

19  asking Holi.  So I don't know if it was asked.  I don't recall.

20  Q    So you also testified earlier that it was old school, you

21  guys did not have -- did not record things?

22  A    I don't know -- I'm not sure if I said old school.  I

23  mean, if I did, I -- that's okay.

24       Well, I mean, we use recordings, out on the field,

25  especially in particular if we're talking to a confidential

1    informant, if we're doing interviews.  But again, we'll -- it's

2    not -- it's not im -- it's not uncommon to not record 'em if

3    we're going to be taking notes and you have other officers as

4    well as witnesses.

5    Q    So you do not recall whether you asked him or not, but the

6    recording did not take place?

7    A    I don't re -- I remember asking Jacintho or being asked by

8    one of us, but I don't recall at all if we asked Holi.  If we

9    did, I don't -- I don't recall that.

10   Q    But you do recall Mr. Holi telling you that he knew why he

11   was there at Magic Island?

12   A    Yes, I do.

13   Q    What does that mean?

14   A    I'm not sure how to answer that.

15            MR. SINGH:  I have nothing further.

16            THE COURT:  Thank you.

17            Redirect.

18            MS. NAMMAR:  Yes, Your Honor.

19                         REDIRECT EXAMINATION

20   BY MS. NAMMAR:

21   Q    Mr. Hironaka was asking you questions about asking Blaine

22   Jacintho if he wanted the interview recorded.

23        If Mr. Jacintho had asked you to record the interview,

24   would you have done so?

25   A    Yes, I would have.

1  Q    And is there a reason you -- in your experience, do you

2  know, do defendants typically ask that the interviews be

3  recorded?

4  A    Not -- they don't typically ask.  If anything, I've had

5  other instances, not so much with the DEA, but they would ask

6  if it was being recorded.  I've had -- that I can remember from

7  the top of my head, but not -- it's not common for -- to ask

8  them or ask us to record it, no, through my experience.

9  Q    And when you're conducting these interviews, is part -- is

10 your objective to make the person you're interviewing feel

11 comfortable?

12 A    Oh, yes.  Definitely.

13 Q    Mr. Hironaka asked you some questions about the --

14 Mr. Jacintho's statement to you and how much money was owed.

15      Do you recall those questions?

16 A    Yes.

17 Q    And I believe you stated that Mr. Jacintho told you that

18 he was going to pay $55,000; is that correct?

19 A    That's correct.

20 Q    Are you certain about that amount?

21 A    It's something I -- I've been reading the reports.  It's

22 something I came cross -- came across in other reports.  So

23 that's how I was able to -- to acknowledge it was about 55,

24 approximately.

25 Q    And so could you -- could that be 50,000 instead of 55?

1    A    Absolutely.  I mean, like I said, I -- I've been -- I've

2    been away from this particular case, year and a half, two

3    years, and I'm catching up with some of the reports that were

4    given to me -- just, you know, to be able to read yesterday.

5    So that's possible.

6    Q    Mr. Hironaka was asking you some questions about the

7    February 1st, 2021 drug transaction.  Do you recall those

8    questions?

9    A    If you could, please say 'em again.

10   Q    Yeah.  So I think there's some confusion about who reached

11   out to who when.

12        So in -- I believe you testified that the cooperator had

13   reached out to you in December of 2020; is that correct?

14   A    December of 2020, the cooperator.  We had a meeting with

15   him for the fiscal year coming up, for 2021, the GS -- it's a

16   GS fiscal year, the group supervisor has to meet with the

17   cooperators.  And if that's the date, I'm not sure the exact

18   date.  I think -- for some reason I think it was December 4th,

19   2020.  And then that day we learned from the cooperator, Roscoe

20   Agapay, that he had been in contact with Jacintho.  And there

21   was a conversation that -- just that he could -- he could

22   purchase.  That's Roscoe could purchase illegal drugs from

23   Jacintho.  And he -- he even mentioned that he could send a

24   runner on his behalf to pick up the drugs and make the

25   transaction.

1   Q   So just to clarify, did the cooperator tell you that

2   Mr. Jacintho had reached out to him and told him he could sell

3   him the drugs?

4   A   I don't -- it's hard to -- I wouldn't be able to

5   acknowledge if he re -- if who reached out to who.  But I know

6   there was a conversation.  I'm not sure who made the initial

7   call.  I don't -- I don't recall that.

8           MS. NAMMAR:  Okay.  One moment, please.

9   BY MS. NAMMAR:

10  Q   Based on your meeting with the cooperator on December 4th,

11  then what happened next?  After your December 4th meeting.

12  A   Okay.  After December 4th, we had a -- a second meeting.

13  It was early January.  I don't -- yeah, it was actually

14  January 13th, yes.  After learning from the December 4, 2020

15  conversation with Roscoe Agapay, we -- I guess we discussed to

16  have the next meeting.  They were supposed -- supposed to meet

17  with them January 13 and see if we could set up a -- a call

18  to -- to have a transaction of illegal drugs for payment.  And

19  it was -- all this was going to be done on the 13th, with our

20  direction and our instructions to Roscoe.

21  Q   Okay.  And so why did you -- what led you to set up

22  that -- that call?

23  A   The one -- it's the -- the 12th, 12/4/2020, that's what

24  led us.  That he made -- you know, Roscoe had made a comment

25  that he was in contact or had been in contact with Jacintho,

1  and it was a discussion that he -- he was -- he could call him,

2  and pretty much anytime, and make -- make a deal.  So that's

3  what led us to -- to the next time to meet with Roscoe, is to

4  have him shoot the call is what we call it.

5  Q    Okay.  And so during the course of performing your duties

6  in this case, did you take notes?

7  A    For the January 13th?

8  Q    Or just in general, did you take notes or write formal

9  reports in this case?

10 A    Yes.

11 Q    And what's the purpose of taking notes?

12 A    Well, in my -- my particular -- you know, if I'm looking

13 at it for myself is it helps me remember certain -- I don't

14 write the details other than bullets to help me, kind of help

15 write a report which will be written soon after.  And it just

16 kind of helps me to remember things that I may not remember as

17 I'm writing a report.

18      Also, from my understanding, it's -- if you have other

19 officers there, they should be writing notes to make sure as

20 much as possible it's captured and everything is -- it's

21 correct.

22 Q    Okay.  And this was not the only investigation that you

23 were conducting at the time, was it?

24 A    Correct.

25 Q    Would it refresh your recollection if you were to look at

1    your report to determine what you were told on December -- in

2    December to refresh your recollection as to why you acted

3    thereafter?

4    A    It would definitely help, yes.

5           MS. NAMMAR:  Your Honor, I ask permission to approach

6    the witness and show him his report.  I will show it to

7    defense.

8           THE COURT:  All right.

9           THE WITNESS:  Thank you.

10   BY MS. NAMMAR:

11   Q    If you could take a look at that, and after you're

12   finished reading it, look up at me?

13   A    Okay.

14   Q    And let me know --

15   A    (Reviews document.)  Okay.

16   Q    Does that refresh your recollection as to your meeting

17   with the cooperator in December of 2020?

18   A    Yes.

19   Q    And what happened when you met with the cooperator in

20   December 2020?

21   A    I believe I initially said it was -- my supervisor was --

22   was the group supervisor, Michael Short.  And I made a mistake.

23   I guess I felt it was Fujimoto that was with me, but it wasn't.

24   It was TFO Jim Inguwin [phonetic] who was there with me.  I --

25   and that conversation is essentially what I summarized.

1       It doesn't state in my report, and that's probably why I

2   don't remember who, who made the initial call, whether it was

3   Blaine over to -- to Roscoe or Roscoe, vice versa.

4       But in there it states that Roscoe had made contact, or

5   was in coming -- or was in communication with Jacintho two or

6   three weeks prior to this meeting and -- and in that

7   conversation he -- Roscoe had said that he could call him

8   anytime and -- and purchase any kind of -- purchase drugs.

9   Q    That who could call him anytime?

10  A    That -- that he could call Jacintho anytime.

11  Q    And did you -- in December, did you ask the cooperator to

12  do anything, in December 2020?

13  A    For this particular, no, I did not.

14  Q    After interviewing Mr. Holi and following his arrest, were

15  you able to confirm whether -- who the individual was that you

16  saw on the North Shore with Blaine Jacintho on January 30th,

17  when you conducted surveillance?

18  A    Yes.  I was able to confirm.  We -- pictures were taken of

19  the individuals, the three individuals I mentioned.  And they

20  were all sent to --

21  Q    I'm going to stop you right there.

22       I want to know if you personally, from -- did you see --

23  personally conduct surveillance on January 30th --

24  A    Yes.

25  Q    -- on the North Shore?

1   A    I did.

2   Q    And you saw two male individuals; is that correct?

3   A    Yes.

4   Q    After making the arrests, were you able -- you -- you

5   arrested two individuals that evening, on February 1st; is that

6   correct?

7   A    They were -- they were arrested, two individuals, yes.

8   But not (simultaneous speaking) --

9   Q    Okay.  And are those two individuals -- who were they?

10  A    It was Blaine Jacintho and Keoni Holi.

11  Q    And are those the two individuals that you saw on the

12  North Shore on January 30th?

13  A    Yes.

14          MS. NAMMAR:  One moment, please.

15          No further questions.

16          THE COURT:  Any recross?

17          MR. HIRONAKA:  Yes, Your Honor.

18                    RECROSS-EXAMINATION

19  BY MR. HIRONAKA:

20  Q    Mr. Lopez, you testified when I was asking you questions

21  that the -- what ended up being the February 1, 2021

22  transaction was initiated by and under the direct supervision

23  of the DEA and Agapay.  You recall testifying to that?

24  A    Yes.

25  Q    Okay.  Now, Ms. Nammar asked you some questions, and your

1   testimony now is you're not sure if it was initiated by the DEA

2   and Agapay?

3   A    The question that I recall her asking, and I understood

4   that I -- she wanted me to answer was the -- the meeting for

5   the, I guess the 12/4 GS meeting that we had with Roscoe; which

6   in this particular report it's dated the 12/4th and that he was

7   in contact with Jace Blucintho [verbatim].  But I felt that

8   where she was asking me, said did I direct him to make this

9   call or communication, that's the one I was answering to, and

10  not the actual February 1st.

11  Q    Okay.  The events of February 1, 2021, They -- there was a

12  genesis to it, right?  It took a while to -- for -- for that to

13  be kind of set up and put in motion, correct?

14  A    Yes, I would agree.

15  Q    You would agree with that?

16  A    Yes.

17  Q    Okay.  And so the -- the question that I had asked, that

18  you had answered, are you saying that this still stands?  That

19  that operation for Agapay to purchase drugs from Jacintho was

20  initiated under the direct supervision of DEA and Agapay?

21  A    For this particular question you're asking me, yes.  It

22  was initiated by DEA on the February 1st operation and arrest

23  for the buy-bust -- buy-bust, yes.

24  Q    Through Agapay?

25  A    Yes.

1    Q    Okay.  Now, you were asked some questions, too, about --

2    well, and just to follow up on that, are there -- the way that

3    those calls were recorded, how -- how is that done?

4         So, like, the call from Agapay to Mr. Jacintho --

5    A    Yes.

6    Q    -- that was on Agapay's cell phone?

7    A    Yes.

8    Q    Okay.  Is he just putting it on speaker and you guys are

9    using a different device to record it?  How is it recorded?

10   A    It's your typical recording device, gray in color, cyl --

11   rectangular in shape, so big.  And it's just the one you could

12   -- you know, back in the day you could buy at pretty much any

13   store, as far as like Target or Radio Shack.

14        But -- so it's just a recording device and, yeah, you just

15   turn it on.  And while the other -- and in this particular

16   instance, it was placed on speaker, and it was the -- the --

17   Roscoe's phone was used.

18        He dialed, put it on speaker, then we could record it

19   using the device.

20        But to answer your question, nothing hooks up to his

21   phone.  It's just lay there next to his cell phone.

22   Q    Okay.  Agapay's phone is on -- is on speaker when, excuse

23   me, every time he's initiating these calls?

24   A    Yes.

25   Q    Okay.  Now, you just had your memory refreshed with

1    respect to the December 4, 2020 conversation or meeting that --

2    that you had, correct?

3    A    Yes.

4    Q    And after refreshing your recollection, it turns out you

5    were actually wrong about some of the people who were -- who

6    were even there, right?

7    A    Right.

8    Q    Okay.  And you said that you take notes, you do reports in

9    general because they help you remember things, right?

10   A    Yes.

11   Q    Okay.  You answered questions from Ms. Nammar about -- you

12   testified that if Mr. Jacintho asked to record the interview

13   you did, conducted of him on -- in February 2021, that you

14   would have recorded it?

15   A    Yes.

16   Q    Okay.  Now, recording would have been a better way to --

17   for you to remember or to capture what was actually said,

18   correct?

19   A    It depends on what we're trying to accomplish.

20   Q    Okay.  Are you -- are you saying that just testifying from

21   your memory is a better way for us to know what was said during

22   that conversation?

23   A    No.  Either way, we will take notes, regardless if there's

24   a recording device, and it's going to be documented to the best

25   of our ability in a report, which is what I used the last

1  couple days to -- to refresh my memory and relearn the case

2  to -- to talk to you.

3        And as far as -- I'm not going to say it's better.  But it

4  depends.  Like I mentioned, we got to make sure that he's

5  comfortable and then he's going to be willing to cooperate, if

6  that's what he wants to do.

7        I felt that if he did not want it recorded, then I felt

8  very comfortable knowing that I had three other officers with

9  me hearing the same thing, and then we could document its

10 accuracy as -- in a report.  So --

11 Q    Let -- let's be clear, though.  Your testimony is that in

12 no prior interview that you conducted did you record the

13 interview, right?  As a task force officer with DEA.

14 A    Right.  So I didn't have -- I didn't have any cases while

15 I was task force officer that I had to use a recording device

16 during a -- an interview, if that's what you're asking.

17 Q    Are you saying you didn't have any recording devices

18 available to you?

19 A    Well, I had them available, but we didn't at the time, for

20 whatever reason, whether it was them or most -- it would be

21 them.  That -- we never had to record, so --

22 Q    Right.  I'm not --

23 A    In my kind of cases.

24 Q    Okay.  And I'm sorry.  Let me clarify.  I'm not asking the

25 reasons why you may or may not have done it.  I'm just saying

1    that you never previously recorded an interview, correct?

2    A    I have, but not -- not that particular -- not that

3    particular night or other T -- DEA cases.  But I have had other

4    cases that I've had the recording device, and they were okay

5    with recording it.

6    Q    As a police officer?

7    A    Yes.

8    Q    Okay.  I mean, in those other cases it didn't matter

9    whether the defendant or the suspect was okay with recording,

10   you would record it as a police officer, correct?

11   A    I mean, again, I -- it just depends on the situation and

12   if they're going to cooperate, and I feel that it's going to

13   make the difference if they're going to cooperate or not,

14   having a -- a recording device.

15        So I can't -- I don't recall, those other cases, why I

16   didn't, but I've had other cases that I've actually recorded

17   the interview.

18   Q    So the only thing we know for sure is as the TFO with the

19   DEA you've never recorded an interview?

20   A    Correct.

21   Q    Including this one?

22   A    Right.

23            MR. HIRONAKA:  That's all I have, Your Honor.

24            THE COURT:  Mr. Singh, anything else?

25            MR. SINGH:  No, Your Honor.  No questions.

1                    THE COURT:  Thank you.

2                    May this witness be excused?

3                    MS. NAMMAR:  Yes, Your Honor.

4                    MR. HIRONAKA:  Yes.

5                    THE COURT:  All right.  Thank you, Mr. Lopez.  You

6     may step down.

7                    The government may call its next witness.

8                    MS. HUDSPETH:  Your Honor, the government calls

9     Dustin Broad.

10                   I'm sorry.  Tyler Yates.  That's my fault.  It's

11    Tyler Yates.

12                   COURTROOM MANAGER:  Good afternoon.

13                   Come to the front of the chair and remain standing.

14                   All right.  Raise your right hand.

15                   TYLER YATES, GOVERNMENT'S WITNESS, SWORN.

16                   THE WITNESS:  Yes.

17                   COURTROOM MANAGER:  Thank you.  Please be seated.

18                   Speak about four to six inches away from the mic.

19                   Please state your name and spell your first and last

20    name for the record.

21                   THE WITNESS:  My name's Tyler Yates, spelled

22    T-Y-L-E-R; last name, Y-A-T-E-S.

23                              DIRECT EXAMINATION

24    BY MS. HUDSPETH:

25    Q    Good afternoon.  Where are you currently employed?

1    A    With the Kauai Police Department.

2    Q    And what is your title?

3    A    I'm a sergeant in the patrol services bureau.

4    Q    And how long have you been with the Kauai Police

5    Department?

6    A    Nine, almost ten years.

7    Q    And can you tell the jury a little bit about your ten

8    years with the Kauai Police Department?

9    A    I started three and a half years in patrol.  Then I

10   transferred to vice.  Spent five years in -- five, five and a

11   half years in the vice narcotics unit.  And the last six months

12   I've been as a sergeant in the patrol services bureau.

13   Q    And going from vice to a sergeant in patrol services

14   vehicle -- I said that wrong, but -- in patrol services, is

15   that a demotion or promotion?

16   A    Promotion.

17   Q    So it's a leadership job?

18   A    Yes.

19   Q    And as a vice officer -- 'cause we're going to focus on

20   that -- do you remember the years, generally, that you were the

21   vice -- a vice officer?

22   A    I believe I got in in 2016 and two thousand -- what is it,

23   '23 came out -- or '22, December '22 was promoted to sergeant.

24   Q    Okay.  And what kind of duties did you do as a vice

25   officer for KPD?

1  A    I investigated the drugs and criminal activities on the

2  island of Kauai.

3  Q    And what were some of your tactics that you used to

4  conduct investigations for drugs -- you mean illegal narcotics,

5  you mean?

6  A    Illegal narcotics, yes.

7  Q    Okay.  So what were some of your investigative techniques,

8  generally?

9  A    Surveillance, using informants, gathering information from

10  sources, usually.

11  Q    And I'm sorry that I talked over you.

12      Now, with respect to the DEA, which is a federal agency,

13  and you are a state?

14  A    County.

15  Q    County.

16      Did you happen to as a county officer get involved with a

17  DEA investigation?

18  A    Yes.

19  Q    And I'm going to focus you to -- have you been in more

20  than one?

21  A    Yes.

22  Q    Okay.  So then I'll focus you to 2020 --

23  A    Okay.

24  Q    -- and the defendants here, the Jacintho case.

25      So can you tell us how you got involved in that

1    investigation?

2    A    So DEA Agent Perry Lardizabal called our sergeant in the

3    vice narcotics unit and asked if we knew anybody on the island

4    with the initials B and J that was possibly involved in the

5    illegal narcotics.  And we -- or I -- stated Blaine Jacintho

6    and we -- couple other guys in the unit had two or three other

7    names.  We started doing our investigation, sent him the

8    pictures, and Lardizabal showed it to his source.  It would

9    confirm it was Blaine Jacintho.

10    Q    And when you say he, you sent it to him?

11    A    Sorry.  DEA Agent Perry Lardizabal.

12    Q    Okay.  And do you remember the time frame in 2020 that

13    this became part of -- the DEA operation contacted KPD?

14    A    I want to say around April of 2020.

15    Q    Okay and were you further involved in that DEA

16    investigation after April 2020?

17    A    I was -- I became the point contact for DEA on -- on the

18    island of Kauai, regarding that case.  When DEA needed some

19    information or if I gathered information, I would pass it on to

20    them.  And if we -- they wanted some surveillance done, they

21    heard something, we conducted surveillance for them and relayed

22    the information.

23    Q    Okay.  And -- and so over the course of the next year, was

24    that generally what your involvement was?

25    A    Yeah.  It --

1    Q    Did at some point you take a more active role in the DEA

2    investigation?

3    A    Yes.  When they called me and asked if I wanted to

4    participate in the operation they were doing, which was, I

5    believe, in February, I flew up to Oahu and helped them with

6    surveillance on -- during their operation at that time.

7    Q    And what year of February?

8    A    20 -- was it '21?

9    Q    Okay.

10    A    I believe so.

11    Q    So you start in April 2020?

12    A    Yeah.

13    Q    And you have this sharing of information up until

14    February 2021, and that's when you active -- you actively

15    become involved with their operation beyond information

16    sharing?

17    A    Yes.

18    Q    And what was your understanding of the operation that was

19    occurring in that time frame in 2021 that you were going to

20    actively participate in?

21    A    Well, I was informed that they were using their informant

22    to purchase ten pounds of crystal methamphetamine from the

23    suspect and that the -- he was on the island and that --

24    Q    Who was on the island?

25    A    The suspect Blaine Jacintho was on the island of Oahu.

1    And that I was to ride along with another DEA agent in a

2    vehicle and conduct surveillance with them.

3    Q    And prior to you becoming involved with this operation,

4    you had said you offered the name Blaine Jacintho could be BJ

5    and other officers offered other names that could be BJ.

6         Did you know who Blaine Jacintho was as a -- what he

7    looked like?

8    A    Yes.

9    Q    And how did you know?  And we're talking April 2020.  How

10   did you know in April 2020 what Blaine Jacintho looked like?

11   A    From --

12             MR. HIRONAKA:  Your Honor, object.  Objection.

13             THE COURT:  Let's have a sidebar on this, please.

14   Thank you.

15             (Sidebar on the record.)

16             MS. HUDSPETH:  I'm not eliciting.

17             THE COURT:  One second.

18             What do you anticipate his answer will be?

19             MS. HUDSPETH:  They grew up together playing sports.

20             THE COURT:  Okay.

21             MS. HUDSPETH:  I'm staying away from reputation.

22             THE COURT:  Okay.  Has he been informed --

23             MS. HUDSPETH:  Yes.

24             THE COURT:  Has this witness been informed that?

25             MR. HIRONAKA:  Wow.  If --

1        MS. HUDSPETH:  It's Kauai.  And he's going to talk
2   about that.
3        MR. HIRONAKA:  Wow, I was going to say, who throws
4   that name out when they're asking -- the DEA is asking if you
5   know a BJ?  But anyway --
6        THE COURT:  All right.
7        MR. HIRONAKA:  -- let's leave it that.
8        THE COURT:  Okay.
9        MR. HIRONAKA:  Yeah.  All right.
10        (End of sidebar.)
11   BY MS. HUDSPETH:
12   Q    In April 2020, what was your general familiarity with what
13   Blaine Jacintho looked like?
14   A    Being born on the island in a small community on the south
15   side, in the Koloa area where I'm from, and I know where he --
16   where he was born and raised as well.  Growing up together.  I
17   was older but knowing who he was, he played -- through sports
18   and beach activities and surfing.  That's how I know, knew who
19   he was.
20   Q    And so how -- how confident -- I mean, are you saying you
21   guys literally grew up together?
22   A    Pretty much, yes.
23   Q    And --
24        DEFENDANT 1 JACINTHO:  (Nods.)
25   BY MS. HUDSPETH:

1  Q     -- do you also have a brother?

2  A     Yes, I do.

3  Q     And what's his name?

4  A     Spencer.

5  Q     And to your knowledge, does Defendant Jacintho know your

6  brother?

7  A     Yes.

8  Q     And do you and your brother, are you similar in any

9  physical ways or age?

10 A     We -- we're both big Caucasian men.  If you look -- a lot

11 of people get our names mixed up a lot when they see us.  It's

12 not uncommon.  And, you know, we're two and a half years apart,

13 but, yeah, we do have similarities.

14 Q     Okay.  So I'm going to bring you back to -- well,

15 actually, I should stop at this point then and ask you if you

16 see Blaine Jacintho in the courtroom today.

17 A     Yes, I do.

18 Q     So I'll ask you to identify an article of clothing he is

19 wearing.

20 A     He's wearing a blue or a green aloha-type shirt.

21 Q     And where is he sitting?

22 A     Next -- right over there, next to the attorney.

23        MS. HUDSPETH:  Your Honor, may the record reflect

24 that Officer Yates has identified Defendant Jacintho?

25        THE COURT:  It shall.

1   BY MS. HUDSPETH:

2   Q    Okay.  So you're here on Oahu then for February 1, 2021;

3   is that correct?

4   A    Correct.

5   Q    And can you tell the jury what your involvement was that

6   day?

7   A    I was assisting DEA with their operation and assigned to

8   assist and surveillance, and I was assigned to another DEA

9   agent as a passenger in his vehicle.

10  Q    And while you're doing surveillance on February 1, 2021,

11  what, if anything, did you see relative to this investigation?

12  A    We were in Makaha, in the vicinity of Makaha Beach.  We

13  had a description of the vehicle that he was possibly driving.

14  It was a white-colored passenger mini-van.  It was relayed that

15  it was possibly parked on the mauka side of the road.  And as

16  I -- as we did a driveby, I was able to identify Blaine

17  Jacintho through the windshield as the driver of the vehicle.

18  Q    And I'm sure it's going to be -- everyone's going to

19  wonder how you're able to identify somebody as you're driving

20  by.  Can you just kind of help us understand that?

21  A    Well, 'cause I was, you know, knowing that -- knowing what

22  Blaine Jacintho looks like and being on the passenger side of

23  the vehicle, facing the car, and the way he was parked towards

24  the road and the rental car -- or passenger -- the white

25  passenger van that he was driving did not have tinted windows,

1    and I had a clear, unobstructed view of who he was sitting in

2    the driver's seat.

3    Q    And you said the way it was parked on the side of the

4    road.  How was the car parked on the side?

5    A    So the -- he was like perpendicular to the road or nose

6    was pointed out towards the -- towards the highway.

7    Q    Okay.  So the front windshield was actually facing the

8    highway?

9    A    Correct.

10   Q    And did you notice any other passengers in the vehicle at

11   the time you drove by?

12   A    I did not.

13   Q    Does that mean no one else was in there?

14   A    No.

15   Q    What does it mean?

16   A    Just means I was so focused on identifying the driver and

17   looking for Blaine that that was all I saw in the vehicle at

18   that time.

19   Q    And about what time of day did you see the van parked over

20   in Makaha on the side of the road?

21   A    I would say early afternoon, around 3:00, 3:30 p.m.

22   Q    And did you have any other involvement that day with the

23   DEA operation?

24   A    Yes.

25   Q    And what was that?

1    A    Later in the evening the meet was supposed to happen with

2    the undercover agent and Blaine.  I was with the -- another DEA

3    agent.  We were parked on the -- on the side in a parking lot

4    area of Magic Island, towards where the meet was going to

5    happen.

6    Q    Okay.  And what did you see?

7    A    I saw a similar van matching the description of what they

8    were -- Blaine was driving, or op -- involved with arrive at

9    the location.

10   Q    And was it similar to the one that you saw in Makaha?

11   A    Yes.

12   Q    And after -- did -- after he was arrested in Magic Island,

13   did you have any further involvement?

14   A    I did.

15   Q    And what was that?

16   A    I -- I -- was -- sorry.  I was involved in the interview

17   process, and I was -- I entered the room and began with the

18   interview process and started asking questions.

19   Q    With Blaine Jacintho?

20   A    With Blaine Jacintho.

21   Q    And did Blaine Jacintho make any statements to you?

22   A    He did.

23   Q    And could you tell the jury what he said to you?

24   A    Okay.  I recall Blaine stating that earlier, or before all

25   this happened, that he was in Mexico -- or he went to

1  California, traveled to California on a surf trip with his
2  friends and family and end up going to Mexico.  He crossed the
3  border.  He then was down there a little while and then he
4  crossed back over the border and was in the Southern California
5  area again.
6      He stated that at that time he had no money and that he
7  was broke.  And he contacted another source on Kauai, Kaui, and
8  at that time Kaui put him in touch with his source -- or her
9  source -- named Amigo, in the California area.  And he said he
10 met Amigo and ordered -- ordered up five pounds of dope, or
11 crystal meth, and that that was sent to his cousin, Lucas
12 Bukoski, back home on Kauai, and that Lucas was supposed to
13 sell off that crystal meth and then send him the money so he
14 could -- was able to fly himself and his family back home.
15 Q    And did he tell you what time period he's telling you this
16 story about California, Mexico, California?
17 A    No.  I would say --
18 Q    -- generally?
19 A    -- October of two thousand -- what was that?
20 Q    So in February 2021, when he's telling you this, he's
21 referencing something that happened before?
22 A    Correct.
23 Q    And can you tell the jury how October came up and -- in
24 this trip to California?
25 A    So during the questioning, I asked him if the parcel that

1    he received today was from Amigo, which he said yes.  And then

2    I said -- I asked him again did you send any, have any other

3    parcels sent back to the island of Kauai.  And he said yes.

4    And he mentioned that he sent five pounds to Lucas Bukoski.

5    And at that time is when that October incident with the five

6    pounds and meeting Amigo, all that came about.

7              THE COURT:  I'm sorry.  Can I clarify the year?  It's

8    not in the record.  So if you could state the year again,

9    please, sir.  October of what year?

10             THE WITNESS:  I'm trying to think right now.  I

11   believe it was 20 -- 2020, yeah.

12             THE COURT:  Thank you.

13   BY MS. HUDSPETH:

14   Q    So when you're hearing all of this, just to be clear

15   that -- your recollection, so you're talking to him February 1,

16   2021.  Is he referencing something that just happened a few

17   months ago?

18   A    Yes.

19   Q    Okay.  So that was your understanding at the time?

20   A    That was my understanding.

21   Q    Okay.  And did he say anything about the five pounds to

22   Lucas that piqued your interest in particular?

23   A    Yes.  He said that he was the one that sent the parcel, or

24   had the parcel sent, then that it was interdicted by the Kauai

25   Police Department at the time.

1  Q    Now, are you aware, were you involved in any kind of

2  operation in October 2020 with five pounds of methamphetamine

3  that was interdicted by Kauai Police Department?

4  A    Yes.

5  Q    And at the time, in October 2020, did you have any

6  indication that Blaine Jacintho was involved?

7  A    I had a hunch but no solid evidence whatsoever.

8  Q    What was your direct involvement with the October parcel

9  of five pounds?

10  A    The Kauai Police Department vice narcotics unit conducted

11  a controlled delivery of that parcel.

12       My specific role was to conduct surveillance and then be a

13  part of the takedown team if it ever -- if the investigation

14  warranted it.

15  Q    Okay.  And at any point during that operation with the

16  controlled delivery, which we'll talk about later with somebody

17  else, but what, if any, contact did you have with any suspects?

18  A    So during the -- during the operation we -- myself,

19  Sergeant Anthony Abalos, and Officer Dustin Broad -- decided to

20  approach the residence at Lucas Bukos -- sorry -- Lucas

21  Bukoski's residence and make contact with him.  We made

22  contact.  We approached the residence bearing our police badges

23  and identification.  We -- myself and Officer Dustin Broad

24  pulled Lucas aside and we started talking to Lucas.

25       We asked him if he knew what was in the parcel, if the

1  parcel was for him, he knew where it came from, and he

2  decide -- he said:  I don't know what's in the parcel.  I

3  wasn't expecting a parcel.  I don't know where it came from or

4  who sent it and that I was going to bring it back to the post

5  office the next day.

6  Q    When you, Officer Abalos -- does he have a nickname?

7  A    Tones.

8  Q    Tone?

9  A    Tones, short for Anthony.

10 Q    Anthony?

11 A    Yeah.

12 Q    And people call him Tones.  And Broad, what's Officer

13 Broad's full name?

14 A    Officer Dustin Broad.

15 Q    When the three of you engaged with Lucas Bukoski, did you

16 introduce yourselves or have any way for him to know who he was

17 talking to?

18 A    Like Blaine, we know each other from sports growing up on

19 the south side as well.  It is a -- like I said, it's a small

20 community and we don't live very far apart from each other.

21 Q    And do you remember the date in October 2020 that you

22 engaged with Lucas Bukoski?

23 A    I believe it was October 15th.

24 Q    Could it have been the 16th?  Or 15th?  Yeah, I think.

25 A    I believe it was the 15th.

1    Q    You're right.  I'm wrong.

2         So if --

3              MS. HUDSPETH:  I'm going to put for the witness only,

4    if you could put up Exhibit 71 delta.

5              THE COURT:  71D has --

6              MS. HUDSPETH:  Actually --

7              THE COURT:  -- already been admitted.

8              MS. HUDSPETH:  Oh, you're right.  Sorry, Your Honor.

9              THE COURT:  So we can show it to the jurors if you

10   want.

11             MS. HUDSPETH:  Yes.  Please.  So we can show --

12   publish.  And I'm going to ask you to zoom in on --

13             Okay.  So I have this marked wrong.

14             Actually, 71D-3.

15   BY MS. HUDSPETH:

16   Q    Okay.  So --

17             THE COURT:  I'm sorry, to clarify, Ms. Nammar, was

18   71D-3 the one that you added earlier today that was not on your

19   exhibit list?

20             MS. NAMMAR:  Yes, Your Honor.

21             THE COURT:  Okay.  So this one has been admitted?

22             MS. NAMMAR:  Yes.

23             THE COURT:  It may be shown to the jury.

24             MS. HUDSPETH:  Okay.  So we're going to zoom in to

25   the first part of the text string where it talks --

1  participants and phone numbers, the white part.  And you

2  actually -- if you just zoom in just for the phone numbers so

3  that they get bigger.

4           Okay.  And --

5  BY MS. HUDSPETH:

6  Q    So the participants here are -- can you read those phone

7  numbers?

8  A    I can.

9  Q    Out loud?

10 A    Yes.  The top line is 1 (808) 639-0595.

11 Q    Okay.

12 A    The bottom line is 1 (808) 755-5466.

13 Q    Okay.  Thank you.

14           MS. HUDSPETH:  And if you'd zoom out of that,

15 Ms. Vess, and zoom into the first text box on that page.

16 BY MS. HUDSPETH:

17 Q    And are you able to tell from this text -- have you seen

18 this exhibit before?

19 A    Yes.

20 Q    Okay.  And you're familiar with it?

21 A    Yes.

22 Q    And with respect to the text number on the "from," what is

23 that number?

24 A    1 (808) 755-5466.

25 Q    And the "to"?

1   A    1 (808) 639-0595.

2   Q    And what is the date of this text message?

3   A    10/15/2020.

4   Q    And can you read the substantive portion of the text

5   message?

6   A    Yo, cuz, this is Lucas.  So the cops just came here.  You

7   can call me on this phone.

8   Q    Do you recall about the time of day that you engaged with

9   Lucas Bukoski on August -- October 15th, 2020?

10  A    It was around 9:30 to ten -- 10:00 p.m. at night.

11  Q    And did I already ask you to say the time on this text?

12  A    No, you didn't.

13  Q    Oh, would you go ahead and say the time that this text was

14  read?

15  A    Ten --

16  Q    Or, I'm sorry, the text at the bottom, when it was sent.

17  A    When it was sent?  10:21:02 p.m.

18  Q    Okay.  If you would take that down.

19          MR. HIRONAKA:  Your Honor, may we approach?

20          THE COURT:  You may.

21          (Sidebar on the record.)

22          MR. HIRONAKA:  Your Honor, my concern is that there

23  was no foundation laid that this witness knows who anybody's

24  phone number is.  So he's essentially testifying by implication

25  that these are messages from Lucas Bukoski to my client, and

1    there is zero foundation for that laid.  And --

2          THE COURT:  Why does a foundation need to be laid if

3    it's already been admitted?

4          MR. HIRONAKA:  I mean it's admitted, so I guess he

5    can read it.

6          THE COURT:  Yes.

7          MR. HIRONAKA:  But given that he testified about

8    events involving Lucas Bukoski, it's leaving the jury with the

9    impression that these are text messages from Lucas Bukoski to

10   Blaine Jacintho, which may very well be true.  But unless he

11   has knowledge of that, I just don't think it's appropriate for

12   it to come out this way.

13         THE COURT:  Is there any reason why he can't just

14   read what the text says?  Is there any rule that prohibits him

15   from reading what the text says if it's already been admitted?

16         MR. HIRONAKA:  I guess my objection then would be

17   that he doesn't have -- he doesn't have personal knowledge,

18   Your Honor, of this communication if he -- if he -- if he can't

19   at a minimum say whose phone numbers these belong to.

20         THE COURT:  Okay.

21         MS. HUDSPETH:  I can get him to lay -- I can get him

22   to give a lay opinion of after reviewing the entire text

23   conversation in context who he believes the two persons are

24   talking in the text string.  And then he's a relevance witness

25   for why this exhibit is relevant, and it's corroborating an

1    activity that the witness was personally involved in.

2            THE COURT:  Well, what more were you going to cover

3    with him?

4            MS. HUDSPETH:  Well, there's text messages about the

5    event, and then there's going to be text messages in Blaine

6    Jacintho's phone that corroborate all the things that Blaine

7    Jacintho told this officer during the confession.

8            And he's the proponent for that corroborating

9    evidence.

10           THE COURT:  Okay.

11           MS. HUDSPETH:  That he's previously reviewed and has

12   admitted.

13           THE COURT:  Well, I'll let you voir dire him.

14           So I'll let you conduct voir dire of him now to ask

15   him what familiarity he has at all, if any, with these phone

16   numbers or these text messages.

17           MR. HIRONAKA:  Okay.  I guess I do want to make clear

18   that Ms. Hudspeth's proffer is asking the witness to speculate.

19   It's still not based on personal knowledge that he has.  And he

20   may very well say that he was told by somebody else what Lucas

21   Bukoski's number is, but that's hearsay.

22           THE COURT:  That's why I'm going to give you an

23   opportunity to voir dire.

24           MR. HIRONAKA:  Okay.

25           MS. HUDSPETH:  But I just want to state that he's not

 1    offering any opinions.  He's stating what's in the evidence.

 2    And he can offer an opinion, a lay opinion of who he believes

 3    the text message is.  But I'm not proponing that we're saying

 4    it's Lucas.  That's circumstantial evidence for us to be able

 5    to connect the dots in closing, that at the same time and place

 6    somebody named Lucas texts Blaine Jacintho on Blaine Jacintho's

 7    phone and happens to correspond exactly with this parcel.  And

 8    then they have a whole string of communications about this

 9    parcel.  And then Blaine Jacintho talks about this parcel in

10    his confession.  And so we're corroborating the confession.

11              THE COURT:  I understand why you want it.

12              MS. HUDSPETH:  Yeah.  Well, I'm trying --

13              THE COURT:  The question that Mr. Hironaka's raising

14    is why does it come in through this witness who has no personal

15    knowledge of this.

16              MS. HUDSPETH:  He -- it doesn't have to have personal

17    knowledge, because I'm not laying a foundation right now.  I'm

18    coming in to corroborate his testimony.

19              MR. HIRONAKA:  But then he's giving opinion

20    testimony.

21              THE COURT:  Right.

22              MR. HIRONAKA:  If it's literally going to be his

23    opinion --

24              THE COURT:  Right.

25              MR. HIRONAKA:  -- who's speaking to who right now.

1          THE COURT:  He can't offer a lay opinion on something

2   that he has no personal knowledge.

3          MS. HUDSPETH:  I didn't ask him who wrote it.  I only

4   asked him to read it out loud.

5          THE COURT:  I know, but you just told us a minute ago

6   that you were going to ask him.

7          MS. HUDSPETH:  I said I could if -- if he wants, or

8   voir dire.  I was just offering another option.

9          THE COURT:  Let's have you voir dire him and then

10  we'll see how it goes.

11         MS. HUDSPETH:  Okay.

12         (End of sidebar.)

13         THE COURT:  Ladies and gentlemen, we're going to

14  allow Mr. Hironaka to voir dire the witness, which is to say

15  he's going to have an opportunity to ask the witness a few

16  questions before Ms. Hudspeth continues.

17         MR. HIRONAKA:  If we can enlarge that same, those top

18  two numbers?

19         Thank you.

20                    VOIR DIRE EXAMINATION

21  BY MR. HIRONAKA:

22  Q    Okay.  Officer, now, I want to start with the first

23  number, the (808) 639-0595.  Do you have direct or personal

24  knowledge of whose number that is?  And -- and when I say

25  direct or personal meaning, not because somebody else told you?

1    A    No.

2    Q    Second number, (808) 755-5466, same question.

3    A    No.

4              MR. HIRONAKA:  Okay.  Thank you, Officer.

5              Your Honor, that's all I have.

6              THE COURT:  Thank you.

7              MS. HUDSPETH:  You can take that down, please.

8              Now, if we could please put up Exhibit 71H.  And if

9    we could zoom in on the top two numbers.

10                   DIRECT EXAMINATION (Continued)

11   BY MS. HUDSPETH:

12   Q    And if you could read the top number again?

13   A    1 (808) 639-0595.

14   Q    And is that a -- the same number that was on the top of

15   the last exhibit we just saw?

16   A    Yes.

17   Q    And what's the second number?

18   A    1 (808) 346-2451.

19   Q    Okay.  And if you could zoom out of that and go into the

20   first text box.  And if you could read the time and date stamp

21   of this text message?

22   A    Dated 10/16/2020, at 11:45:49 a.m.

23   Q    And is this the next day from what we were just testifying

24   about?

25   A    It is.

1    Q    And what is the content OF that text?

2    A    B, this is me.  Kauai.

3    Q    And if we could zoom out of that and go to the very next

4    text box.  And if you could read the date/time stamps on that?

5    A    Dated 10/16/2020, at 11:46:12 a.m.

6    Q    And if you could read the contents.

7    A    So the box got delayed on top of it all, question mark.

8    Q    Thank you.

9         If we could go to the next page and zoom in on the first

10   text box.

11        And if you could read the number that this text is from?

12   A    1 (808) 639-0595.

13   Q    And can you read the date/time stamp?

14   A    Dated 10/16/2020, at 11:48:58 a.m.

15   Q    And if you could read the contents of that text out loud.

16   A    And Amigo said let's see what happens tomorrow.

17        Well, what happened today is I woke up to a headache.

18   Lucas texted me the box got picked up by cops.  And yesterday

19   telling me he not going open 'em for two days.  And I was

20   telling Amigo all of this.  But I think he's mad 'cause I was

21   right.

22   Q    And if you could take down that text.  If you could pull

23   up the next text.  And if you could read the date/time stamp.

24   A    Dated 10/16/2020, at 11:52:30 a.m.

25   Q    And this is from the other number; is that correct?  Based

1    on your understanding of this document?

2    A    Yes.

3    Q    And what is the content of this text?

4    A    Well, I'm gonna see what I can do to talk him down 'cause,

5    yeah, he's pissed, but I'm gonna talk to him, okay?

6         Where is Lucas, question mark.  Tell him if he can call me

7    on this number, maybe me and him can meet up.

8    Q    And I think you said -- did I hear you right:  I can do to

9    talk him down or calm him down?  Maybe I --

10   A    I can do to calm him down.

11   Q    Okay.  And if we could pull up the next text box, please?

12        And if -- is your understanding this is from the owner of

13   the phone 0595, ending in 0595?

14   A    Correct.

15   Q    And what's the date/time stamp?

16   A    Dated 10/16/2020 at 11:57:59 a.m.

17   Q    And if you could read text.

18   A    Okay.  Lucas is my blood cousin, as the guy I use for

19   Chris.  I told him 8K.  He was giving 'em to me for 5K so I was

20   over it from beginning.  But I figure Lucas can make off of

21   'em.  And start the flow.  But I called four guys to -- too for

22   line up and the first package got hit.  I told him I can bring

23   'em myself.

24   Q    And then if we can read the last text box in this exhibit.

25   Put it up, I mean.  Next page.

1       And is it your understanding this is the reply?

2   A    Yes.

3   Q    And what's the date/time stamp?

4   A    10/16/2020, at 12:07:40 p.m.

5   Q    And if you could read that text.

6   A    Okay.  I believe you B.  I'm sorry.  I will try to fix

7   this.  Tell Lucas to call me if can, please.  (808) 346-2451.

8   Q    Okay.  And you can take that down.

9        Now I'd like to pull up Exhibit 71D.

10          THE COURT:  71D has previously been admitted and can

11  be shown to the jury.

12          MS. HUDSPETH:  Thank you, Your Honor.

13  BY MS. HUDSPETH:

14  Q    If we could zoom in on the participants of this text.

15       And can you read the email address, from?

16  A    Spell it out?

17  Q    You can just use --

18  A    Say it?

19  Q    Say it.

20  A    Okay.  Jacintho5055@gmail.com.

21  Q    And another number that's next listed for a participant?

22  A    1 (808) 631-6469.

23  Q    And the name underneath that?

24  A    Cousin Lucas.

25  Q    And then finally the last number?

1   A    1 (808) 639-0595.

2   Q    And is that 0595 the same number that we talked about in

3   the two previous exhibits?

4   A    Yes.

5          MS. HUDSPETH:  Okay.  And I would like to go to page

6   13 and ask that, Ms. Vess, you zoom in on the after the text

7   box on that page.

8   BY MS. HUDSPETH:

9   Q    And if you could, Officer Yates, state the date/time stamp

10  on that text.

11  A    Dated 10/25/2020, at 9:11:32 a.m.

12  Q    And if you could state who was the sender on that text.

13  A    1 (808) 639-0595.

14  Q    And if you could read, please, the contents of that text.

15  A    Not my 5.  This wasn't a business run.  This was a surf

16  trip.  So I never bring my copa.  But when I met Amigo, he

17  pumped me up to turn it on, and I had guys send me money.  So

18  if my friend never sent me money, I wouldn't -- I wouldn't have

19  had no money.

20  Q    And what was the statement that Blaine Jacintho made to

21  you on February 1st, 2020?

22  A    He stated that when he was in California he was broke.

23          MS. HUDSPETH:  If we could go to the next page of

24  this exhibit and zoom in on the first text box.

25  BY MS. HUDSPETH:

1    Q    And what's the date/time stamp of this?

2    A    Dated 10/25/2020, at 9:11:48 a.m.

3    Q    And who is it from?  You can just give the last five.

4    A    Last four is zero --

5    Q    Or last four.

6    A    0595.

7    Q    And if you could read the contents.

8    A    I've been gone for two months.

9    Q    And if we could go to the next text box.

10        And if you could read the date/time stamp.

11   A    10/25/2020, at 9:12:57 a.m.

12   Q    And this is a text from what phone number, last four?

13   A    0595.

14   Q    And if you could please read the contents.

15   A    And I had six guys with me.  We came up for pack one pod

16   with my Vegas house.  Then I went to porter -- Puerto Escondido

17   to surf.

18   Q    And are you familiar with Escondido?

19   A    Yes.

20   Q    Do you know where that is, generally?

21   A    It's in the country of Mexico.

22        MS. HUDSPETH:  And if we could go to the next page.

23   And zoom in on the first text box.

24   BY MS. HUDSPETH:

25   Q    And if you could read the date/time stamp.

1   A    Dated 10/25/2020, at 9:16:30 a.m.

2   Q    And if you could read the last four of the sender of this

3   text.

4   A    0595.

5   Q    And if you'd please read the contents of the text.

6   A    October 1st was my flight home.  I only brought 'nuff for

7   Vegas and surf trip.  So I'm on a layover and I had to change

8   my flights to go down to TJ, so I didn't make my flights home.

9   And the five was going.  Make my flights and I could have

10  grabbed four ounce, 4 O-Z, with whatever else.  But hopefully

11  Amigo hooks me up.  That's why I wanted you to clear that up.

12  Q    Thank you.  You can take that down.

13       I'm going to skip forward to page 83 of this Exhibit 71D.

14       And zoom in on the first text.

15       And if you could state the date/time stamp.

16  A    Dated 12/28/2020, at 11:00:51 a.m.

17  Q    And the sender, last four?

18  A    0595.

19  Q    And if you could please read the contents of this text.

20  A    YUP.  A key and a half 70K I made him and he no like send

21  more.  As why I asking for help.  But I know Kaui had call you,

22  so I no need you playing two sides.  I need you to be solid

23  like how I am to you.  I brought you that five pounds to you

24  and got that other package wiped away from your tab.  I'm

25  paying for that package, and that's why he no like send 'em.

1    But fuck him.  I no like need this shit -- or his shit --

2    sorry -- and I needed it to start something up, but I can't

3    with the numbers he's giving me.  So I gotta shop around.  But

4    I'm good.  I get something brewing for after the holidays.

5    But, yeah, let me know, or LMK, cuz the guy was waiting three

6    days and I hate being someone that says can and not deliver.

7    Q    To your knowledge, you were involved in the investigation

8    of Blaine Jacintho during this time period; is that correct?

9    A    Correct.

10   Q    And you were aware of what KPD was doing; is that correct?

11   A    Correct.

12   Q    And generally, you're aware of the DEA operations as well,

13   because of your communication that you had established with

14   them?

15   A    Not totally, but, yes, I'm aware of some of what's going

16   on.

17   Q    And are you aware of any operation that is brewing after

18   the holidays at this point?

19   A    No.

20   Q    And then with respect to this exhibit, one more text box

21   I'd like to highlight for the members -- or the jury is page 92

22   and the second text box.

23        And if you could, please state the date/time stamp.

24   A    Dated 1/6/2021, at 8:28:59 a.m.

25   Q    And the sender, last four?

1    A    0595.

2    Q    And the contents, if you'd please read it.

3    A    As why I went surf to make sure I land the biggest deal I

4    can and I met the guy.  Trust me on this.  You jump on this

5    first one and we will be swimming in money.  Next one we grab

6    'em for cheap, the white, and I'll invest on your side.  But on

7    this deal alone, I can give you 15, at least, from 30.

8    Q    Okay.  You can take that exhibit down.

9         And I'm going to bring up one more text string that was

10   pulled from Defendant Jacintho's phone.  It's Exhibit 71E.

11             THE COURT:  71E has been admitted and can be shown to

12   the jury.

13             MS. HUDSPETH:  Thank you, Your Honor.

14             Can you please zoom in on the participants?

15   BY MS. HUDSPETH:

16   Q    And Officer Yates, would you please identify the three

17   participants that you see on this exhibit?

18   A    The top line reads:  Jacintho5055@gmail.com.

19        Second line is 1 (808) 639-0595.  And the third line is 1

20   (808) 723-9826.

21   Q    And if we could next zoom in the first text box.

22        Let's start with the date.  What's the date on this text?

23   A    Dated 9/6/2020, at 10:12:34 p.m.

24   Q    And the sender, last four?

25   A    Is 0595.

1  Q    And the contents?

2  A    I texted Amigo just to let you know.  Just to let you

3  know -- just to let him know my number and told him -- told 'em

4  to HMU when he gets a chance.

5  Q    And then if we could look at the next text on that page.

6  And if you could read the date/time stamp?

7  A    9/6/2020, at 10:39:26 p.m.

8  Q    And read -- the sender, that's a reply; is that correct?

9  A    Correct.

10  Q    And can you read the contents, please?

11  A    Blaine, he changed his number again so I am going -- I am

12  to give you it again.  So I am to give you it, Kay?  (657)

13  263-7551.  K, good night.

14  Q    Okay.  And then we can skip ahead on -- I'd like to

15  highlight two more text messages on page 46.

16       And if we could zoom in on the middle text bubble on that

17  page.  And we could talk -- if you could please state the date/

18  time stamp of this text?

19  A    Dated 10/16/2020, at 11:09:47 a.m.

20  Q    And the sender of this text is -- what's the last four?

21  A    9826.

22  Q    And can you read the contents?

23  A    B, do you know what's going on?  Amigo is saying some

24  things I don't understand.

25  Q    And then -- and 10/16, just to refresh, this is the day

1    after the parcel is seized by law enforcement?

2    A    Correct.

3    Q    Or, I should say, the interdiction, the controlled

4    delivery you talked about?

5    A    Controlled delivery operation.

6    Q    Okay.  If we can just finish with this exhibit on the next

7    text message on that page.

8         And date/time stamp, please?

9    A    10/16/2020, at 11:39:23 a.m.

10   Q    And the sender?

11   A    0595.

12   Q    And if you could read the contents.

13   A    He sent a box and it got hit by the cops.  But Lucas never

14   open 'em so they took box.

15        I told Amigo from the day before that I think it got hit

16   'cause Erica got the call that they're trying to rush order a

17   warrant for Lucas's arrest, but he never open.  Last night

18   Spencer Yates, Tone Abalos, Dustin Broad had grabbed the box

19   from Lucas's possession and Amigo thinks we tried to steal it.

20   Q    You can take that exhibit down.

21        And just to be clear, what were the three officers that

22   came the day before and talked to Lucas?

23   A    Myself, Officer Tyler Yates, Sergeant Anthony Abalos, and

24   Officer Dustin Broad.

25   Q    And your name is not Spencer Yates?

```
 1   A    Correct.

 2   Q    That is who?

 3   A    That's my brother.

 4             MS. HUDSPETH:  Okay.  I have no more questions.

 5             THE COURT:  Thank you.

 6             Mr. Hironaka, cross-examination.

 7             MR. HIRONAKA:  Thank you, Your Honor.

 8                          CROSS-EXAMINATION

 9   BY MR. HIRONAKA:

10   Q    Okay.  Officer Yates, good afternoon.

11   A    Good afternoon, sir.

12   Q    Now -- okay.  So you first talked about getting involved

13   with this sort of -- is it -- is it like a joint KPD/DEA kind

14   of a task force thing?

15   A    I'm not on the DEA task force.  It's -- we work with

16   fed -- federal agency partners on certain cases.  This was a

17   DEA case, and being that there's no agents on the island of

18   Kauai, I was assisting them in their -- what they needed.

19   Q    I see.  Okay.

20        So when they first called about the initials B.J., you

21   told us that you knew Blaine Jacintho through sports and, did

22   you say, beach activities?

23   A    Yeah, surfing.  Yeah.

24   Q    Okay.  And then you later testified that the DEA called

25   and asked if you wanted to -- well, I'm sorry.
```

1    When they first asked about the initials, you thought that

2    was sometime around April 2020?

3    A    Around there.

4    Q    Okay.  And then the participation, when they called and

5    asked if you wanted to participate in the February 2021

6    operation, this is about -- this is almost a year later, right?

7    A    Correct.

8    Q    Okay.  And then you talked about you and a few other

9    officers in October 2020 going to Lucas Bukoski's residence?

10   A    Yes.

11   Q    Did -- they had done that -- you guys had done that

12   controlled delivery, and then you chatted with him.  Was that

13   the same day or a day or two later?

14   A    That we chatted with Lucas?

15   Q    Correct.

16   A    That was same day as the operation.  It was later that

17   night.

18   Q    Okay.  And were you -- my question is:  Were you involved

19   with any investigation into Blaine Jacintho between April 2020,

20   when they first asked about initials, to the February 2021

21   operation?

22   A    As in a Kaui Police Department investigation?

23   Q    In any -- in any fashion.

24   A    Through the contact with DEA they came down and we

25   conducted surveillance, I believe, at least one time that I --

1   that I can recall.

2   Q    Okay.  Any other outside of that, during that time period,

3   April 2020 to February '21?

4   A    I mean, I've talked to sources who was giving me

5   information about Blaine.

6   Q    Okay.  So otherwise, the only one that sticks out is this

7   surveillance that you described?

8   A    Correct.

9   Q    Okay.  When was that?

10  A    I -- I can't recall.  It's been a while already --

11  (simultaneous speaking).

12  Q    Okay.  Who was that -- who was that with?

13  A    DEA.

14  Q    I mean specifically, the person.  Do you recall?

15  A    I know it was the first time I met Agent Rolo, Lopez, I

16  believe, that's his name.

17  Q    Okay.

18  A    And his unit that came down.  I believe his -- and I'm

19  not -- you know, his boss -- I'm not really good with

20  acronyms -- was Short, the last name, I believe.

21  Q    Okay.

22  A    And I don't remember everybody else that was there.

23  Q    How -- over what time period was this surveillance?

24  A    I mean --

25  Q    You know, a few hours?  A few days?

1  A    I believe it was, yeah, about six hours, six to eight

2  hours.  It was a day's worth of work.

3  Q    Okay.  And it was just observing from afar?

4  A    In the area that he was within, yes.

5  Q    Okay.  So other than that, no -- no other involvement

6  with -- well, let me ask you this.  Do you know Roscoe Agapay?

7  A    Do I know him?

8  Q    Yes.

9  A    No, I just heard the name Roscoe.  That was all I know.

10 Q    Okay.  So you yourself haven't had any interactions

11 with --

12 A    No.

13 Q    -- Agapay?

14 A    I had a conversation with him on the phone for about maybe

15 five minutes and that was it.

16 Q    Okay.

17 A    But I don't know.  I couldn't point him out.  I don't know

18 what he looks like.

19 Q    Okay.  Now, you talked also about some surveillance

20 leading up to the February 2021 operation that you were

21 involved with in Makaha, I think you said, right?

22 A    Correct.

23 Q    Okay.  Excluding what happened on February 1, 2021, I'm

24 just talking about leading up to it, did you have any other

25 involvement in the investigation other than that surveillance

1    and identification?

2    A    On that day?

3    Q    Leading up to February 1, 2021.

4    A    Not really.  Like -- like I said, it was just a

5    surveillance that when they came down we as a unit conducted

6    surveillance maybe two other times that they requested that we

7    go and see what's going on.  But nothing like, you know, out of

8    the normal, I would say.

9    Q    So the DEA, just kind of them calling and asking if you

10   wanted to participate in the February 2021 operation, didn't

11   have anything to do with any knowledge you had of any ongoing

12   investigation, I guess?

13   A    They had to do with the investigation that they were

14   doing.  I was sharing information with them from the sources I

15   was getting information from.  And it was like a, I guess you

16   want to say, courtesy to come up and be a part of it.  Because,

17   you know, as a -- because I put time and effort into it to go

18   -- technically to go and play and, you know, be a part of it.

19   Q    Are you aware, sir, of the sort of how that February 1,

20   2020 transaction -- well, I'll just ask you a simple question.

21        Are you aware whether that transaction was initiated by

22   Mr. Jacintho or -- or the DEA or --

23   A    I --

24   Q    -- a cooperating source?

25   A    I don't recall.

1  Q    No idea?

2  A    I don't recall.

3  Q    Okay.

4  A    Yeah.

5  Q    You said you were involved after Mr. Jacintho got arrested

6  on February 1, 2021, with his interview?

7  A    Yes.

8  Q    Okay.  And who else participated in that interview, aside

9  from you and Mr. Jacintho?

10  A    I know there was somebody else in the room.  I don't

11  remember who it was.  Yeah, I can't recall who was in the room

12  with me at that time.  I was not familiar with a lot of the

13  faces that I was working with that day.

14  Q    Okay.  You only recall one other law enforcement?

15  A    No, I'm not saying that.  I said I don't recall everybody

16  that was in the room.

17  Q    Oh, okay.  But going back to where you said you recall

18  there was one other person in the room?

19  A    At least one other person.

20  Q    Oh, at least one other person.  Okay.

21      But you don't know how many people were in there?

22  A    No.

23  Q    Were you in the interview of Mr. Jacintho for the entire

24  time?

25  A    No.

1    Q    Okay.  Were you there from the beginning?

2    A    No.

3    Q    Were you there at the end?

4    A    I don't know.  I don't remember.

5    Q    Okay.  So you came in sometime after it started?

6    A    After it started, correct.

7    Q    The interview, to your knowledge, was not audio or video

8    recorded?

9    A    To my knowledge, correct.

10   Q    Were you involved in any other aspect of the investigation

11   post-arrest, search --

12   A    No.

13   Q    -- of any --

14   A    Because I was not a federal agency or part of a federal

15   agency at that time, I was not allowed to -- or didn't want to

16   be a part of the hands on or anything like that, for several

17   reasons.

18            MR. HIRONAKA:  Okay.  All right, Officer Yates,

19   that's all I have.

20            THE COURT:  Mr. Singh, how long do you think you will

21   be?

22            MR. SINGH:  Very short.

23            THE COURT:  All right.  Thank you.

24   ///

25   ///

1                          CROSS-EXAMINATION

2   BY MR. SINGH:

3   Q    Good afternoon, Officer Yates.

4   A    Good afternoon, sir.

5   Q    Do you know Mr. Holi?

6   A    I do.

7   Q    How do you know him?

8   A    Like with Blaine, knowing growing up on the south side of

9   the island, knowing who he is and running into him every now

10  and then.

11  Q    And while you were a police officer, did you have any

12  encounters with him?

13  A    Not while I was a police officer, no.

14  Q    And do you know whether he had ever been arrested up in

15  Kauai?

16  A    I do know that he's been arrested.

17  Q    What was he arrested for?

18  A    I don't -- I -- I don't know.  I can't -- I don't know

19  that information.

20           MR. SINGH:  Okay.  I have nothing further.

21           THE COURT:  Thank you.

22           Any redirect?

23           MS. HUDSPETH:  Yes, Your Honor.  Just two questions.

24           THE COURT:  All right.

25  ///

1                         REDIRECT EXAMINATION

2    BY MS. HUDSPETH:

3    Q    The surveillance that you discussed earlier about -- the

4    initial when DEA came to Kauai, that you participated in, do

5    you recall where you guys were -- what you were surveilling,

6    what area?

7    A    Yeah.  It was in the Poipu area, specifically the Lawai

8    Beach Resort area.

9    Q    Okay.  And with respect to the statements that -- the

10   interview session with Defendant Jacintho that you talked

11   about, the defense counsel raised that you don't recall who was

12   in the room with you, and you don't recall necessarily when it

13   ended or if you were there at the end.

14        How well do you remember the statements that you testified

15   to earlier that Defendant Jacintho made?

16   A    I remember them really well.

17             MS. HUDSPETH:  No further questions.

18             THE COURT:  All right.  Thank you.

19             May this witness be excused?

20             MR. HIRONAKA:  Yes.

21             MR. SINGH:  Yes, Your Honor.

22             THE COURT:  All right.  Sir, you may step down.

23   Thank you.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  You are excused.

1                                    (Witness excused.)

2           THE COURT:  Ladies and gentlemen of the jury, I just

3    wanted to let you know that tomorrow morning you should be here

4    at 8:30 and meet in the grand jury room.  Okay, not your usual

5    place.  There's another trial that's starting tomorrow, and

6    they're picking a jury, so we need you to stay out of their way

7    and just be elsewhere.  So I appreciate that.

8           I also have another hearing tomorrow at 3:00 o'clock,

9    which is why we are going to end again tomorrow at 2:30, not

10   3:00 o'clock.  So your calendar is incorrect in that regard.

11          So whenever I have a hearing in the afternoon, we'll

12   end at 2:30.  So I have one today.  I have one tomorrow.  And

13   that's why.

14          As always, thank you so much for your attention and

15   your patience with this process.  Continue, please, to follow

16   our rules.  You're doing a good job of that.

17          And don't talk to anybody about this case.  Don't do

18   any research about it.  And we will see you tomorrow at 8:30 in

19   the grand jury room.  Thank you.

20          COURTROOM MANAGER:  All rise for the jury.

21          (The jury was excused at 2:33 p.m.)

22          (Open court out of the presence of the jury.)

23          THE COURT:  All right.  Thank you.  You may all be

24   seated.

25          Before I take up anything that needs -- might need my

 1   attention, I wanted to remind you all that in case you haven't

 2   seen it yet, I think it has been docketed.  If not, I

 3   apologize.

 4          We have a status conference scheduled for tomorrow at

 5   3:45 on jury instructions.

 6          MR. HIRONAKA:  Oh.

 7          MS. NAMMAR:  Your Honor?

 8          THE COURT:  Oh, I'm sorry.  You have not been

 9   informed of that yet.

10          Are you folks not available at that time?

11          MS. NAMMAR:  Your Honor, I have a hearing before

12   Judge Gillmor that she has instructed that I must be at.  And

13   she thought the trial was ending at 3:00, so I think she set it

14   -- or 2:30.  I think she set it for 3:00.  There's a chance we

15   could be done.  But just in case --

16          THE COURT:  What kind of hearing is it?

17          MS. NAMMAR:  It's a motion to withdraw as counsel in

18   the Ng matter.

19          THE COURT:  Okay.

20          MS. NAMMAR:  I think it starts at 3:00 but --

21          MR. HIRONAKA:  Yeah, and tomorrow's actually the only

22   afternoon I have a -- I have a 4:15 Zoom status for a Kona

23   case.

24          THE COURT:  Let me ask you folks this.  Are we going

25   faster than expected or how's our --

1          MS. NAMMAR:  (Nods.)

2          THE COURT:  We're going pretty fast, it feels like.

3     What I don't want to do is I don't want to get caught

4     flatfooted on the jury instructions.  And so that's why it's

5     important to me that we have a conference on them.  I'm, of

6     course, not going to overrule Judge Gillmor.  Nor am I going to

7     overrule any judge on the Big Island.

8          So if you folks have an alternative time -- well, let

9     me ask you this.  When do you think you'll rest, Ms. Nammar?

10         MS. NAMMAR:  I'm sorry.  When --

11         THE COURT:  When do you think you'll rest?

12         MS. NAMMAR:  I am not sure, Your Honor.  I'm --

13    things are going very fast.  And I'm running on very little

14    sleep, so I need to look back over our witnesses and kind of

15    reassess.  I know we've still got several witnesses, so --

16         MS. HUDSPETH:  (Confers off the record.)

17         THE COURT:  Let me ask Ms. Mizukami.

18         (Confers off the record.)

19         MS. NAMMAR:  Your Honor --

20         THE COURT:  Yes.

21         MS. NAMMAR:  -- I'm sorry.  In case it may help,

22    maybe no later than Thursday lunch, probably.

23         But maybe tomorrow.

24         THE COURT:  Okay.

25         COURTROOM MANAGER:  (Confers off the record.)

1           THE COURT:  So really, this is just a logistical

2    question that we're trying to figure out.  We plan on giving to

3    you via email tonight the proposed Court's jury instructions.

4    And so then we would need to have a conference after that so

5    that you can raise objections, and perhaps we can reconsider

6    some of the ways that we have decided the jury instructions.

7           I'd imagine that could take up to 45 minutes.  And so

8    we're just trying to figure out a time that we can do that

9    where we're not slowing the train down.

10          Mr. Hironaka, do you expect to present a case?

11          MR. HIRONAKA:  I -- I do at -- at the moment.  I

12   guess things could always change.

13          Your Honor, the only thing I'm thinking is I -- my

14   status tomorrow is actually by Zoom, obviously.  So I -- I

15   could duck into a -- and I don't think it'll take very long.

16   It's at 4:15.  Maybe it'll be done by 4:30.  So I don't know.

17   You have a sentencing tomorrow?

18          THE COURT:  I do.  No, sorry.  I have a sentencing

19   today.  I have a change of plea tomorrow at 3:00.  But then

20   Ms. Nammar's going to be with Judge Gillmor starting at 3:30,

21   Ms. Mizukami's telling me.  So --

22          MR. HIRONAKA:  Oh, it's 3:30.

23          THE COURT:  I mean, one option is I could ask the

24   magistrate judge to take the plea in the case, which happens to

25   be Ms. Hudspeth's case.

```
 1          Which let me ask, Ms. Hudspeth, are you going to be
 2   participating in the jury instruction discussion or no?
 3          MS. HUDSPETH:  I intended to, Your Honor.
 4          THE COURT:  Okay.
 5          MS. HUDSPETH:  But I wondered if we could possibly
 6   ask that -- I can ask with that side if they want to go a
 7   little later and do 4:00 if -- I don't know how late the
 8   Court's willing to work, but perhaps we can do that hearing a
 9   little later in order to accommodate --
10          THE COURT:  That actually makes more sense, I think.
11          So -- okay.  So, Ms. Nammar, if we hold the jury
12   instruction conference tomorrow at 2:30, would that work for
13   everybody?  With the understanding that you have something at
14   3:30, Mr. Hironaka has something at 4:15, and then I would
15   potentially be taking a plea at 4:00.
16          MS. NAMMAR:  That works for me.  And, you know, my --
17   my hearing could be ten minutes.  It could be longer.
18          THE COURT:  Okay.
19          MS. NAMMAR:  I don't know the extent of what will be
20   raised.
21          THE COURT:  All right.  So Ms. Mizukami will reach
22   out to the attorney in the plea case that we have scheduled
23   tomorrow to see if we can move that to four o'clock.
24          And even if we can't, my recollection is that that
25   defendant is out of custody anyway, so it's probably not a big
```

1    deal if we try to move it to another day altogether.

2              COURTROOM MANAGER:  (Confers off the record.)

3              THE COURT:  So I forgot.  His -- the defense attorney

4    will be out of town for a bit, but we'll see if we can make it

5    work.  And so for now, folks, let's plan on 2:30 for our jury

6    instruction conference.

7              MS. NAMMAR:  2:30?

8              THE COURT:  Yes.

9              MS. NAMMAR:  Okay.

10             THE COURT:  And like I said, we'll have the Court's

11   proposed jury instructions for you tonight.  My intention is

12   that we show up tomorrow, you guys have read all of them, and

13   you're ready to raise objections to them.  All right?

14             MS. NAMMAR:  (Nods.)

15             THE COURT:  Okay.  Anything that needs my attention?

16             MS. NAMMAR:  No, Your Honor.

17             MR. HIRONAKA:  Not -- not from me.

18             MR. SINGH:  No, Your Honor.

19             THE COURT:  All right.  I did want to --

20             Oh, yes.  Yes.  I did want to state on the record as

21   well that in speaking with Ms. Mizukami, it's my understanding

22   that the parties' answer to my question earlier today about how

23   the jurors would view the extraction of the cell phone, the

24   response was that they want to use -- that the parties want to

25   use JERS, which is a court system, court computer system by

1    which they could access that exhibit.  Plus, you would like to

2    have the exhibits also in hard copy available to them.

3            So is that correct, Ms. Nammar?

4            MS. NAMMAR:  So we have a couple exhibits, like 71B

5    is the video.  71, I think it was C-1 and C-2, images.  Those

6    types of exhibits that can't be printed out, we would like to

7    put those on the JERS system, because my understanding is you

8    have to use an encrypted laptop and the U.S. Attorney's Office

9    doesn't have an encrypt -- or a non-encrypted laptop to be able

10   to send back.

11           And -- but then all of the text messages can be read

12   in their printed format.  And so I think that'd be the easiest

13   way.  And then -- so that they're -- the actual extraction is a

14   very, very large file.  I don't know that they -- I guess if

15   they wanted to see something on it, we would probably have to

16   come to the courtroom for that.

17           THE COURT:  So they cannot access the encryption file

18   via the JERS system?

19           MS. NAMMAR:  They will not be able to access that

20   entire extraction, no.

21           THE COURT:  Okay.  But the --

22           MS. NAMMAR:  But --

23           THE COURT:  -- the text messages obviously are going

24   to be printed out for them?

25           MS. NAMMAR:  Yes.  And we don't propose sending the

1    extraction back.  It would be like a drug evidence.  We would

2    just keep it.  But if the -- so it's, I think, five maybe

3    pieces of media is all we need to put into the JERS system --

4                THE COURT:  Okay.

5                MS. NAMMAR:  -- approximately.  Don't quote me.

6                THE COURT:  Okay.  And those are videos?

7                MS. NAMMAR:  I'm sorry.  We have audios, too, the

8    recordings.  Yeah.

9                THE COURT:  So --

10               MS. NAMMAR:  Videos and then the audio calls.

11               THE COURT:  Okay.  Let me ask, Mr. Hironaka, your

12   position on whether or not the jury should be able to play

13   those video and audio recordings in the deliberation room.

14               MR. HIRONAKA:  For admitted exhibits, yeah, that's no

15   problem.

16               So just so I'm clear, we're talking about using the

17   Court system just for those exhibits.  All the other exhibits

18   that are, say, in the binders, they're just going to have a

19   hard copy of that?

20               THE COURT:  Right.  And then if they need to see

21   something from the extraction for some reason, they would have

22   to ask us for that, and then we would have to reconvene and

23   pull them in and have somebody access it for them.

24               MR. HIRONAKA:  Yeah.  No objection to that process.

25               MR. SINGH:  No objections, Your Honor.

1      THE COURT:  All right.  Thank you.

2      Okay.  Anything else?

3      MR. HIRONAKA:  Your Honor, I guess while we're

4  talking about exhibits, so I was able to obtain Mr. Agapay's --

5  what's in the binder, A through D.  E, I'm expecting to have

6  this afternoon are -- they're documents from his state case,

7  but -- and, I mean, unless he testifies, but I'm gathering at

8  this point the government does not intend to call him as a

9  witness, then I -- I'm right now kind of thinking I'm not going

10  to seek to admit those Exhibits A through D.

11      The only ones off the top of my head that I'm

12  thinking I would seek to admit would be the -- and I'd have to

13  take a closer look at them -- but would be the plea agreements

14  for Mr. Agapay and Ms. Boggs, which I believe are part of the

15  government's exhibits.

16      THE COURT:  All right.  Thanks for the heads-up.

17      I don't have anything under Tab E in my folder.

18      MR. HIRONAKA:  Yeah, so that's a early termination he

19  received sometime last year.  That's -- that's the one that

20  I -- I should be getting this afternoon.

21      THE COURT:  Got it, okay.

22      MR. HIRONAKA:  But I don't think any of A through E,

23  and none of my exhibits I would probably be seeking to admit.

24      THE COURT:  Okay.

25      MR. HIRONAKA:  Unless he testifies.

1           THE COURT:  All right.

2           All right.  Sorry, one last thing.  Ms. Nammar, I did

3    want to explain a prior ruling of mine that I had at sidebar

4    with regard to excluding some of the testimony of, I think it

5    was, former Officer Lopez as a hybrid -- as hybrid testimony.

6           So your question to him was:  Based on your training

7    and experience, and experience in this case, what does "waters"

8    mean?

9           And in my mind, because you had prefaced it with

10   "based on your training and experience," that fell into the

11   category of expert testimony.  And so that's why I had excluded

12   it.

13          So if you had asked him -- asked him it differently,

14   I might not have excluded it, just for future reference.

15          MS. NAMMAR:  Okay.  Understood.

16          I was confused in thinking that I couldn't go into

17   anything about the substance.  And he was nervous too and would

18   never say methamphetamine.

19          THE COURT:  I noticed that and I thought about

20   interjecting, but then I thought, well, he eventually did say

21   it at one point.  So --

22          MS. NAMMAR:  So I apologize for going into the

23   training and experience.  I think it was just inadvertent.  I

24   meant personally -- personal involvement in the investigation.

25          THE COURT:  Okay.

1          MS. NAMMAR:  Thank you.

2          THE COURT:  All right.  Then I will see all of you

3    tomorrow.  We're scheduled to begin at 8:45.  And so for now,

4    2:30 for our jury instruction conference.

5          Oh, we do have a sentencing at 3:00.  So if you could

6    take your things with you, that would be helpful.

7          All right.  Thank you.

8          COURTROOM MANAGER:  All rise.

9          Court is now in recess.

10         (The proceedings adjourned at 2:45 p.m., June 6,

11    2023.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER CERTIFICATE

2          I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9          DATED at Honolulu, Hawaii, May 4, 2024.

10

11

12
                         _/s/ Ann B. Matsumoto_____
13                       ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25